# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on May 11, 2006**

| | | |
|---|---|---|
| | : | **Criminal No.** |
| **UNITED STATES OF AMERICA** | : | |
| | : | **GRAND JURY ORIGINAL** |
| v. | : | |
| | : | **VIOLATIONS:** |
| **E-GOLD, LTD.** | : | |
| **GOLD & SILVER RESERVE, INC.** | : | **18 U.S.C. § 1956 (Conspiracy** |
| **DOUGLAS L. JACKSON,** | : | **to Launder Monetary Instruments);** |
| **BARRY K. DOWNEY, and** | : | |
| **REID A. JACKSON,** | : | **18 U.S.C. § 371 (Conspiracy);** |
| | : | |
| **Defendants.** | : | **18 U.S.C. § 1960 (Operation of** |
| | : | **Unlicensed Money Transmitting** |
| | : | **Business);** |
| | : | |
| | : | **D.C. Code § 26-1002 (Money** |
| | : | **Transmitting Without a License)** |
| | : | |
| | : | **18 U.S.C. § 2 (Aiding** |
| | : | **and Abetting and Causing an Act to** |
| | : | **be Done); and** |
| | : | |
| | : | **18 U.S.C. § 982(a)(1) (Criminal** |
| | : | **Forfeiture).** |

## I N D I C T M E N T

The Grand Jury Charges:

<u>INTRODUCTION</u>

At all times material to this Indictment:

**Digital Currency**

1.     A "digital currency" was a medium of exchange offered over the Internet that was purportedly backed by precious metals and offered users another option for conducting on-line funds transfers.  Digital currencies were generally marketed as offering global acceptance without the need for conversion between national currencies, and were valued at fluctuating rates tied to the price of a particular precious metal, particularly gold.  Digital currency was used for on-line commerce and for funds transfers between individuals for non-commercial purposes. While technically speaking, the owner of digital currency could have had some right to acquire the actual metal behind the currency, digital currency users typically converted their value into a national currency when they wanted to take value out of the on-line system.

2.     One of the earliest issuers of digital currency was e-gold, Ltd. (**E-GOLD**), which operated via the Internet using the domain name www.e-gold.com, and began offering the digital currency "e-gold" in 1996.  **E-GOLD** appeared as the most popular and prominent digital currency available on-line.  **E-GOLD** was widely accepted as a payment mechanism for transactions involving credit card and identification fraud, high yield investment programs and other investment scams, and child exploitation.  **E-GOLD** was not widely accepted by large or mainstream vendors.

3.     There were four primary steps involved in a financial transaction using "e-gold": (i) opening a digital currency account with **E-GOLD**; (ii) converting national currency into "e-gold" to fund the account; (iii) using "e-gold" to buy or sell a good or service or transfer funds to another person; and (iv) exchanging "e-gold" back into national currency.  **E-GOLD** needed two

additional parties to complete these steps:  (i) digital currency exchangers; and (ii) merchants or individuals that accepted "e-gold" for the payment of goods and services or the transfer of funds.

4.      Digital currency exchangers took national currency from customers and exchanged it into "e-gold" for purposes of funding a new **E-GOLD** account, or increasing the value of an existing account.

5.      Exchangers also exchanged "e-gold" back into national currency and were typically the only method by which users could obtain the value out of an **E-GOLD** account, short of taking possession of the precious metal itself, which was not always possible and practically never done.  Each exchanger set its own terms and conditions on the types and amounts of national currency that would be accepted for exchange.  Some only accepted transfers from banks or credit card accounts.  Others accepted cash and money orders.  Many exchangers operated out of their home by using an Internet website to service customers, bank accounts for accepting cash and other deposits, and post office boxes for receipt of checks and other mailings.

6.      Users around the world may register for a free **E-GOLD** account via the **E-GOLD** website and fund their account through a third party digital currency exchanger or through **E-GOLD**'s own exchange service, which it called "OmniPay."  Once open and funded, account holders could access their accounts through the Internet and conduct transactions with other parties anywhere in the world.  **E-GOLD** advertised on its website that it is "an alternative Internet payment system" that "empowers people to use gold as money."  **E-GOLD** advertised its service as "Better Money," and "Internet Payments 100% backed by Gold."

**Money Transmitting Business Laws and Bank Secrecy Act Requirements**

7.      Under 18 U.S.C. Section 1960, it is a felony to conduct a money transmitting business without the appropriate state license (in a state that has a licensing requirement and punishes such operation as a misdemeanor or felony) or federal registration, or when it otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or intended to be used to promote unlawful activity. The majority of States and the District of Columbia require money transmitting businesses to obtain a license and comply with the other regulatory requirements that apply to such licensed entities, and punish the unlicensed operation of a money transmitting business as a misdemeanor or felony. Likewise, the federal government requires money transmitting businesses to have registered with the Financial Crimes Enforcement Network (FinCEN), a bureau of the Department of Treasury, by December 31, 2001 if they were in existence before that date, and, otherwise, within 180 days after the date the business was established.

