UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA                    :
                                            :
            v.                              :
                                            :        Criminal No.  07-109 - RMC
E-GOLD LIMITED,                             :
GOLD & SILVER RESERVE, INC.,                :
DOUGLAS L. JACKSON,                         :
BARRY K. DOWNEY and                         :
REID A. JACKSON                             :
_____/  :

related case:                               :
                                            :
In the Matter of the Seizure of             :
Any and all property in/underlying E-GOLD   :
Account **544179** and in/underlying E-GOLD     :        CASE NUMBER:
account **109243**, held by E-GOLD, Ltd. or     :        07-167-M-01
Gold & Silver Reserve, Inc. on behalf       :
of **E-GOLD, Ltd.**                             :
_____/

## DEFENDANTS' STATUS REPORT AND NOTICE OF COMPLIANCE WITH THIS COURT'S SEIZURE WARRANTS AND POST-INDICTMENT RESTRAINING ORDER

Defendants e-gold Limited ("e-gold, Ltd."), Gold & Silver Reserve, Inc. ("G&SR"),

Douglas L. Jackson, M.D., Barry K. Downey, Esquire and Mr. Reid A. Jackson, in response to

the government's as yet undisclosed *ex parte* submissions and in connection with the status

hearing scheduled by the Court, submit the following status report:

### INTRODUCTION

This is not a story of common criminals operating surreptitiously in a netherworld to

launder money and commit crimes. Rather, this case is about three respected individuals –

Douglas L. Jackson, M.D., a talented medical doctor; Barry K. Downey, a prominent lawyer; and

Reid A. Jackson, a gifted systems analyst – who took seriously the rights and liberties guaranteed

to them by the Constitution and laws of the United States and created an alternative global

currency and payment system for the betterment of mankind. They did so forthrightly and openly, meeting at conferences with world bankers and representatives of international monetary funds, working hand-in-hand with various agencies of the United States government and even testifying on Capitol Hill about the nature of their business enterprise. They believed – and continue to believe – that they complied with all laws and regulations applicable to their business.

e-gold Ltd. and G&SR, which represent an innovative new approach to exchanging value over the Internet in a global economy, are not subject to existing statutes and regulations drafted in an earlier day to govern "money transmitting businesses." Nor does the mere fact that criminals have allegedly used e-gold to commit crimes – just as they use United States currency, credit cards, other traditional forms of payment or other web sites – subject Defendants to criminal liability for money laundering. Any such alleged criminal activity was committed by others without Defendants' knowledge and despite Defendants' continuing best efforts and systems implemented to prevent their businesses from being used by persons engaged in fraud or other illicit activities.

These criminal and forfeiture proceedings were brought because certain government agents, the prosecutors in this case, mistakenly contend that the operations of the business have failed to comply with certain federal laws and regulations. Yet strikingly, Defendants are not the only ones who disagree with many of the prosecutors' assertions in this case. Many others in the federal government have previously stated that existing federal laws and regulations do not apply to digital age businesses such as e-gold and G&SR. For example:

- A January, 2007 United States House of Representatives Energy Committee staff report, addressing digital currencies such as e-gold, concluded that: **"Digital currencies that do business in the United States are not subject to any of the U.S. banking requirements."** Indeed, the staff report noted **"the lack of**

regulation of digital currencies by any government entity, domestic or foreign."[1]

- A Special Agent of the FBI's Cyber Crimes Unit, when questioned by Fox News about the government's investigation of the e-gold business, stated that: "At this point it is not illegal, **it operates in an area of the law where there is no law.**"[2].

- In a December, 2005 report titled U.S. Money Laundering Threat Assessment, issued jointly by a number of government agencies, including the Department of Treasury and Department of Justice, those agencies observed **that "[w]hether an online payment system or digital currency service meets the definition of a money transmitting business pursuant to BSA regulations . . . depends upon its location and the ways in which it participates in or conducts transactions."**[3]

- In its October 13, 2006 *Report on New Payment Methods*, the Financial Action Task Force (FATF) indicated that in the United States, money transmitters are among moneyservices businesses that are required to register with the FIU (FinCEN), they also are subject to AML reporting and recordkeeping requirements and are often required to be licensed on the state level. **"Whether an online payment system or digital precious metals dealer meets the definition of a money transmitter pursuant to the relevant regulations, though, depends upon its location and the ways in which it participates in or conducts transactions."**[4]

This matter, therefore, ultimately amounts to a legal dispute about the application of a law to a particular factual situation. There are two divergent interpretations: one held by the prosecutors in this case, and the other by the Defendants, and validated by staff (and apparently

---

[1]     http://republicans.energycommerce.house.gov/108/News/01032007_Report.pdf    (last viewed May 15, 2007), pp. 29-30; [Emphasis added].

[2]     Interview available at: http://www.myfoxla.com/myfox/pages/Home/Detail;jsessionid=CE5F83220C1D2F0AA947712 455408CDF?contentId=2521038&version=3&locale=EN-US&layoutCode=VSTY&pageId=1.1.1 (last visited May 15, 2007).

[3]     http://www.treasury.gov/press/releases/reports/js3077_01112005_MLTA.pdf (last visited May 15, 2007). p. 27.

[4]     http://www.fatf-gafi.org/dataoecd/30/47/37627240.pdf (last visited May 16, 2007), p.39. While not technically a federal department or agency, the FATF is an inter-governmental body which sets standards and develops and promotes policies to combat money laundering and terrorist financing; see, www.fatf-gafi.org.

members) of the United States House of Representatives, FBI agents, United States Department of Treasury and Department of Justice staff, the FATF, and many others. It is not about audacious or furtive acts committed to advance a criminally intentioned enterprise. And this is certainly not a typical money laundering case.

Defendants eagerly await the opportunity to present their arguments and to prevail at trial. In the meantime, however, given the legitimacy of Defendants' interpretation of the applicable law, as validated by others in the United States government, it is unconscionable that the prosecutors in this case – on an *ex parte* basis, before trial and, indeed, before even *any* opportunity for Defendants to be heard – seek to effectively destroy and permanently end Defendants' business.[5] The travesty of that action is compounded only by the fact that, to obtain the seizure warrants, the government apparently failed to advise the Court of this good faith disagreement about the application of the law to the business.

Likewise, the government, in its unbridled zeal to seize assets, also presumably failed to apprise the Court of the continuing cooperation that Defendants have provided during the course of the government's nearly three-year investigation. The government also, in suggesting that the e-gold "might become worthless," presumably failed to explain to the Court that every ounce of e-gold in circulation is secured by actual gold bullion and other precious metals held in allocated storage repositories, certified by the London Bullion Market Association, under the terms of a

---

[5]     To the extent there is any uncertainty that such is the government's true objective, one need look no further than the opening lines – and continuing theme – of the government's indictment: "One of the earliest issuers of digital currency **WAS** e-gold, Limited..., which **OPERATED** via the Internet....E-GOLD **WAS** widely accepted as a payment mechanism...." *See,* Indictment, at ¶ 2. [Emphasis added]. The Defendants therefore question whether an ulterior, improper purpose – i.e. to unilaterally, without trial or anything even resembling due process, shut down and permanently destroy an ongoing business enterprise – stands at the root of the Indictment and subsequent *ex parte* requests.

protected trust subject to the authority of a third party escrow agent. Both of these latter factors would have lessened any perceived need for seizure warrants.