8.      The federal unlicensed money transmitting business statute, Title 18, United States Code, Section 1960, was enacted in 1992 in order "to combat the growing use of money transmitting businesses to transfer large amounts of the monetary proceeds of unlawful enterprises."

9.      The term "money transmitting" under Section 1960(b)(2) includes "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." The term "State," under Section 1960(b)(3) includes the District of Columbia.

10.      In addition to being subject to the state licensing and federal registration

4

requirements, money transmitting businesses are subject to provisions of the Bank Secrecy Act.
The Bank Secrecy Act and its implementing regulations require, among other things, such
businesses to take steps to avoid laundering the proceeds of crime and to report suspicious
transactions to law enforcement authorities.

11.     Pursuant to Title 31, United States Code, Section 5318(h), and the implementing
regulations (31 C.F.R. § 103.125), effective July 24, 2002, money transmitting businesses must
establish in writing an anti-money laundering program, minimally including:

(A)     the development of internal policies, procedures, and controls;

(B)     the designation of a compliance officer;

(C)     an ongoing employee training program; and

(D)     an independent audit function to test programs.

Therefore, unlike an ordinary business, money transmitting businesses have an independent
statutory and regulatory obligation to understand the nature and source of the funds they
transmit, and to ensure systems are in place to detect and prevent transactions made with the
proceeds of crime.

12.     Pursuant to section 5318(g) of Title 31, United States Code, in conjunction with
31 C.F.R. § 103.20, money transmitting businesses are also required to file reports of suspicious
transactions (so-called "Suspicious Activity Reports" or "SARs") in circumstances set forth by
statute and regulation, including where a transaction or pattern of transactions exceeding a
specified amount is in possible violation of a law or regulation.

13.     **E-GOLD** and its associated entities were in the business of transmitting funds on
behalf of the public and were required to be licensed by the District of Columbia, the State of
Florida, and other States, to be registered with the federal government, and to establish an anti-

money laundering program.

## Conspirators and their Roles

14.    **E-GOLD, LTD.** ("**E-GOLD**") was the issuer of the digital currency known as "e-gold," which functioned as an alternative payment system, was purportedly backed by stored physical gold, and operated via the Internet using the domain name www.e-gold.com.  **E-GOLD** was incorporated in the British West Indies island nation of St. Kitts and Nevis, but was operated out of Melbourne, Florida.

15.    **GOLD & SILVER RESERVE, INC.** ("**GSR**") was the operator of **E-GOLD** and its respective website, and offered a digital currency exchange service (known as OmniPay) for individuals wishing to purchase, transfer, and/or sell e-gold.  OmniPay operated via the Internet using the domain name www.omnipay.com.

16.    **DOUGLAS L. JACKSON** ("**DOUGLAS JACKSON**") was the co-founder, Chairman, and Chief Executive Officer of **E-GOLD** and **GSR** (collectively "the **E-GOLD** operation").  He also owned approximately fifty-five percent of **GSR**.

17.    **BARRY K. DOWNEY** ("**BARRY DOWNEY**") was the co-founder, Secretary, Vice-President, and Director of **E-GOLD** and **GSR**.  He also owned approximately twenty percent of **GSR**.

18.    **REID A. JACKSON** ("**REID JACKSON**") was the Managing Director of **E-GOLD** and **GSR**.  He also owned approximately three percent of **GSR**.

## The E-GOLD Operation

19.    The **E-GOLD** operation claimed publicly that it was not subject to the statutes and regulations of the United States nor of any other country in which they operated or offered their services, unlike legitimate financial institutions.

20.    A valid email address was the only information required to open an **E-GOLD** account.  Although other contact information was requested, this information was not verified. **E-GOLD** advertised on its website that there are no barriers to entry, that it costs nothing to open an **E-GOLD** account, that there is no credit check, and that there is no minimum balance requirement.

21.    During the regular course of business, thousands of **E-GOLD** users opened their accounts with obviously bogus and false contact information, including accounts opened in the name of "Mickey Mouse," "Donald Duck," "Anonymous Man," "bud weiser," "No Name," and others.

22.    Unlike other Internet payment systems, **E-GOLD** did not include any statement in its User Agreement prohibiting the use of "e-gold" for criminal activity.

23.    Because of the lack of controls as compared to those present with other payment systems, **E-GOLD** has been a highly-favored method of payment by operators of investment scams, which generally refers to pyramids, ponzis, HYIPs (*i.e.*, high-yield investment programs) and other "get-rich-quick"schemes.  These scams typically promise abnormally high short-term returns on investments, but rather than paying investors any actual returns on real investments, the scams pay investors with new, incoming investment money from other investors in the scam. Eventually, the operators of the scam either disappear with all the investment money or the scam collapses because investment naturally slows as the scam grows and the operators are unable to continue paying out the promised returns.  **E-GOLD** has been favored in this area particularly because of a user's ability to operate accounts anonymously, and **E-GOLD**'s policy of making all transfers of "e-gold" irrevocable and not subject to reversal.

24.    Thousands of **E-GOLD** accounts have been opened using the term "hyip" in

either the account-owner's name or e-mail address, or where "hyip" appears in the "memo" field of the transaction record.  **E-GOLD** employees knew and understood that these accounts were used to fund investment scams, yet took no proactive measures to prevent the use of the **E-GOLD** system for this activity.