Finally, the government apparently failed to advise the Court that the almost certain consequence that will follow from the Court's seizure warrants is the complete destruction of the businesses. Indeed, it appears that in its *ex parte* applications, the government persuaded the Court to enter seizure warrants and restraining order upon two central representations: (a) "the alleged "need to preserve the availability of the subject property through the entry of the order requested" and (b) the suggestion that "the order requested is narrowly tailored to allow orderly continuation of defendants' business activities as well as the ability of the defendants' customers to access their funds through it." *See* Post Indictment Restraining Order, *at* ¶ 7. Neither representation is even remotely true.

**E-GOLD, LTD. AND GOLD & SILVER RESERVE, INC.
OPERATE INNOVATIVE AND LAWFUL BUSINESSES**

**A.     The medium of exchange called "e-gold"**

There is no dispute that e-gold is an innovative undertaking. It is the world's first electronic currency designed for borderless, electronic business transactions over the Internet. e-gold, Ltd. issues the e-gold currency which enables the worldwide use of gold as money.

Dr. Douglas Jackson left the practice of medicine at the peak of his career, giving up a successful radiation oncology practice and the only source of steady income that he had, because he had a vision: to establish a currency that could be designed with a governance model rendering it immune to debasement by even those administering it, and to bring new opportunities to the global economy and to persons throughout the world who most needed such a monetary and payment system. Since being launched in 1999, e-gold has gained worldwide

acceptance.    The e-gold digital currency has been lauded by knowledgeable and forward-thinking publications such as Barron's, The Financial Times and Wired magazine.[6][7][8]

e-gold is unique in that every ounce is secured by actual gold bullion held in allocated storage at repositories certified by the London Bullion Market Association.  Title to that bullion is held by the E-Gold Bullion Reserve Special Purpose Trust, which exists for the express "purpose of holding precious metal bullion on behalf of and for the exclusive benefit of all e-metal account holders collectively, pursuant to the e-gold, e-silver, e-platinum, and e-palladium currency contracts." Declaration of Trust, The E-Gold Bullion Reserve Special Purpose Trust ("Trust Agreement'), § 4.1; see, http://www.e-gold.com/contracts/egold-spt-111899.htm.    A previously scheduled audit of all bullion subject to the Special Purpose Trust took place on Monday, April 30, 2007 and confirmed that e-gold is what it purports to be, i.e. "100% backed at all times by gold bullion in allocated storage." See, http://www.e-gold.com/unsecure/qanda.html.

As such, the e-gold in the e-gold system is insulated from physical, legal and political risks.  The gold and other precious metal is – and, particularly under the terms of the Court's

---

[6]    "e-gold is the only electronic currency that has achieved critical mass on the web… For merchants, e-gold has a further bonus: unlike credit cards, which are liable to chargebacks, the system guarantees payment once ordered." "When gold may make a lot of cents", *The Financial Times*, July 13, 1999.

[7]    "With the global expansion of the Internet and eCommerce, the world needs a new type of currency. It needs an asset backed, high-tech monetary standard, without the political machinations that hobble the euro, the dollar, the yen and all other traditional currencies… One company, e-gold, already allows online users to settle payments using its currency, which is 100% backed by gold." "Making New Money," *Barron's*, April 23, 2001.

[8]    "Invulnerable to government manipulation and subject to the kinds of market forces only a worldwide, 24/7, open-ended network can bring to bear, e-gold promises not simply better money but the best: a money supply kept so straight and narrow that it has room for neither bubbles or crashes." "In Gold We Trust", *Wired*, January 2002.

restraining order, always will be  – available to satisfy any forfeiture order that the government may seek, in the unlikely event it were to prevail at the conclusion of this case.

There are currently about 143,000 e-gold account holders in nearly 165 countries with existing account balances.  Prior to the government's seizure, approximately 60,000 "spends," comprising about $5,000,000 of total value, were settled by the e-gold system each weekday as part of lawful and legitimate business and personal exchange transactions.

The total amount of e-gold in circulation prior to the execution of the latest seizure warrants was 3.49 million grams.  At applicable exchange rates, that was the equivalent of more than Eighty Million U.S. Dollars ($80,000,000).  This was backed (prior to the seizure) by physical gold bullion reserves in the Special Purpose Trust, which exceeded the official gold reserves of Mexico or Canada.

Users acquire and maintain e-gold balances in their e-gold accounts.  Account holders use their e-gold to make payments (called "spends") directly from their e-gold accounts to other e-gold account holders who accept e-gold as medium of exchange for a given transaction.  Thus, an account holder may acquire e-gold to fund his or her account by receiving a "spend" either from another account holder or by purchasing e-gold from an exchange provider (as explained more fully below) and receiving a "spend" from that service.

There are many significant reasons why the e-gold business model has attracted so many account holders.  First and foremost, e-gold was designed to serve the global economy and to afford people the opportunity to send a currency worldwide, immediately and with minimal cost.  Indeed, it does just that.

For example, according to a recent news story, "[f]or an immigrant earning the minimum wage in New York City, it takes a full week of work to pay off the fees Western Union charges

during a year of sending money home." http://www.thenation.com/doc/20070528/thompson (last visited May 15, 2007); *see also*, *e.g.*, Global Economic Prospects 2006, World Bank Report,[9] ("an important benefit to developing countries is the receipt of remittances or transfers from income earned by overseas emigrants"). In contrast, the same worker using e-gold may transfer as much value that he or she has in an e-gold account for a maximum fee of 5 centigrams of gold, which is the equivalent $1.06 at current exchange rates.

Second, e-gold "spends" are, under almost all circumstances, irreversible. While the government asserts that this may make the system attractive to persons engaged in fraud, the finality of settlement is equally important and attractive to legitimate business people. It allows a merchant selling a product to know that he or she has been paid, irrevocably, before merchandise is shipped. As Magistrate Judge John Facciola aptly noted in articulating his initial impressions of the e-gold model:

> And I explained to these [government agents] that I didn't quite understand why, if I understood the situation correctly, why there was any governmental concern about an instrument that struck me as being fairly common in the marketplace. That is, I could conjure up a situation in which a gentleman in Argentina, for example, who was a merchant, would buy goods from France. Since in Argentina his currency might be fluctuating wildly, I could understand why the merchant in France would be unwilling to be paid in pesos, and therefore would be willing to be paid in an international instrument like this.[10]

There are many other reasons why e-gold is as popular as it is – not the least of which is that a substantial segment of the world economy still desires to trade in currency still backed by

---

[9]

http://econ.worldbank.org/WBSITE/EXTERNAL/EXTDEC/EXTDECPROSPECTS/GEPEXT/E XTGEP2006/0,,menuPK:1026834~pagePK:64167702~piPK:64167676~theSitePK:1026804,00. html (last visited May 15, 2007)

[10]      *See, Case No. 05-02497*, DE 31, *at* p.6.

gold – and the Defendants look forward to educating the Court about these reasons throughout the course of this case.