25.    "e-gold" has been a highly-favored method of payment on websites operating to facilitate credit card and identity fraud – so-called "carding" websites.  Carding websites operate as bulletin boards and are dedicated to the promotion and facilitation of a wide variety of criminal activities including, among others, electronic theft of personal identifying information, credit card and debit card fraud, and the production and sale of false identification documents. On these websites, criminals around the world meet virtually and advertise and sell their contraband, including stolen credit card numbers, compromised identities, and false identifications, using "e-gold" as a method of payment.

26.    "e-gold" has been a highly-favored method of payment for sellers of child pornography over the Internet.  In some instances, "e-gold" has been the only method of payment available on websites offering child pornography for sale.

27.    On every transfer of "e-gold" from one **E-GOLD** account to another, **E-GOLD** collected a specified transaction (or "spend") fee.  **E-GOLD** also collected a maintenance or storage fee, which was deducted monthly and was based on average daily value in the account.

**<u>COUNT ONE</u>**

(Conspiracy to Launder Monetary Instruments)

8

28.     The allegations in paragraphs 14 through 27 are realleged as if fully set forth herein.

## THE CONSPIRACY

29.     From on or about 1999 through December 2005, in the District of Columbia and elsewhere, the defendants:

**E-GOLD, LTD.,**
**GOLD & SILVER RESERVE, INC.,**
**DOUGLAS L. JACKSON,**
**BARRY K. DOWNEY, and**
**REID A. JACKSON**

did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, to wit:

(a)  to knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, that is transfers of "e-gold" from one account to another, which involved the proceeds of a specified unlawful activity, that is child exploitation, wire fraud, and access device fraud with the intent to promote the carrying on of specified unlawful activity, that is child exploitation, wire fraud, and access device fraud, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

(b)  to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, child exploitation, wire fraud, and access device fraud, knowing that the transactions were designed in whole or in part to conceal and disguise the

nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

(c)  to transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument or funds involving the proceeds of specified unlawful activity, that is, child exploitation, wire fraud, and access device fraud, from a place in the United States to or through a place outside the United States, knowing that the funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i); and

(d)    to knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is the deposit, withdrawal, or transfer of funds, such property having been derived from a specified unlawful activity, that is, child exploitation, wire fraud, and access device fraud, contrary to the provisions of Title 18, United States Code, Section 1957.

## **GOAL OF THE CONSPIRACY**

30.    It was the purpose of the conspiracy to engage in financial transactions with those

known to be involved in criminal activity in order to build the market share and profitability of
**E-GOLD** and enhance the personal wealth of **DOUGLAS JACKSON, BARRY DOWNEY,**
and **REID JACKSON**.

## MANNER AND MEANS

The manner and means used to accomplish the objectives of the conspiracy included,
among others, the following:

31.    The **E-GOLD** operation did not require users to provide their true identity, or any
specific identity at all, nor did it require any information, except for an e-mail address, to verify
or identify account holders at the time an account was opened.  Numerous accounts were opened
using obviously false identifying and contact information.

32.    With few exceptions, the employees hired to operate the **E-GOLD** payment
system had no experience in conducting financial transactions and no background in financial
matters at all.  Employees of the **E-GOLD** operation received no training regarding financial
transactions or avoiding criminal transactions, nor were they provided any written materials on
these matters.

33.    The **E-GOLD** operation routinely required law enforcement and others
requesting information through Grand Jury subpoenas and other process about "e-gold" accounts
to send their requests to a law firm in Bermuda, falsely making it appear as if the **E-GOLD**
operation was actually located offshore.  In fact, the **E-GOLD** operation was located entirely in
Melbourne, Florida and all account information was located there.

34.    Regularly, during the course of conducting the **E-GOLD** operation, the
defendants and their employees recognized that certain accounts were being used for criminal
purposes.  On numerous occasions, the **E-GOLD** operation indicated in the account records

11

contained in the "e-gold" computer database the type of criminal activity that the account-holder was engaged in, including, among other things, "child porn," "Scammer," and "CC fraud." The defendants nevertheless allowed transactions in these accounts to continue.

35.    The **E-GOLD** operation regularly received complaints from customers that they had been the victim of a crime and also regularly received notification from customers of specific "e-gold" accounts that were involved in criminal activity. It was not the **E-GOLD** operation's practice to either close these accounts or, as is required by law for certain financial institutions, report the activity to law enforcement. In certain cases, the **E-GOLD** operation sent messages to customers who reported investment scams advising them to "educate" themselves about certain types of investment fraud.

36.    On numerous occasions when the **E-GOLD** operation discovered that its customers were involved in activity that appeared to be unlawful, it would require that customer to submit paperwork establishing that the customer was not an affiliate of the **E-GOLD** operation, but then allow the customer to continue operating once the paperwork was received rather than closing the account and refusing to engage in conducting further criminal financial transactions.