### B.     The OmniPay system

e-gold account holders hold an ownership interest in gold and may transfer that ownership interest (or portions thereof) to other e-gold accounts holders.  However, to make payments to persons or businesses who do not yet accept e-gold directly, customers may use an exchange provider.  OmniPay, owned and operated by G&SR, is but one such provider.  Thus, G&SR, and other exchange providers like it, facilitate the operation of e-gold, Ltd.

G&SR does not deal in cash or cash-equivalents, and does not sell money orders or send money by wire.  It merely affords people the opportunity to buy or sell e-gold, the liability of e-gold, Ltd. representing the value of an amount of gold bullion owned by and titled to the Special Purpose Trust.  Thus, G&SR has never operated an unlicensed or otherwise illegal money transmitting business, because G&SR was not, and is not,  operating a money transmitting business in the first place.  OmniPay, and other exchange providers, simply extend the usefulness of e-gold by seamlessly integrating it with existing payment systems.

### C.     The Exchange Orders that OmniPay processes

There are three types of exchange orders  that OmniPay processes:

1.      "InExchange" (National Currency to e-metal):

A user remits national currency (for example, USD) to OmniPay via the banking system. Upon receipt of remittance, OmniPay pays the User in e-gold via the e-gold system, according to the terms of the exchange order.

2.      "Metal-to-Metal" (e-metal to e-metal):

A user remits e-metal (for example, e-silver) to OmniPay via the e-gold system.  Upon

receipt of remittance, OmniPay pays the user in a different e-metal (such as e-gold) via the e-gold system, according to the terms of the exchange order.

3.    "OutExchange" (e-metal to National Currency):

A user remits e-gold to OmniPay via the e-gold system.  Upon receipt of remittance, OmniPay pays the Payee, as specified by user, in national currency (for example, USD) via the banking system, according to the terms of the exchange order.

## DEFENDANTS HAVE FOR YEARS WORKED
## COOPERATIVELY WITH THE GOVERNMENT

Since the earliest days of operations, e-gold, Ltd. and G&SR have worked hand-in-hand with government agents – including investigators from the Federal Bureau of Investigation (FBI), United States Postal Service, Federal Trade Commission (FTC), Securities and Exchange Commission (SEC), Commodity Futures Trading Commission (CFTC), and Assistant United States Attorneys and local prosecutors throughout the nation – to root out fraud and illicit activity perpetuated by people using the e-gold system for improper purposes.  They have provided records of transactions, affidavits and certifications to help further such investigations and assist in the prosecutions of criminals using the e-gold system.[11]

Defendants also initiated a dialogue with the United States Secret Service to discuss further measures that could be implemented to locate abusers of the e-gold system.  *See* e-mails between Dr. Jackson and officials of the Secret Service and Department of Justice from November – December, 2004, attached as Exhibit A hereto.  In 2004, Dr. Jackson personally arranged to visit Secret Service headquarters in Washington, D.C. to teach the Secret Service

---

[11]    On January 13, 2006, during a hearing before this Court in Case No. 05-02497, undersigned counsel provided records of **more than 300 instances** of such subpoena compliance to counsel for the government. Such subpoenas are complied with and maintained in the ordinary course of e-gold, Ltd.'s business.

(along with agents of the United Kingdom's National High Tech Crime Unit and the Australian Federal Police) about e-gold and about how to efficiently interact with e-gold's in-house investigative staff. *Id.* Curiously, however, Secret Service management cancelled the training at the last minute on grounds that have never been explained. *Id.*[12]

Additionally, throughout the course of the investigation related to this case, the Defendants complied with a horde of grand jury subpoenas, appeared before this Court for numerous conferences and hearings related to the forfeiture action, and continued to respond to all summonses and subpoenas related to other e-gold account holders. Similarly, counsel for the Defendants have done everything possible to keep an open dialogue with government counsel and have met with counsel for the government at least twice in an effort to settle this matter. (Dr. Jackson accompanied undersigned counsel to the U.S. Attorney's Office for one such meeting on December 29, 2006.) At no point has there been any indication that the Defendants would ever attempt to abscond with any of the gold backing the e-gold system or to render e-gold worthless. Any allegations that this Court may have heard during the government's *ex parte* presentations concerning suspicions that the Defendants would somehow render e-gold "worthless" would have been made with a reckless disregard for the truth. Similarly, any omission of the continuing course of cooperative communications between the Defendants and the government before the Indictment was issued would have substantially undermined the interests of truth and justice.

---

[12]     Dr. Jackson, nonetheless, continued his efforts to work with the Secret service.   On February 10, 2006, for example, undersigned counsel received a letter from AUSA Bill Cowden concerning communications with Dr. Jackson at a law enforcement conference in Russia. In that letter, Mr. Cowden noted that "contacts at the United States Secret Service have informed me that Dr. Jackson recently attempted to contact the USSS (and potentially other law enforcement agencies) to provide information about potential criminal activity of which he is aware. Specifically, I understand that Dr. Jackson may have information concerning a ring of thieves selling  confidential credit card information and using e-gold to secure payment." *See* Exhibit B hereto.

## DEFENDANTS HAVE HAD LIMITED RESOURCES
## AVAILABLE TO REFINE THEIR SYSTEMS

None of the founders of e-gold, Ltd. or G&SR were, or are, wealthy people; the resources they have been able to invest in these businesses has therefore been limited.  As a result, while seeking to fund day-to-day operating expenses – including substantial professional fees incurred in complying with government requests for information and assistance in investigations of criminals using the e-gold and OmniPay systems (as described above) and, over the past two years, to defend against the government's charges ultimately brought in this Court – Defendants have simply not had funds to implement many state-of-the-art modifications that they would have liked to create to increase the sophistication of their systems.  While, as the government has gratuitously observed, other entities such as Paypal, Western Union, and others devote greater resources to detecting fraud, e-gold Ltd. and G&SR undoubtedly dedicate a far greater *proportion* of their resources to such activities.   They may not be penalized, however, because they lack the greater resources that publicly traded mega-corporations have available to them to focus on such issues.

## THE SEIZURE WARRANTS AND POST INDICTMENT RESTRAINING
## ORDER, OBTAINED ON THE BASIS OF MISLEADING AND INCOMPLETE
## INFORMATION PRESENTED TO THE COURT, HAVE UNFAIRLY CRIPPLED
## DEFENDANTS' BUSINESSES

On April 26, 2007, the government served Defendants with twenty-four (24) seizure warrants and a post-indictment restraining order.  The seizure warrants directed the Defendants to liquidate a collection of e-gold accounts – including e-gold, Ltd.'s primary operating account and G&SR's primary operating account – and turn over the value of those accounts to the government within twenty-four (24) hours.  The Post-Indictment Restraining Order directed the Defendants to perform certain managerial tasks designed to "preserve the availability of certain

property that is subject to forfeiture in the above styled criminal action." *See,* Post-Indictment Restraining Order, at p.1.