37.    Knowing that "e-gold" was being used for criminal activity, including child exploitation, wire fraud (investment scams), and access device fraud (credit card and identity theft), the **E-GOLD** operation continued to allow accounts to be opened without verification of user identity, assigned only a single employee with no relevant experience to monitor hundreds of thousands of accounts for criminal activity, and encouraged users whose criminal activity had been discovered to transfer their criminal proceeds among other "e-gold" accounts.

38.    When a specific account was determined to be engaged in criminal activity,

defendants would regularly place a "value-limit" on that account, a procedure whereby an entry would be made in the **E-GOLD** database limiting the incoming "e-gold" funds that could be received by that account (sometimes to $5,000, sometimes to $500, and sometimes to $0), but not limiting the ability of the account-holder to spend the funds already in the account. Thus, even in circumstances in which the defendants knew that the account contained the proceeds of crime, the defendants allowed the funds to be exchanged out into national currency or transferred to another account.

39.    On some occasions, when an **E-GOLD** customer was informed that a "value-limit" had been placed on his or her account, it was also suggested that an alternative to providing further documentation for the existing account would be to open another **E-GOLD** account. A single person or entity was able to open numerous "e-gold" accounts, without any verification of identity or the source and purpose of the funds in question.

40.    In some instances where a "value-limit" had been placed on an account, the **E-GOLD** operation would inform the customer subject to the "value-limit" that s/he was still free to move funds out of the **E-GOLD** account. In these circumstances, no limit was placed on the customer's ability to transfer their "e-gold" funds to another account they controlled or to another individual engaged in criminal activity, or to use those funds to purchase further contraband, such as child pornography. Similarly, even if the "e-gold" funds involved were criminal proceeds, the customer was free to exchange the "e-gold" for United States or other national currencies without restriction. The customer was also free to open a new account and transfer the funds to that account.

41.    In various instances, the **E-GOLD** operation, at the request of its customer,

transferred funds from an account known to be engaged in criminal activity to another operated by the same individual(s), who was then allowed to continue the same criminal activity.

42.    On or about the dates listed below, defendants conducted the following transactions on behalf of their customers within the District of Columbia:

| DATE | APPROXIMATE AMOUNT | TRANSACTION |
| --- | --- | --- |
| 11/15/2004 | $45.00 worth of "e-gold" | Transfer from "e-gold" account number xxx4061 to "e-gold" account number xxx1237 for the purchase of child pornography |
| 12/8/2004 | $100.00 worth of "e-gold" | Transfer from "e-gold" account number xxx4061 to "e-gold" account number xxx1242 for the purchase of child pornography |
| 1/21/2005 | $100.00 worth of "e-gold" | Transfer from "e-gold" account number xxx4061 to "e-gold" account number xxx1242 for the purchase of child pornography |
| 12/5/2005 | $200.00 worth of "e-gold" | Transfer from "e-gold" account number xxx2902 to "e-gold" account number xxx9602 for the purchase of stolen credit card information |
| 12/12/2005 | $39.95 worth of "e-gold" | Transfer from "e-gold" account number xxx4061 to "e-gold" account number xxx4220 for the purchase of child pornography |

43.    On or about the dates listed below, among others, defendants conducted funds transfers on behalf of their customers, knowing that the funds involved were the proceeds of unlawful activity, namely child exploitation, and having placed a "value-limit" on those accounts:

### The "LS" Transactions

| DATE | APPROXIMATE AMOUNT | TRANSACTION |
| --- | --- | --- |
| 1/30/2004 | $11,056 worth of "e-gold" | Transfer from "e-gold" account number xxx8135 to "e-gold" account number xxx3751 for exchange |

| 1/30/2004 | $5,944 worth of "e-gold" | Transfer from "e-gold" account number xxx0965 to "e-gold" account number xxx3751 for exchange |
| 2/22/2004 | $7,660.40 worth of "e-gold" | Transfer from "e-gold" account number xxx9785 to "e-gold" account number xxx0493 |
| 2/22/2004 | $3,169.80 worth of "e-gold" | Transfer from "e-gold" account number xxx3520 to "e-gold" account number xxx0493 |
| 3/9/2004 | $1,970.50 worth of "e-gold" | Transfer from "e-gold" account number xxx1960 to "e-gold" account number xxx3751 for exchange |
| 3/22/2004 | $12,869 worth of "e-gold" | Transfer from "e-gold" account number xxx4255 to "e-gold" account number xxx3751 for exchange |

### The "MyLola" Transactions

| DATE | APPROXIMATE AMOUNT | TRANSACTION |
|---|---|---|
| 11/20/2003 | $400.00 worth of "e-gold" | Transfer from "e-gold" account number xxx6988 to "e-gold" account number xx4486 for exchange |
| 3/13/2004 | $1,235.00 worth of "e-gold" | Transfer from "e-gold" account number xxx7553 to "e-gold" account number xx9481 |
| 6/30/2005 | $663.75 worth of "e-gold" | Transfer from "e-gold" account number xxx3897 to "e-gold" account number xxx7684 |