The seizure warrant signed by this Court in Case Number 07-167-M-01 ordered the seizure of "[a]ny and all property in/underlying E-GOLD account **544179** and in/underlying E-GOLD account **109243**, held by E-GOLD, Ltd. or Gold & Silver reserve, Inc. on behalf of **E-GOLD, Ltd**." Those two (2) e-gold accounts contained the equivalent of approximately $1,498,000 (as of April 28, 2007), approximately $762,000 of which is titled to e-gold, Ltd., and approximately $736,000 of which is titled to Gold & Silver Reserve, Inc. Those two accounts are the two (2) primary operating accounts of the defendant corporations. Indeed, they are the very lifeblood of those corporations.

Timely performance under the terms specified in the Post-Indictment Restraining Order and seizure warrants was not even remotely possible. Indeed, per the language of the Seizure Warrant, it necessarily follows that the government believed – or at the very least alleged *ex parte* – that the Defendants could

> exchange/convert the e-gold held in the E-GOLD account(s) at issue [in the 24 seizure warrants served on April 26, 2007] into gold or into the funds denominated as United States currency in the amount corresponding to the value represented by the account(s) at issue **and to provide such gold or funds to the Federal law enforcement officer(s) executing this warrant within twenty-four (24) hours of the execution of the warrant.** Funds shall be provided in cash (denominated as U.S. currency) or by wire transfer to an account under the control of the Secretary or his designee (wire transfer information having been provided by the Secretary or designee), or by certified check drawn on a United States bank and made payable to: "United States Secret Service."

*Seizure Warrants*; [Emphasis added]. However, in order to liquidate and turn over all of the seized accounts on a timely basis, the Defendants needed to freeze the 58 seized accounts, change the passwords of the seized accounts to avoid outside corruption, consolidate the frozen

accounts, order the sale of physical bullion in foreign storage facilities, receive the value of the sold bullion, order wire remittances from G&SR's one remaining bank account (located in Estonia), and have the Estonian bank wire the money (measured in millions of dollars) to the Secret Service in the United States **all within 24 hours.**

After explaining to counsel for the government (AUSA Laurel Loomis Rimon) why the twenty-four timetable was simply fanciful, and after similarly representing to her that the Defendants would act in accordance with the spirit of the various orders and neither hide nor dissipate any of the subject property, Ms. Rimon agreed that the Defendants could comply with the various orders on a rolling basis. Virtually all of those compliance tasks – including the liquidation of more than $11 million worth of gold bullion and the subsequent turnover of that money to the Secret Service – has already occurred. Nevertheless, the government's very inclusion of the twenty-four hour deadline in the seizure warrants proves one of two things: either **(a)** the government has absolutely no idea how the defendants' business operates, or **(b)** the government acted with a reckless disregard for **(i)** the integrity of this court, **(ii)** the defendants' constitutional rights, and **(iii)** the truth.

In any event, the Defendants' full good faith performance is leading to the total destruction of the Defendant corporate entities. The loss of the e-gold, Ltd. and G&SR operating accounts, coupled with **(a)** the substantial reduction in business that has already ensued as a result of the unsealing of the indictment, and **(b)** the freezing of the e-gold accounts of the three largest other e-gold exchange services, will grind the business to a halt in short order.

As this Court is aware, on December 30, 2005 in Civil Action No. 05-02497, the Clerk signed a Warrant of Arrest *in Rem* which resulted in the arrest of two of G&SR's bank accounts containing approximately $850,000 titled to Gold & Silver Reserve, Inc. (The value contained in

those two bank accounts is currently the subject of stayed litigation (Civil Action No. 05-02497) which is presently before this Court.) Consequently, **without ever having been heard**, the Defendants have had approximately $2,300,000 arrested or seized, leaving them an insufficient sum of money with which to operate their businesses, pay attorneys fees, and pay for reasonable living expenses.

That result is at odds with the language of the Post-Indictment Restraining Order, which indicates that

> the need to preserve the availability of the subject property through the entry of the order requested herein outweighs the hardship on any party against whom the order is to be entered, and that the order requested is **narrowly tailored to allow orderly continuation of defendants' business activities as well as the ability of the defendants' customers to access their funds.**

*Post-Indictment Restraining Order*, at ¶ 7; [Emphasis added.] Once again, the Defendants find it impossible that the government could have genuinely believed that, following the seizure of the Defendants' primary operating accounts (on top of the 2 bank accounts seized by the government in 2005) and the vast majority of the Defendants' operating assets, the Defendants could still have maintained the "orderly" flow of their business activities *and* ensured that none of their customers would suffer any of the collateral consequences of those orders. However, it comes as no surprise that the government would take advantage of its *ex parte* privileges to make such unfounded allegations.

The Defendants and the government have been steeped in litigation since December of 2005 when the government first executed seizure warrants over the primary G&SR bank accounts. Immediately after the execution of those warrants, the Defendants moved Magistrate Judge Facciola to release the freezes. The transcript of the December 29, 2005 hearing before Magistrate Judge Facciola is extremely informative, especially in light of the *ex parte* process the

government followed in its efforts to secure the Post-Indictment Restraining Order and seizure warrants at issue *sub judice*. Indeed, based upon their plain language, it appears that the Seizure Warrants were signed specifically because this Court believed that

> [t]here is probable cause to believe that the property at issue, e-gold in E-GOLD account(s), **may become worthless property for purposes of its forfeiture to the extent that it cannot promptly be redeemed, or exchanged, for precious metal or a national currency** and that, at this time, conversion of property valued as e-gold into gold or funds denominated as United States, by Gold & Silver Reserve, Inc. d/b/a OmniPay, an operator of the E-GOLD system, is reasonable and necessary.

[Emphasis added].

The Defendants are baffled as to how such a devaluation could possibly occur, and find it remarkable that the government – which knows very well that every bit of e-gold within the e-gold system is 100% backed at all times by gold bullion in allocated storage – could make such an accusation. Still, it comes as no surprise that the government told this Court that such a devaluation was inevitable.

In fact, the parties have already discussed this issue, and the government has been on notice for more than a year about the hardships endured by the Defendants *and* their customers when operating assets are seized from the Defendants' possession. The hardships are obvious and very easy to understand, and the record reveals the government's willful indifference of them. For instance, on the one hand, when AUSA Bill Cowden presented this matter to Magistrate Judge Facciola for purposes of having a freeze order entered, the Magistrate Judge has stated that the following discussion took place:[13]

---

[13]      The transcript of the December 29, 2005 hearing before Magistrate Judge John Facciola was included in the record in the civil case (Civil Action No. 05-02497) before this court as Docket Entry No. 31.