### The "Kidz Index / Timothy McNabb" Transactions

| DATE | APPROXIMATE AMOUNT | TRANSACTION |
|---|---|---|
| 9/9/2005 | $890 worth of "e-gold" | Transfer from "e-gold" account number xxx6181 to "e-gold" account number xx0775 for exchange |

| 9/20/2005 | $45.00 worth of "e-gold" | Transfer from "e-gold" account number xxx1046 to "e-gold" account number xxx4936 |
| 9/20/2005 | $101.61 worth of "e-gold" | Transfer from "e-gold" account number xxx1046 to "e-gold" account number xx0775 for exchange |
| 9/20/2005 | $40.70 worth of "e-gold" | Transfer from "e-gold" account number xxx5548 to "e-gold" account number xx0775 for exchange |
| 10/4/2005 | $66.24 worth of "e-gold" | Transfer from "e-gold" account number xxx1216 to "e-gold" account number xxx5236 |

### The "lolitanymphets" Transaction

| DATE | APPROXIMATE AMOUNT | TRANSACTION |
| --- | --- | --- |
| 9/20/2005 | $598.00 worth of "e-gold" | Transfer from "e-gold" account number xxx1022 to "e-gold" account number xxx0069 |

44.    The **E-GOLD** operation conducted approximately $474,754 worth of transfers within the above-listed accounts, all of which were engaged in the selling of child pornography.

45.    On the following occasions, among others, defendants conducted funds transfers on behalf of their customers, knowing that the funds involved were the proceeds of unlawful activity, namely credit card fraud, and having placed a "value-limit" on those accounts:

| DATE | APPROXIMATE AMOUNT | TRANSACTION |
| --- | --- | --- |
| 8/9/2004 | $50 worth of "e-gold" | Transfer from "e-gold" account number xxx0398 to "e-gold" account number xx3647 |
| 8/9/2004 | $846 worth of "e-gold" | Transfer from "e-gold" account number xxx0398 to "e-gold" account number xx6160 |
| 8/14/2004 | $50 worth of "e-gold" | Transfer from "e-gold" account number xxx0398 to "e-gold" account number xx0775 |
| 9/15/2004 | $3,000 worth of "e-gold" | Transfer from "e-gold" account number xxx0398 to "e-gold" account number xx7789 |
| 9/22/2004 | $3,000 worth of "e-gold" | Transfer from "e-gold" account number xxx0398 to "e-gold" account number xx7789 |

| 9/24/2004 | $276 worth of "e-gold" | Transfer from "e-gold" account number xxx0398 to "e-gold" account number xxx9368 |
| 9/29/2004 | $3,000 worth of "e-gold" | Transfer from "e-gold" account number xxx0398 to "e-gold" account number xx7789 |
| 10/18/2004 | $3,000 worth of "e-gold | Transfer from "e-gold" account number xxx0398 to "e-gold" account number xx7789 |

46.    The **E-GOLD** operation transferred approximately $76,688 in "e-gold" funds into and out "e-gold" account number xxx0398, which belonged to an individual known to be responsible for credit card fraud via the Internet.  The **E-GOLD** operation transferred another approximately $158,508 into and out of another account belonging to the same individual.

47.    On the following occasions, among others, defendants conducted funds transfers on behalf of their customers, knowing that the funds involved were the proceeds of unlawful activity, namely wire (investment) fraud, and having placed a "value-limit" on those accounts:

| DATE | APPROXIMATE AMOUNT | TRANSACTION |
| --- | --- | --- |
| 8/26/2000 - 6/21/2001 | $342,670.17 worth of "e-gold" | Transfers of "e-gold" from account number xx5589 to "e-gold" account number xx0015 |
| 9/16/2000 - 1/05/2001 | $270,125.50 worth of "e-gold" | Transfers of "e-gold" from account number xx5589 to "e-gold" account number xx5585 |
| 5/19/2004- 2/09/2005 | $19,953 worth of "e-gold" | Transfers of "e-gold" from account xxx3269 to "e-gold" account number xx7715 |
| 6/29/2005 | $1,009.40 worth of "e-gold" | Transfer of "e-gold" from account number xx5589 to "e-gold" account number xx9243 for exchange |
| 9/16/2005 | $90,000 worth of "e-gold" | Transfer of "e-gold" from account number xx5405 to "e-gold" account number xxx2125 |
| 9/16/2005 | $102,689 worth of "e-gold" | Transfer of "e-gold" from account number xx5405 to "e-gold" account number xxx2125 |
| 11/21/2005 | $725,000 worth of "e-gold" | Four transfers of "e-gold" from account number xxx9005 to "e-gold" account number xxx9949 |

| 11/29/2005 | $300,000 worth of "e-gold" | Transfer of "e-gold" from account number xxx9949 to "e-gold" account number xxx9005 |
|---|---|---|

48.     The total value of "e-gold" funds that the **E-GOLD** operation transferred

and caused to be transferred into and out of the above-listed accounts was approximately

$145,535,374.26.

(**Conspiracy to Launder Monetary Instruments**, in violation of Title 18,
United States Code, §§ 1956 (a)(1)(A)(i), (a)(1)(B)(i), (a)(2)(B)(i), 1957, and 1956(h))

## COUNT TWO

(Conspiracy to Operate Unlicensed Money Transmitting Business)

## THE CONSPIRACY

49.     The allegations in paragraphs 7 through 27 and 31 through 48 are realleged as if

fully set forth herein.