> [By: The Magistrate Judge]: The first concern I had was – although not primary in my thinking, but the one that first came to mind – was whether there would be innocent third parties at the other end of this transaction who, by virtue of the Government's action, would be unable, for example, to have their checks honored by the merchants and others to whom they gave them because of the absence of funds to cover them. **I was assured by Mr. Cowden (sic) that that was not a concern.**

DE 31, at p.5 [Emphasis added]. However, on the other hand, when later questioned by the Magistrate Judge as to whether such third party injuries could have occurred following the entry of the original freeze orders, counsel for the government, AUSA Laurel Loomis Rimon stated as follows:

> [By: Ms. Rimon]: The only checks that should have bounced were the ones that were in the process at the time of the seizure before they knew and had the opportunity to not write any further checks.

DE 31, at p.66. As a result of the freeze of the G&SR bank accounts in December of 2005, G&SR refunded dozens of OutExchange orders totaling more than $230,000. While that sum may have not been a concern for the government at the time of the freeze, to G&SR and its customers, it was devastating.

In this case, the government's *ex parte* allegation that the requested orders were "narrowly tailored" so as to preserve "the ability of the defendants' customers to access their funds" was similarly unfounded. Indeed, as was the case following the seizure of the Defendants' two primary American bank accounts, the Defendants have had to take extraordinary actions to prevent their customers from feeling the ramifications of the seizure warrants entered in this case.

In the forfeiture case (Civil Action No. 05-02497, *at* DE 19), G&SR replied to the government's opposition to Gold & Silver Reserve, Inc.'s motion for the release of seized property filed pursuant to 18 U.S.C. § 983(f). In that reply, G&SR very clearly explained how

{06676/0/00282450.DOCv1}

the seizure injured both G&SR and the company's innocent, third-party customers. With respect
to G&SR's Regions Bank account:

> [T]he seizure of the Regions Bank account prevented the
> Claimants from sending and receiving wires, but did not stop
> additional incoming wires from being credited to the "frozen"
> account. Accordingly, if a customer, shortly before or during the
> freeze, had wired funds to the Claimant's Regions Bank account in
> exchange for the quantity of e-gold specified in an InExchange
> order, those funds were then locked inside the frozen Regions
> account, *presumably* leaving the customer to be deprived of either
> the fulfillment (via e-gold) or refund (via wire) of the customer's
> InExchange order.

DE 19, *at* 7. Following the seizure of that account, **G&SR gave its injured customers its own**
**e-gold** so as to prevent its customers from being further injured by the government's actions, **and**
**the Government knew that to be true**.

The Defendants realized similar hardships with respect to their seized SunTrust Bank
account:

> [W]hen the government seized the Claimant's SunTrust account on
> December 20, 2005, in excess of 200 checks drafted from that
> account remained outstanding... Consequently following the
> seizure, every single check presented for payment from that
> account bounced. Understandably, as checks began bouncing, the
> Claimant began receiving complaints.

DE 19, *at* 8. Nevertheless, G&SR responded to the incoming complaints of its customers by
refunding the value of those bounced checks to its customers using its own e-gold. **The**
**government knew that to be true as well.**

In this case, the Defendants have had to take substantially similar actions (although of an
inverse shape) to prevent their customers from being harmed. When the government previously
seized the Defendants' bank accounts, OutExchange orders – in the form of checks and wires
which only had value when backed by an unfrozen account – became valueless and innocent

third parties suffered as a result. Similarly, when the government recently seized the Defendants operating accounts, InExchange orders – which were supposed to be filled with e-gold out of e-gold, Ltd.'s primary operating account – could not be filled once that account was frozen.[14]

Accordingly, in this case, if the government in fact alleged to this Court that no innocent parties would be injured as the result of this Court's signing of seizure warrants for the Defendants' primary operating accounts, one of the following two possibilities must be true: either **(a)** the government – after repeatedly subpoenaing and receiving from Defendants (and presumably others) all information applicable to the nature and operations of Defendants' businesses – still does not understand that those two operating accounts are commonly used for the purposes of redeeming the InExchange orders of innocent third parties, or **(b)** the government **knew** the effect that its actions would have, yet acted with reckless disregard for the consequences to the Defendants and their many customers. One of those two things happened, and the Defendants – in the very near future – will request an evidentiary hearing to determine which one really did.

In no uncertain terms, the orderly continuation of the defendants' business activities will be impossible should the present circumstances persist. Additionally, should the current state of affairs continue, the Defendants will similarly be incapable of paying the attorneys fees necessary for a defense in this case. The resulting hardships on the Defendant corporations *clearly outweigh* the government's need for such a draconian pretrial restraint of assets. The Defendants' Fifth and Sixth Amendment rights have been squarely implicated, and an evidentiary hearing consistent with *United States v. Monsanto,* 924 F.2d 1186, 1203 (2nd Cir.

---

[14]     As of the date of the filing of this motion, the Defendants have not yet quantified the amount of e-gold that they have been forced to give their customers as a result of the seizure warrants, but they hope to have that data gathered before the date of any evidentiary hearing ordered in this case.

1991) is plainly in order.[15]  The Defendants are currently preparing to formally request such a hearing.

Respectfully submitted,

/s/ Andrew S. Ittleman
Mitchell S. Fuerst, Esq.
Florida Bar No. 264598
Andrew S. Ittleman, Esq.
Florida Bar No. 802441
Fuerst Humphrey Ittleman, PL
1001 Brickell Bay Drive, Suite 2002
Miami, FL 33131
305-350-5690 (o)
305-371-8989 (f)

/s/ Aron U. Raskas
Aron U. Raskas
District Court for the
District of Columbia Bar No. 422939
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202-3201
Telephone: 410-752-6030
Fax: 410-539-1269
araskas@kg-law.com

Counsel for Defendants

---

[15]     "[T]he fifth and sixth amendments, considered in combination, require an adversary, post-restraint, pretrial hearing as to probable cause that (a) the defendant committed crimes that provide a basis for forfeiture, and (b) the properties specified as forfeitable in the indictment are properly forfeitable, to continue a restraint of assets (i) needed to retain counsel of choice and (ii) ordered *ex parte* pursuant to 21 U.S.C. § 853(e)(1)(A)..." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48-49 (1993).

{06676/0/00282450.DOCv1}

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing

**DEFENDANTS' STATUS REPORT AND NOTICE OF COMPLIANCE WITH THIS
COURT'S SEIZURE WARRANTS AND POST-INDICTMENT RESTRAINING ORDER**

was served on May 17, 2007 upon all counsel of record via the Court's Electronic Case Filing
system.