50.     From in or about October 26, 2001 through in or about December 2005, in the

District of Columbia and elsewhere, the defendants

**E-GOLD, LTD.,**
**GOLD & SILVER RESERVE, INC.,**
**DOUGLAS L. JACKSON,**
**BARRY K. DOWNEY**
**and**
**REID A. JACKSON**

knowingly and willfully combined, conspired, confederated and agreed with each other and with

others known and unknown to the Grand Jury to commit an offense against the United States, to

wit, to knowingly conduct, control, manage, supervise, direct and own all or part of an

unlicensed money transmitting business which affected interstate and foreign commerce in any

manner and degree, and which was operated without an appropriate money transmitting license

in a state where such operation is punishable as a misdemeanor or a felony under state law, and

which failed to comply with the money transmitting business regulations under Section 5330 of Title 31, United States Code, and regulations prescribed thereunder, and which involved the transportation and transmission of funds that were known to the defendants to have been derived from a criminal offense and were intended to be used to promote and support unlawful activity.

## OBJECT OF THE CONSPIRACY

51.     It was a goal of the conspiracy that defendants **DOUGLAS JACKSON, BARRY DOWNEY**, and **REID JACKSON**, and their co-conspirators, to provide money transmitting services to the public through the **E-GOLD** operation thereby establishing the **E-GOLD** operation as a viable private currency and enhancing their own personal wealth.

## MANNER AND MEANS

52.     It was a part of the conspiracy that **DOUGLAS JACKSON**, **BARRY DOWNEY**, and **REID JACKSON**, and others known and unknown to the Grand Jury, doing business as **E-GOLD**, **GSR**, and OmniPay (the **E-GOLD** operation), offered a payment processing service to the public in the form of "e-gold," a digital currency they created that was purportedly backed by stored physical gold and other precious metals.

53.     The **E-GOLD** operation was operating as a money transmitting business as that term is defined in Title 18, United States Code, Section 1960(b)(2).

54.     Defendants **DOUGLAS JACKSON**, **BARRY DOWNEY**, and **REID JACKSON**, solicited and caused to be solicited customers for their money transmittal business from inside and outside the United States by, among other things, advertising their service via the Internet at www.e-gold.com and www.omnipay.com.

55.     Internal documents drafted in consultation with **DOUGLAS JACKSON** described the "e-gold" system as being a competitor of PayPal and Western Union with respect

to providing payment services and funds transfers.

56.    The **E-GOLD** operation conducted financial transactions on behalf of its customers using computer systems and databases specifically designed for "e-gold" transactions and operated by the principals and employees of the **E-GOLD** operation in Melbourne, Florida.

57.    In order to conduct transactions in "e-gold," it was necessary for the customer to open an "e-gold" account via the Internet website located at www.e-gold.com.   To obtain "e-gold," a customer must exchange some amount of national currency, such as United States dollars, into "e-gold" through a company or individual who offers such exchange services.  The **E-GOLD** operation offered its own exchange service in the name of "OmniPay" via the Internet website located at www.omnipay.com.  Third party exchangers are a necessary part of the **E-GOLD** operation in that they provide access to the "e-gold" system for the majority of "e-gold" users.

58.    To obtain "e-gold" through OmniPay, a customer was required to wire national currency, in an amount greater than $1,000, to a bank account specified by the **E-GOLD** operation.  Thereafter, the customer's "e-gold" account would be credited for the amount of the wire, minus an exchange fee collected by OmniPay.

59.    The **E-GOLD** operation also allowed other individuals and companies to offer "e-gold" exchange services, provided some of those exchangers with wholesale rates for "e-gold," and listed certain exchangers on the www.e-gold.com website in its "e-gold Directory."  These exchangers accepted a variety of different types of payments, including, checks, money orders, and cash deposits.

60.    The **E-GOLD** operation did not require other individuals or entities offering "e-gold" exchange services to be licensed or registered as a money transmitting business, nor did it

concern itself with the policies and practices of those exchangers related to the acceptance of cash or other funds, or the true identification of the exchangers' customers. None of these exchangers are themselves registered or licensed as money transmitting businesses.

61.     The **E-GOLD** operation charged its customers "spend" fees, which are collected on each transfer of "e-gold" from one account to another, as well as "storage" fees, which are an annual fee based on the value of the "e-gold" account.

62.     In every transaction where an "e-gold" exchanger converted national currency to "e-gold," or "e-gold" back to national currency for the benefit of its own customers, the **E-GOLD** operation earned a "spend" fee.

63.     Once a customer had obtained "e-gold," the customer could transfer that "e-gold" to another individual or entity that had an "e-gold" account, to another account owned by the same customer, or to an exchanger for conversion back into United States dollars or another national currency.

64.     The **E-GOLD** operation also offered a bill payment service, advertising on the OmniPay website: "Pay your bills with e-gold; Pay your mortgage, utilities, credit card, butcher, baker, candlestick maker - in short - all your bills with e-gold." Through this service, a customer could place an order with OmniPay requesting to cash out his or her "e-gold" via check made payable to any individual or creditor specified by the customer.