/s/  Aron U. Raskas
Aron U. Raskas
District Court for the
District of Columbia Bar No. 422939
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202-3201
Telephone: 410-752-6030
Fax: 410-539-1269
araskas@kg-law.com

{06676/0/00282450.DOCv1}

EXHIBIT
A

Case 1:07-cr-00109-RMC     Document 28-2     Filed 05/17/2007     Page 2 of 17

Link to malicious code analysis ref. E-Gold

**Subject:** Link to malicious code analysis ref. E-Gold
**From:** "Eric S. Winter" <ewinter@usss.dhs.gov>
**Date:** Mon, 22 Nov 2004 14:16:43 -0500
**To:** <djackson@omnipay.net>
**CC:** "Ruskowski, Paul" <Paul.Ruskowski@usss.dhs.gov>, "'Christopher Williams, David'"
<Christopher.Williams@usss.dhs.gov>, "'Jay L. Perry'" <jl.perry@usss.dhs.gov>

Mr. Jackson,

      Thank you for your time today.  I will contact the National Hi-Tech Crimes Unit and Australian Federal Police regarding our meeting on December 13th at 10:00am.  Our office is located at 1100 L St. NW Suite 6000, Washington, D.C. 20005.  You can reach me directly at 202-406-8589, or 202-406-8500 (Squad number). In addition, our fax number is 202-406-8503.

      I have attached a link to the new malicious code that appears to target E-Gold account holders.  I look forward to the meeting and future cooperation in investigations.

Thank you, Eric Winter

http://www.lurhq.com/grams.html

Case 1:07-cr-00109-RMC    Document 28-2    Filed 05/17/2007    Page 3 of 17

Re: Link to malicious code analysis ref. E-Gold

**Subject:** Re: Link to malicious code analysis ref. E-Gold
**From:** Douglas Jackson <djackson@e-gold.com>
**Date:** Wed, 24 Nov 2004 15:43:57 -0500
**To:** "Eric S. Winter" <ewinter@usss.dhs.gov>
**CC:** djackson@omnipay.net, "Ruskowski, Paul" <Paul.Ruskowski@usss.dhs.gov>, "'Christopher Williams, David'" <Christopher.Williams@usss.dhs.gov>, "'Jay L. Perry'" <jl.perry@usss.dhs.gov>

Mr. Winter,

Thank you for your note. I confirm that 10:00 December 13th is good for me. I would estimate we can cover the basics in one hour although with discussion it could easily run longer. I'll be available for as long as it takes.

sincere regards,
Douglas Jackson
Director e-gold Ltd.
http://www.e-gold.com/unsecure/aboutus.html
CEO, OmniPay
175 East Nasa Blvd.
Suite 300
Melbourne, FL 32901
(800) 909-6590 ext. 114
outside US +1 321 956 1200 ext. 114
mobile (321) 223-8695

Eric S. Winter wrote:

> Mr. Jackson,
>          Thank you for your time today. I will contact the National Hi-Tech Crimes Unit and Australian Federal Police regarding our meeting on December 13th at 10:00am. Our office is located at 1100 L St. NW Suite 6000, Washington, D.C. 20005. You can reach me directly at 202-406-8589, or 202-406-8500 (Squad number). In addition, our fax number is 202-406-8503.
>          I have attached a link to the new malicious code that appears to target E-Gold account holders. I look forward to the meeting and future cooperation in investigations.
>
> Thank you, Eric Winter
>
> http://www.lurhq.com/grams.html

**Subject:** RE: Link to malicious code analysis ref. E-Gold
**From:** "Eric S. Winter" <ewinter@usss.dhs.gov>
**Date:** Wed, 1 Dec 2004 11:24:14 -0500
**To:** "'Douglas Jackson'" <djackson@e-gold.com>

I am forwarding the appropriate paperwork to pay for your air travel.

Eric

-----Original Message-----
**From:** Douglas Jackson [mailto:djackson@e-gold.com]
**Sent:** Wednesday, November 24, 2004 3:44 PM
**To:** Eric S. Winter
**Cc:** djackson@omnipay.net; Ruskowski, Paul; 'Christopher Williams, David'; 'Jay L. Perry'
**Subject:** Re: Link to malicious code analysis ref. E-Gold

Mr. Winter,

Thank you for your note. I confirm that 10:00 December 13th is good for me. I would estimate we can cover the basics in one hour although with discussion it could easily run longer. I'll be available for as long as it takes.

sincere regards,
Douglas Jackson
Director e-gold Ltd.
http://www.e-gold.com/unsecure/aboutus.html
CEO, OmniPay
175 East Nasa Blvd.
Suite 300
Melbourne, FL 32901
(800) 909-6590 ext. 114
outside US +1 321 956 1200 ext. 114
mobile (321) 223-8695


Eric S. Winter wrote:

Mr. Jackson,
        Thank you for your time today. I will contact the National Hi-Tech Crimes Unit and Australian Federal Police regarding our meeting on December 13th at 10:00am. Our office is located at 1100 L St. NW Suite 6000, Washington, D.C. 20005. You can reach me directly at 202-406-8589, or 202-406-8500 (Squad number). In addition, our fax number is 202-406-8503.
        I have attached a link to the new malicious code that appears to target E-Gold account holders. I look forward to the meeting and future cooperation in investigations.

Thank you, Eric Winter

http://www.lurhq.com/grams.html


GSRVA-4673

1 of 1

**Subject:** Re: Link to malicious code analysis ref. E-Gold
**From:** Douglas Jackson <djackson@e-gold.com>
**Date:** Wed, 01 Dec 2004 13:24:38 -0500
**To:** "Eric S. Winter" <ewinter@usss.dhs.gov>

Eric S. Winter wrote:

> I am forwarding the appropriate paperwork to pay for your air travel.

Terrific - much appreciated!

Eric

-----Original Message-----
**From:** Douglas Jackson [mailto:djackson@e-gold.com]
**Sent:** Wednesday, November 24, 2004 3:44 PM
**To:** Eric S. Winter
**Cc:** djackson@omnipay.net; Ruskowski, Paul; 'Christopher Williams, David'; 'Jay L. Perry'
**Subject:** Re: Link to malicious code analysis ref. E-Gold

Mr. Winter,

Thank you for your note. I confirm that 10:00 December 13th is good for me. I would estimate we can cover the basics in one hour although with discussion it could easily run longer. I'll be available for as long as it takes.

sincere regards,
Douglas Jackson
Director e-gold Ltd.
http://www.e-gold.com/unsecure/aboutus.html
CEO, OmniPay
175 East Nasa Blvd.
Suite 300
Melbourne, FL 32901
(800) 909-6590 ext. 114
outside US +1 321 956 1200 ext. 114
mobile (321) 223-8695

Eric S. Winter wrote:

Mr. Jackson,
        Thank you for your time today.  I will contact the National Hi-Tech Crimes Unit and Australian Federal Police regarding our meeting on December 13th at 10:00am.  Our office is located at 1100 L St. NW Suite 6000, Washington, D.C. 20005.  You can reach me directly at 202-406-8589, or 202-406-8500 (Squad number).  In addition, our fax number is 202-406-8503.

GSRVA-4674

Re: Link to malicious code analysis ref. E-Gold

I have attached a link to the new malicious code that appears to target E-Gold account holders. I look forward to the meeting and future cooperation in investigations.