65.     To provide its digital currency exchange service for the purpose of facilitating "e-gold" funds transfers, defendants opened and maintained several bank accounts in the name of Gold & Silver Reserve, Inc., doing business as OmniPay.

66.     Defendants conducted wire transfers both into and out of their **GSR** bank

accounts in amounts generally totaling millions of dollars each month, both within and outside of the United States.  Defendants received wire transfers into their accounts from individual customers seeking to exchange their national currency into "e-gold," and from other individuals and entities who needed to buy "e-gold" to provide their own "e-gold" exchange service. Defendants transferred money out of their accounts by wire for the purpose of exchanging "e-gold" back into national currency.  Defendants transferred funds between e-gold accounts to fulfill orders by their customers.

67.    The **E-GOLD** operation conducted thousands of transactions per day.  For example, on November 25, 2005, the defendants advertised on www.e-gold.com that there were 2,500,942 then-existing e-gold accounts.  The website recorded the system activity in the previous 24 hours and showed the following information: 2,932 new accounts, 33,179 users accessing accounts, 38,843 e-metal spends (deposits & withdrawals) and "velocity"(*i.e.*, value circulated by spends over a given time) $6,362,572.88 USD equivalent in gold.

68.    Defendants **E-GOLD, LTD., GOLD & SILVER RESERVE, INC., DOUGLAS JACKSON**, **BARRY DOWNEY**, and **REID JACKSON**, operated the **GSR** bank accounts and money transmitting business of **E-GOLD** and OmniPay without a license in the District of Columbia or any other state, or registering with the federal government.

## OVERT ACTS

In the course of and in furtherance of the conspiracy, and to effect the objects thereof, at least one of the defendants committed or caused to be committed at least one of the following acts, among others, in the District of Columbia and elsewhere:

69.     On or about June 26, 2002, defendants opened account no. xxxxxxxxx7487 at First Union National Bank in the name of "Gold & Silver Reserve, Inc. dba OmniPay - Wire account."

70.     On or about March 7, 2002, defendants opened account no. xxxxxxxx7192 at Bank of America in the name of "Gold & Silver Reserve, Inc. dba OmniPay."

71.     On or about December 30, 2004, defendants opened account no. xxxxxx4851 at Regions Bank in the name of Gold & Silver Reserve, Inc. dba OmniPay.

72.     On or about December 7, 2004, defendants opened account no. xxxxxxxxx8359 at SunTrust bank in the name of "Gold & Silver Reserve, Inc. dba OmniPay."

73.     Defendants advertised on their website at www.e-gold.com that "e-gold" may be used for: "e-commerce," "business-to-business payments," "point of service sales," "person-to-person payments," "payroll," "bill payments," and "charitable donations."

74.     Defendants advertised on their website at www.omnipay.com that they offer "currency exchange services supporting the e-gold family of currencies," and that they offer a bill payment service allowing "e-gold" customers to convert their e-gold into a check payed to the recipient of their choice.

75.     On or about the dates indicated, the defendants conducted the following transactions, which demonstrate their operation of a money transmission service, that is, United States dollars being converted into "e-gold" by OmniPay, then transferred between "e-gold" accounts, and subsequently exchanged back into national currency:

        a.     On or about November 15, 2002, defendants transferred and caused to be transferred by wire the sum of $1,500.00 from account no. xxxx5286 at Riggs National Bank to Gold & Silver Reserve, Inc.'s OmniPay wire

account at First Union Bank for exchange into "e-gold."

b.      On or about November 18, 2002, defendants credited "e-gold" account number xx6355 with $1,432.87 worth of "e-gold."

c.      On or about November 19, 2002, defendants transferred and caused to be transferred $1,420.00 worth of "e-gold" from "e-gold" account number xx6355 to "e-gold" account number xx9605.

d.      On or about November 26, 2002, defendants transferred and caused to be transferred by wire the sum of $6,000 from "e-gold" account number xx9605 to "e-gold" account number xx9732, belonging to the London Gold Exchange, for exchange into national currency for the benefit of the owner of "e-gold" account number xx9605.

76.     On or about the dates listed in the chart below, in furtherance of the conspiracy to operate as an unlicensed money transmitting business, defendants transferred and caused to be transferred the sums indicated to and from banks located in the District of Columbia:

| Date | Amount | From | To |
|------|--------|------|-----|
| 5/14/2002 | $1,000.00 | Account no. xxxx5286 at Riggs National Bank | Gold & Silver Reserve, Inc. Account no. xxxxxxxx7192 at Bank of America |
| 5/28/2002 | $1,000.00 | Account no. xxxx5286 at Riggs National Bank | Gold & Silver Reserve, Inc. Account no. xxxxxxxx7192 at Bank of America |
| 6/27/2002 | $1,000.00 | Account no. xxxx5286 at Riggs National Bank | Gold & Silver Reserve, Inc. Account no. xxxxxxxx7487 at First Union National Bank |
| 10/24/2002 | $70 | Gold & Silver Reserve, Inc. Account no. xxxxxxxxx7487 at First Union National Bank | Account no. xxxxx4345 at Wright Patman Congressional Federal Credit Union |