Thank you, Eric Winter

http://www.lurhq.com/grams.html

GSRVA-4675

**From:** "Todd.M.Hinnen@usdoj.gov" <Todd.M.Hinnen@usdoj.gov>
**Date:** Fri, 03 Dec 2004 11:49:34 -0500 (EST)
**To:** "'djackson@e-gold.com'" <djackson@e-gold.com>

Dr. Jackson –

Thank you for your phone call.  I will try to attend the meeting December 13th if you
send me the details, as I would be very interested to learn more about E-gold's
ability to respond to law enforcement requests for information.  If my schedule
prevents me from attending the meeting, I would like to impose upon your time to talk
about it over the phone at some convenient future time.

Thanks again for the call.

Regards,

Todd Hinnen

GSRV A-4676

**Subject:** Re: e-gold investigative capability and coordination
**From:** Douglas Jackson <djackson@e-gold.com>
**Date:** Fri, 03 Dec 2004 12:13:26 -0500
**To:** "Todd.M.Hinnen@usdoj.gov" <Todd.M.Hinnen@usdoj.gov>

Todd

Thanks for your note. I just now had a call (literally about an hour ago) from Eric Winter, the Secret Service agent coordinating the meeting. He was unable to nail things down with the UK guys for the Dec 13 date and is now looking instead at early/mid January.

I would be delighted in the meanwhile or whenever to discuss these issues. My contact info is below.

Also, my office (Melbourne, FL) is about an hour from Orlando International Airport in case you happened to be in the neighborhood sometime. .

sincere regards,
Douglas Jackson
(800) 909-6590 ext. 114
mobile (321) 223-8695


Todd.M.Hinnen@usdoj.gov wrote:

> Dr. Jackson -
> Thank you for your phone call.  I will try to attend the meeting December 13th if
> you send me the details, as I would be very interested to learn more about
> E-gold's ability to respond to law enforcement requests for information.  If my
> schedule prevents me from attending the meeting, I would like to impose upon your
> time to talk about it over the phone at some convenient future time.
>
> Thanks again for the call.
> Regards,
>
> Todd Hinnen

GSRVA-4677

FW:

**Subject:** FW:
**From:** "Todd.M.Hinnen@usdoj.gov" <Todd.M.Hinnen@usdoj.gov>
**Date:** Wed, 08 Dec 2004 12:52:10 -0500 (EST)
**To:** "'djackson@e-gold.com'" <djackson@e-gold.com>

Dr. Jackson -

As it turns out, I have to be in NH for an arraignment on the 13th.  Would still be
interested in learning more about e-gold, however.  Don't suppose you all have a
white paper, or something, that explains your service.

Regards,

Todd Hinnen


|| Outlook Object<<

Subject:

Dr. Jackson -

Thank you for your phone call.  I will try to attend the meeting December 13th if you
send me the details, as I would be very interested to learn more about E-gold's
ability to respond to law enforcement requests for information.  If my schedule
prevents me from attending the meeting, I would like to impose upon your time to talk
about it over the phone at some convenient future time.

Thanks again for the call.

Regards,

Todd Hinnen

          **Part 1.2**    **Content-Type:**   text/plain
                       **Content-Encoding:** 7BIT

GSRVA-4678

of 1

**Subject:** Meeting Date
**From:** "Eric S. Winter" <ewinter@usss.dhs.gov>
**Date:** Thu, 9 Dec 2004 10:09:35 -0500
**To:** djackson@omnipay.net
**CC:** "Ruskowski, Paul" <Paul.Ruskowski@usss.dhs.gov>

Mr. Jackson,
            I was wondering if you had a chance to check
your calendar for availability in early January.  With
Inauguration on the 20th, the sooner the better for us.  We
will getr busier as that date approaches.  Please let me know
which day (dates) work for you.

Thank you,

Eric Winter

GSRVA-4679

of 1

**Subject:** Re: Meeting Date
**From:** Douglas Jackson <djackson@e-gold.com>
**Date:** Thu, 09 Dec 2004 11:17:26 -0500
**To:** "Eric S. Winter" <ewinter@usss.dhs.gov>

Eric

My best would be Friday 7 January because I'll be in southern Pennsylvania for a
wedding. Next best would be anytime 11th-14th.

Douglas Jackson

Eric S. Winter wrote:

> Mr. Jackson,
>              I was wondering if you had a chance to check your calendar for
> availability in early January.  With Inauguration on the 20th, the sooner the
> better for us.  We will getr busier as that date approaches.  Please let me know
> which day (dates) work for you.
>
> Thank you,
> Eric Winter

**Subject:** Re: FW:
**From:** Douglas Jackson <djackson@e-gold.com>
**Date:** Thu, 09 Dec 2004 12:37:10 -0500
**To:** "Todd.M.Hinnen@usdoj.gov" <Todd.M.Hinnen@usdoj.gov>

Todd

I've been in contact with Eric Winter again this morning to try to nail down a convenient time for early January. My best is Friday 7 January but he's checking availability of the other parties.

I'm attaching a 'big picture' whitepaper laying out the general logic of e-gold. The more pertinent parts may be the mid-section where I walk through the logic of our governance model.

The foundation of my assertion that e-gold would be an imprudent choice for bad guys seeking to obfuscate money trails or otherwise hide the proceeds of crime is two-fold:

1. it is impossible for a general user of e-gold to send/add money (value in any form) into the system... he can only get e-gold by receiving a payment from someone who already has some.
2. there's a permanent record of all transfers.

The application of these entails some subtlety. When someone sees that they can create an e-gold account with bogus contact information it is non-obvious how that fails to keep them anonymous in any useful way. One is a step closer to seeing it though when you note that such an account has nothing in it. The moment the account has some e-gold clicked into it, it becomes tied into a web of transactions, all of which had some discoverable reason, generally a flow of consideration in the opposite direction. When we are doing an actual investigation it can of course get complex as we have to test propositions of things like boundaries between a constellation of accounts controlled by a unified entity vs. transactions that pass value to genuine third parties. An investigation often requires iterative interaction where data we supply may lead to new data from the external agency that gives us grist for an additional round of queries.

Someone like that anonymousgold guy though is basically a charlatan. It is technically extremely hard to create systems that afford anonymity remotely akin to bearer tokens. [e-gold is designed to afford cash-like finality of transfers but as a book entry system couldn't possibly be construed as digital cash]. To expose his uselessness though it may be worthwhile to walk through scenarios in real-time discussion.

I hope some of this is useful, or at least interesting.

sincere regards,
Douglas Jackson

Todd.M.Hinnen@usdoj.gov wrote:

```
Dr. Jackson -

As it turns out, I have to be in NH for an arraignment on the 13th.  Would still
be interested in learning more about e-gold, however.  Don't suppose you all have
```

GSRVA-4681

...—5/2006 9:03 PM

a white paper, or something, that explains your service.

Regards,

Todd Hinnen

Outlook Object<<

Subject:

Dr. Jackson –

Thank you for your phone call. I will try to attend the meeting December 13th if you send me the details, as I would be very interested to learn more about E-gold's ability to respond to law enforcement requests for information. If my schedule prevents me from attending the meeting, I would like to impose upon your time to talk about it over the phone at some convenient future time.

Thanks again for the call.

Regards,

Todd Hinnen

| Prospect of a Global Currency.doc | Content-Type: | application/msword |
| --- | --- | --- |
| | Content-Encoding: | base64 |

GSRVA-4682

10/25/2006 9:03 PM

**Subject:** Re: Meeting Date
**From:** "Eric S. Winter" <ewinter@usss.dhs.gov>
**Date:** Thu, 9 Dec 2004 12:57:36 -0500
**To:** Douglas Jackson <djackson@e-gold.com>

Let's plan on Friday, January 7th at 10am.  Sound good?

Thanks, Eric

GSRVA-4683

**Subject:** Re: Meeting Date
**From:** Douglas Jackson <djackson@e-gold.com>
**Date:** Thu, 09 Dec 2004 13:40:21 -0500
**To:** "Eric S. Winter" <ewinter@usss.dhs.gov>

Excellent. I'll be there.

Eric S. Winter wrote:

> Let's plan on Friday, January 7th at 10am.   Sound good?
>
> Thanks, Eric

GSRVA-4684

5 9:03 PM

**Subject:** e-gold related subpoenas
**From:** Douglas Jackson <djackson@e-gold.com>
**Date:** Wed, 29 Dec 2004 14:49:02 -0500
**To:** "Eric S. Winter" <ewinter@usss.dhs.gov>
**CC:** "Todd.M.Hinnen" <Todd.M.Hinnen@usdoj.gov>

Eric

I am grateful that you called yesterday. I hope that we can get the people who jumped
to the conclusion that we (e-gold) are bad guys will re-consider their opinion in the
light of facts.

I would encourage proceeding with the meeting of 7 January as planned, ideally to
also include whoever interpreted the actions of our obviously worthless Bermudan
counsel as indicative that we are less than cooperative. It simply isn't so. I'm
trying to find out what the hell the problem is with our Bermuda counsel that would
prompt them to sit on subpoenas. But, as we would have reviewed in detail had we met
13 December, there are expeditious ways to cut through any delays and cc/fax
subpoenas/court orders to our investigative staff directly. Our lead investigator, by
the way, who you talked with yesterday, Randy Trotter is at 321 956 1200 ext 106 and
our fax is 321 951 0790. He loves to nail bad guys, and he's very good at it. Its as
simple as that.

I still have my tickets etc. for the 7 January meet and plan to come even if I'm
turned away at the door.

sincere regards,
Douglas Jackson
321 956 1200 ext 114
mobile 321 223 8695

GSRVA-4685

**Subject:** RE: e-gold related subpoenas
**From:** "Eric S. Winter" <ewinter@usss.dhs.gov>
**Date:** Wed, 29 Dec 2004 15:06:35 -0500
**To:** "'Douglas Jackson'" <djackson@e-gold.com>
**CC:** "Ruskowski, Paul" <Paul.Ruskowski@usss.dhs.gov>

I forwarded Randy's information to the appropriate people.  That is all I
can do for now.  I will let you know when I have more information.  Thank
you for your efforts.

Eric

-----Original Message-----
From: Douglas Jackson [mailto:djackson@e-gold.com]
Sent: Wednesday, December 29, 2004 2:49 PM
To: Eric S. Winter
Cc: Todd.M.Hinnen
Subject: e-gold related subpoenas

Eric

I am grateful that you called yesterday. I hope that we can get the
people who jumped to the conclusion that we (e-gold) are bad guys will
re-consider their opinion in the light of facts.

I would encourage proceeding with the meeting of 7 January as planned,
ideally to also include whoever interpreted the actions of our obviously
worthless Bermudan counsel as indicative that we are less than
cooperative. It simply isn't so. I'm trying to find out what the hell
the problem is with our Bermuda counsel that would prompt them to sit on
subpoenas. But, as we would have reviewed in detail had we met 13
December, there are expeditious ways to cut through any delays and
cc/fax subpoenas/court orders to our investigative staff directly. Our
lead investigator, by the way, who you talked with yesterday, Randy
Trotter is at 321 956 1200 ext 106 and our fax is 321 951 0790. He loves
to nail bad guys, and he's very good at it. Its as simple as that.

I still have my tickets etc. for the 7 January meet and plan to come
even if I'm turned away at the door.

sincere regards,
Douglas Jackson
321 956 1200 ext 114
mobile 321 223 8695

GSRVA-4686

10/25/2006 9:03 PM

# EXHIBIT B

 **U.S. Department of Justice**

Kenneth L. Wainstein
United States Attorney

*District of Columbia*

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

February 10, 2005

**By Fax: (305) 371-8989**
**and E-mail**

Mitchell S. Fuerst, Esq.
Andrew S. Ittleman, Esq.
Rodrigues O'Donnell Ross Fuerst
  Gonzalez Williams & England, P.C.
1001 Brickell Bay Drive, Suite 2002
Miami, FL 33131

Dear Messrs. Fuerst and Ittleman:

I write inform you that contacts at the United States Secret Service (USSS) have informed me that Dr. Jackson recently attempted to contact the USSS (and potentially other law enforcement agencies) to provide information about potential criminal activity of which he is aware. Specifically, I understand that Dr. Jackson may have information concerning a ring of thieves selling confidential credit card information and using e-gold to secure payment.

Rule 4.2(a) of the District of Columbia Bar's Rules of Professional Conduct provides that: "During the course of representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party known to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so." This Rule may be inapplicable because the attempted communication about e-Gold activity was initiated by Dr. Jackson, because he indicated that the subject matter of the communication concerns a third party's potential criminal activity, and because the communication at issue may be authorized by law. Nevertheless, in an abundance of caution, I write both to inform you of this recent contact and to seek from you written consent for law enforcement agents to follow-up with Dr. Jackson (or other representatives within G&SR or OmniPay who have similar knowledge) about potential third-party criminal activity.

It should be understood that at this time neither a willingness to share information with the USSS (or with any other agency or entity), nor the quality of any information provided, will have any bearing on the pending civil case, the pending criminal investigation, or any future civil or criminal litigation concerning your client(s). The Department of Justice is not obligated to

enter into any future plea bargain with Dr. Jackson (or any affiliated entity) or to file any motion regarding cooperation provided by him (or by any affiliated entity) and, to date, no promises have been made.  To ensure that there is no confusion concerning the independent tracks of the pending civil case and criminal investigation, I suggest referring Dr. Jackson to a Special Agent other than one working on either of the pending maters.

At your earliest convenience, please let me know, in writing, if this proposal is agreeable.

Very truly yours

KENNETH L. WAINSTEIN
United States Attorney

WILLIAM R. COWDEN
Assistant United States Attorney

cc:     Andrew Levchuk, Esq.
        S.A. Roy Dotson