| 11/15/2002 | $1,500.00 | Account no. xxxx5286 at Riggs National Bank | Gold & Silver Reserve, Inc. Account no. xxxxxxxx7487 at First Union National Bank |
|---|---|---|---|
| 11/20/2002 | $195.00 | Gold & Silver Reserve, Inc. Account no. xxxxxxxxx7487 at Wachovia Bank | Account no. xxxxx4345 at Wright Patman Congressional Federal Credit Union |
| 3/24/2003 | $1,500.00 | Account no. xxxx5286 at Riggs National Bank | Gold & Silver Reserve, Inc. Account no. xxxxxxxxx7487 at Wachovia Bank |

(**Conspiracy to Commit an Offense Against the United States**, in violation of 18 United States Code, Section 371)

### COUNT THREE

(Operation of an Unlicensed Money Transmitting Business)

Beginning on or about October 26, 2001, through at least until December of 2005, in the District of Columbia and elsewhere, the defendants,

**E-GOLD, LTD.,**
**GOLD & SILVER RESERVE, INC.,**
**DOUGLAS L. JACKSON,**
**BARRY K. DOWNEY**,
and
**REID A. JACKSON**

did knowingly conduct, control, manage, supervise, direct, and own all or part of an unlicensed money transmitting business, as that term is defined in Title 18, United States Code, Section 1960(b)(1), through the operation of **E-GOLD** and **GSR** d/b/a OmniPay, in that the business: (i) affected interstate and foreign commerce; (ii) was operated without an appropriate money transmitting license in the District of Columbia, where such operation was punishable as a felony under the law of the District of Columbia; (iii) failed to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed thereunder, and; (iv) otherwise involved the transportation and

transmission of funds that are known to the defendant to have been derived from a criminal

offense and are intended to be used to promote and support unlawful activity.

(**Prohibition of Unlicensed Money Transmitting Business**, in violation of Title 18, United

States Code, Sections 1960 and 2)

## COUNT FOUR

(Money Transmission without a License)

Beginning on or about May 14, 2002, through at least March 25, 2003, in the District of

Columbia, the defendants **DOUGLAS JACKSON, BARRY DOWNEY,** and **REID**

**JACKSON** did, without obtaining a license issued by the Superintendent of the Office of

Banking and Financial Institutions of the District of Columbia, engage in the business of money

transmission, as that term is defined in D.C. ST. § 26-1001(10), through the operation of **E-**

**GOLD** and **GSR** d/b/a OmniPay, in that they engaged in the business of receiving money for

transmission, and transmitting money, within the United States and to locations abroad**.**

(**Money Transmissions**, in violation of § 26-1002 of the D.C. Code)

## NOTICE OF FORFEITURE

77.     The violations alleged in Count One and Three of this indictment are realleged

and incorporated by reference herein for the purpose of alleging forfeiture to the United States of

America pursuant to the provisions of Title 18, United States Code, Section 982(a)(1).


78.     As a result of the offenses alleged in Counts One and Three of this indictment, the

defendants **E-GOLD, LTD., GOLD & SILVER RESERVE, INC., DOUGLAS JACKSON**,

**REID JACKSON**, and **BARRY DOWNEY** shall forfeit to the United States any property, real

or personal, involved in, or traceable to such property involved in money laundering, in violation

of Title 18, United States Code, Section 1956, and in operation of an unlicensed money

transmitting business, in violation of Title 18, United States Code, Section 1960; including, but not limited to the following:

(a)    The sum of money equal to the total amount of property involved in, or traceable to property involved in those violations. Fed.R.Crim.P. 32.2(b)(1).

(b)    All the assets, including without limitation, equipment, inventory, accounts receivable and bank accounts, of **E-GOLD, LTD**., and **GOLD & SILVER RESERVE, INC.,** whether titled in those names or not, including, but not limited to all precious metals, including gold, silver, platinum, and palladium, that "back" the e-metal electronic currency of the **E-GOLD** operation, wherever located.

If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable for the amount derived from such offense.  By virtue of the commission of the felony offenses charged in Counts One and Three of this indictment, any and all interest that the defendant has in the property involved in, or traceable to property involved in money laundering is vested in the United States and hereby forfeited to the United States pursuant to Title 18, United States Code, Section 982(a)(1).

79.    Pursuant to 21 U.S.C. § 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), each defendant shall forfeit substitute property, up to the value of the amount described above, if, by any act or omission of said defendant, the property identified above as subject to forfeiture

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred, sold to or deposited with a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be

27

divided without difficulty.

All in accordance with 18 U.S.C. § 982(b)(1) and Rule 32.2(a), Federal Rules of Criminal

Procedure.

**(Criminal Forfeiture** pursuant to Title 18, United States Code, Sections 982(a)(1); Title 18, United States Code, Section 982(b)(1), and Rule 32.2a, Federal Rules of Criminal Procedure)


A TRUE BILL



FOREPERSON


ATTORNEY FOR THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA