UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Criminal No. 07-109 - RMC |
| E-GOLD LIMITED, | : | |
| GOLD & SILVER RESERVE, INC., | : | |
| DOUGLAS L. JACKSON, | : | |
| BARRY K. DOWNEY and | : | |
| REID A. JACKSON | : | |
| _____/ | | |
| related case: | : | |
| | : | |
| In the Matter of the Seizure of | : | |
| Any and all property in/underlying E-GOLD | : | |
| Account **544179** and in/underlying E-GOLD | : | CASE NUMBER: |
| account **109243**, held by E-GOLD, Ltd. or | : | 07-167-M-01 |
| Gold & Silver Reserve, Inc. on behalf | : | |
| of **E-GOLD, Ltd.** | : | |
| _____/ | | |

**DEFENDANTS' MOTION TO VACATE SEIZURE WARRANT AND TO MODIFY
RESTRAINING ORDER AND REQUEST FOR AN EVIDENTIARY HEARING**

Defendants e-gold Limited ("e-gold Ltd."), Gold & Silver Reserve, Inc. ("G&SR"), Douglas L. Jackson, Barry K. Downey and Reid A. Jackson, by their undersigned counsel, move the Court to vacate the seizure warrant entered in Case No. 07-167-M-01 and modify the post-indictment restraining order, and request an evidentiary hearing on this matter.  In support of this motion, undersigned counsel state as follows:

## I.     INTRODUCTION

e-gold Ltd. and G&SR stand at the forefront of an innovative new approach to exchanging value over the Internet in a global economy.[1]  They do not function in the same manner as – and are not – traditional financial institutions or currency exchange services. Accordingly, they are not subject to existing statutes and regulations drafted in an earlier day to govern "money transmitting businesses."

As described more fully below, many government representatives agree with this interpretation.  The prosecutors in this case are among the few who do not.

This matter, therefore, ultimately amounts to little more than a legal dispute about the application of a law to a particular factual situation.  In such a context – and particularly given the continuing cooperation that Defendants have provided during the course of the government's nearly three-year investigation – the draconian actions that the government persuaded the Court to authorize, based upon an incomplete and at times inaccurate *ex parte* application, are completely inappropriate.

---

[1]     The background of the defendant companies, and the efforts that Defendants have made to work cooperatively with governmental authorities since the birth of the companies, is critical to the consideration of this motion and this case. Defendants did not wish to repeat in this motion the extensive background set forth in Defendants' Status Report And Notice Of Compliance With This Court's Seizure Warrants And Post-Indictment Restraining Order ("Status Report and Notice"); nonetheless, as that information is critical to this motion, Defendants incorporate those matters herein and respectfully urge the Court to carefully consider the factual predicate set forth in that Status Report and Notice.

On April 26, 2007, the government served the Defendants with a post-indictment restraining order and twenty-four (24) seizure warrants. The seizure warrants directed the Defendants, within twenty-four (24) hours, to liquidate a collection of e-gold accounts and turn over to the government the value contained in those accounts. Defendants complied in all respects.[2]

Despite persuading the Court to sign the Post-Indictment Restraining Order stating that "the order requested is narrowly tailored to allow orderly continuation of defendants' business activities as well as the ability of the defendants' customers to access their funds through it," (Post-Indictment Restraining Order, ¶ 7), the government failed to advise the Court that because the seizure warrant issued in Case No. 07-167-M-01 (the "Primary Seizure Warrant") ordered the seizure of "[a]ny and all property" in the primary operating accounts of e-gold Ltd. and G&SR, the Defendants would be left incapable of continuing the orderly operation of the business and of allowing customers the ability to access their funds.

The Primary Seizure Warrant authorized the government to seize "[a]ny and all property in/underlying E-GOLD account **544179** and in/underlying E-GOLD account **109243**, held by E-GOLD, Ltd. or Gold & Silver Reserve, Inc. on behalf of **E-GOLD, Ltd**." As the government was well aware, those two accounts are the two (2) primary operating accounts of the defendant

---

[2]      Although Defendants have done all they could to comply with every aspect of the restraining order and seizure warrants which the government persuaded the Court to enter, Defendants question the legality of some of the affirmative acts they have been ordered to perform. The restraining order, for example, required that Defendants "freeze, that is not conduct or allow any further transactions in e-gold accounts that the e-gold operation itself has identified as being used for criminal activity." Post-Indictment Restraining Order, p.3. Even regulated financial institutions are obliged to rely on court orders directed to specific accounts before freezing them. Yet, this order directs e-gold Ltd. to substitute its own judgment for that of a court acting upon information constituting probable cause furnished by the government.  Additionally, the seizure warrants directed the Defendants "exchange/convert" e-gold in the subject accounts into physical gold or "funds denominated as Unites States currency. Those requirements, which go far beyond the restraint of assets, have caused Defendants substantial additional loss.

corporations. They contained e-metal balances with a U.S. Dollar equivalent of approximately $2,206,927.48 (as of April 26, 2007), approximately $819,121.85 of which is titled to e-gold, Ltd., and approximately $1,387,805.63 of which is titled to G&SR.

Additionally, as this Court is aware, on December 30, 2005, in Civil Action No. 05-02497, the Clerk signed a Warrant of Arrest *in Rem* which resulted in the arrest of two bank accounts containing approximately $850,000 titled to Gold & Silver Reserve, Inc. The value contained in those two bank accounts is currently the subject of stayed litigation (Civil Action No. 05-02497) which is presently before this Court..

Consequently, without ever having been heard on the merits of the seizure, the Defendants have had e-gold and U.S. Dollars with an aggregate approximate value of Three Million Fifty-Five Thousand Eight Hundred Sixteen Dollars ($3,055,816.00) arrested or seized. They have no access to those funds. As a result, they simply do not have money with which to operate their businesses, pay attorneys fees, and pay for reasonable operating and living expenses.

## II.    DEFENDANTS MUST BE AFFORDED AN EVIDENTIARY HEARING BASED UPON THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT

The question which this Court must first resolve is whether – and upon what basis – the Defendants are entitled to an evidentiary hearing before trial to challenge the seizure warrants and post-indictment restraining order which currently restrain the Defendants' assets and impair their livelihood and ability to retain counsel. Based upon the grounds and authorities discussed below, the Court must find that Defendants are to be afforded such a hearing. Following that hearing, the Court should enter an order vacating the Primary Seizure Warrant and appropriately modify the restraining order.

A.     **The Defendants' Fifth Amendment Due Process Rights Have Been Triggered by the Government's Seizure of the Defendants' Property**

It is well recognized that a pre-trial seizure of assets in a criminal case constitutes an impairment on property triggering the Due Process Clause of the Fifth Amendment of the United States Constitution, which provides that "no person shall…be deprived of life, liberty, or property, without due process of law." *See*, *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991); *United States v. Crozier*, 777 F.2d 1376, 1383 (9th Cir. 1985).  The United States Supreme Court has gone so far as to describe pretrial asset restraints as the "nuclear weapon of the law." *Grupo Mexicano de Deasarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 332 (1999).

The federal courts have consistently recognized that particular attention must be paid when dealing with this "severe remedy," *United States v. Razmilovic*, 419 F.3d 134, 137 (2d Cir. 2005).  This is particularly so because asset restraints are imposed on an *ex parte* basis and without the benefit of an adversarial process and because the government has a strong pecuniary interest in the outcome.  *E.g.*, *United States v. James Daniel Good Real Property*, 510 U.S. 43, 56 n.2 (1993) (extent of government's financial stake in forfeiture has produced a concomitant lack of neutrality); *Krimstock v. Kelly*, 306 F.3d 40, 63 (2d Cir. 2002) (there is a need for greater procedural safeguards – here, an early, pretrial adversary hearing – where the government has a pecuniary interest in the outcome of forfeiture proceedings), *cert. denied*, 539 U.S. 969 (2003); 1 David B. Smith, *Prosecution and Defense of Forfeiture Cases*, §§1.01-1.02 (2006 ed.).

B.     **The Triggering of the Defendants' Fifth Amendment Rights Necessitates a Post-Deprivation, Pre-Trial Hearing Where the Defendants May Challenge the Government's Restraint of Their Assets**

The protection afforded by the Due Process Clause's plain text applies whenever the government has "**deprived**" a person "of…property." U.S. Const. Amend. V; [Emphasis added]. Nothing in that clause limits the Fifth Amendment's protections to only those persons who need

to use their seized property or who are indigent.  Accordingly, the federal courts have held that, when the government restrains a criminal defendant's assets before trial on the assertion that they may be subject to forfeiture, due process requires that the defendant be afforded a **post-deprivation, pre-trial hearing** to challenge the restraint if certain minimal conditions are satisfied.[3]

In *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48-49 (1993), the United States Supreme Court held that precedent "establish[es] the general rule that individuals must receive notice and an opportunity to be heard before the Government deprives them of property." *See also, United States v. Perholtz*, 622 F.Supp. 1253, 1256 (D.D.C. 1985) ("The United States cannot obtain a permanent restraining order that prevents a defendant from disposing of his property by means of an *ex parte* proceeding. Due process requires that such an order be temporary and the United States must give affected defendants notice of a hearing within a brief amount of time or the *ex parte* order expires.  A ten day limitation on the duration of such *ex parte* orders seems appropriate.")

### C.    Various Courts Have Relied on Rule 65 of the Federal Rules of Civil Procedure to Decide Matters Such as the One Presently Before this Court

The Fifth and Ninth Circuits have consistently held that a defendant is entitled to a prompt pretrial hearing **whenever** the government obtains an *ex parte* order restraining his property on the assertion that the property may be subject to forfeiture.  In *United States v. Roth*,

---

[3]    Because the seizure warrants in this case were unmistakably punitive in nature, the government should not be permitted to argue that the Defendants are not yet entitled to challenge the pretrial restraints in this case because their assets were seized "civilly."  As the Tenth Circuit has observed "[t]he wholesale use of civil forfeiture proceedings [should cause] grave concern when the Government has clearly focused its law enforcement energies and resources upon a person and attempts to restrain his property in anticipation of formal criminal proceedings." *United States v. $39,000 in Canadian Currency*, 801 F2d 1210, 1219 n.7 (10th Cir. 1986); *see also United States v. Nichols,* 654 F. Supp 1541, 1545 (D.Utah 1987).

912 F.2d 1131, 1133 (9th Cir. 1990), the court held that "in order for a restraining order…to be constitutional, the district court must hold a hearing under Rule 65 to determine whether probable cause exists to issue an injunction." *Id.* ; *see also Crozier*, 777 F.2d at 1384 (holding that "the district court…erred in denying without a hearing the motions of [the defendants] to dissolve the restraining order"); *United States v. Spilotro*, 680 F.2d 612, 617 (10th Cir. 1982) (requiring "an immediate hearing whenever  temporary restraining order has been granted *ex parte*") (internal quotations marks omitted).  The denial of a motion for an evidentiary hearing in such circumstances is immediately appealable; *see, United States v. Kirschenbaum*, 156 F.3d 784, 788 (7th Cir. 1998) ("We agree with the [*In re Assets of Martin*, 1 F.3d 1351, 1355 (3d Cir. 1993)] court that the 'considerable weight' of decisions on point establishes that the restraining order in this case and the district court's order refusing to vacate it are immediately appealable under 28 U.S.C. § 1292(a)(1).")

In *United States v. Unimex, Inc.*, 991 F.2d 546 (9th Cir. 1993), the Court reversed the conviction of the Unimex Corporation ("Unimex"), whose assets had been seized before trial. The Court concluded that Unimex had been denied its Sixth Amendment right to counsel because Unimex had not been afforded either appointed counsel or the opportunity to contest the seizure of its assets.[4] *Unimex* explicitly recognized that, where the moving papers present "a substantial claim," and where "the allegations are sufficient, and factual issues are raised, a hearing is required." *Id.* at 551, (internal quotation marks omitted).  If the matter turns on a disputed factual issue, the moving party must be given an opportunity to present evidence at a

---

[4]     *Unimex* is highly instructive in this matter. In *Unimex* , the court correctly held that (a) it did not have the power to appoint counsel for a corporation and that (b) CJA funds are not available for corporate representation. Accordingly, if the Court in this case does not release sufficient seized assets to allow the two corporations to retain counsel, the corporate defendants will be forced to go to trial without the assistance of counsel.

hearing scheduled sufficiently in advance of trial to enable the movant to retain counsel should it prevail. *Id.*

These cases cannot be dismissed as unique to the "liberal" Ninth Circuit. The conservative Fifth Circuit has reached the same legal conclusions as the Ninth. In *United States v. Holy Land Foundation for Relief and Development*, 445 F.3d 771, 788 (5th Cir. 2006), for example, the government obtained an *ex parte* restraining order under 21 U.S.C. § 853(e) to freeze and preserve the foundation's assets for criminal forfeiture. The government argued that the foundation did "not have an automatic right to a hearing under the forfeiture statute," and that the § 853 post-indictment restraining order had an "indefinite duration." *Id.* at 788. The Fifth Circuit, however, held that "in order for a restraining order under §853 to be constitutional, the district court must hold a hearing under Rule 65 [of the Federal Rules of Civil Procedure] to determine whether probable cause exists to issue an injunction." *Id.* at 792;[5] [6] *see also, United*

---

[5]     Rule 65 of the Federal Rules of Civil Procedure provides, in pertinent part:

**(b) Temporary Restraining Order; Notice; Hearing; Duration**. (b) Temporary Restraining Order; Notice; Hearing; Duration. A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if

(1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and

(2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.

 Every temporary restraining order granted without notice shall be indorsed with the date and hour of issuance; shall be filed forthwith in the clerk's office and entered of record; shall define the injury and state why it is irreparable and why the order was granted without notice; and shall expire by its terms within such time after entry, not to exceed 10 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like  period or unless the party against whom the order is directed consents that it may be extended for a longer period. The reasons for the extension shall be entered of record. In case a temporary restraining order is

*States v. Thier,* 801 F.2d 1463, 1468 (5th Cir. 1986); *United States v. Melrose E. Subdivision,* 357 F.3d 493, 505 n.12 (5th Cir. 2004) ("As a general matter, the Federal Rules presumptively apply except to the extent that they actually conflict with a subsequent statute."); *see also*, *United States v. Riley*, 78 F.3d 367, 379 (8th Cir. 1996) (holding that **before** a post-indictment restraining order may issue "the government must demonstrate at a hearing that the RICO defendant is likely guilty and that the property to be restrained will be subject to criminal forfeiture").

### D.    The *Monsanto* Standard Applies in Most Other Jurisdictions

While not all circuits have aligned with the Fifth, Eighth and Ninth circuits, they have held that a post-restraint hearing must be held where the movant shows that he or she needs the frozen assets to defend against criminal charges or for necessary living expenses during the pendency of criminal litigation.  In those circuits, evidentiary hearings are held when the defendant makes such a showing along with a *prima facie* showing that the grand jury erred in determining that the assets are subject to forfeiture.[7] In *United States v. Monsanto,* 924 F.2d 1186, 1203 (2nd Cir. 1991) (*en banc*), the Court held:

---

granted without notice, the motion for a preliminary injunction shall be set down for hearing at the earliest possible time and takes precedence of all matters except older matters of the same character; and when the motion comes on for hearing the party who obtained the temporary restraining order shall proceed with the application for a preliminary injunction and, if the party does not do so, the court shall dissolve the temporary restraining order.

[6]    The Fifth Circuit also specifically concluded that '[t]his holding is not inconsistent with U*nited States v. Monsanto,* 491 U.S. 600, 109 S. Ct. 2657, 105 L. Ed. 2d 512 (1989)." *Id.*

[7]    In this case, it does not appear that the grand jury ever determined that the frozen assets are subject to forfeiture. The mere fact that forfeiture is **noticed** in the indictment does not prove that the grand jury actually made a probable cause determination with respect to the restrained assets. In order to do so, the government's forfeiture evidence would have to be presented to the grand jury and its theory of forfeiture would have to be explained. Further, the grand jury would have to be properly instructed on the law regarding forfeiture. Such is the import of the "Notice

> [T]he fifth and sixth amendments, considered in combination, require an adversary, post-restraint, pretrial hearing as to probable cause that (a) the defendant committed crimes that provide a basis for forfeiture, and (b) the properties specified as forfeitable in the indictment are properly forfeitable, to continue a restraint of assets (i) needed to retain counsel of choice and (ii) ordered ex parte pursuant to 21 U.S.C. § 853(e)(1)(A)…

924 F.2d at 1195;[8] *see also, United States v. Jones*, 160 F.3d 641 (10th Cir. 1998); *United States v. Farmer*, 274 F.3d 800, 803 (4th Cir. 2001).

Although the D.C. Circuit has never definitively addressed the specific issue, in a recent case raising an almost identical due process issue, the D.C. Circuit held that **before** an organization is designated as a foreign terrorist organization under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), by which the organization is effectively deprived of its property, the organization must be given an opportunity to be heard. *National Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192 (D.C. Cir. 2001). That decision is highly protective of an organization's property rights because it requires a **pre**-deprivation evidentiary hearing as a matter of due process; *see also, Perholtz, supra; United States v. Madeoy,* 652 F.Supp. 371, 376 (D.D.C. 1987).

The Defendants in this case seek only a **post**-deprivation hearing on the pre-trial restraint already in place and urge the Court to adopt the view of the Fifth, Eighth and Ninth Circuits.

---

of Forfeiture" – as opposed to an actual forfeiture count – contained in the indictment. Because forfeiture is merely an aspect of sentencing, it does not necessitate consideration by the grand jury; *Libretti v. United States*, 516 U.S. 29 (1995); Rule 7(c)(2), Fed. R. Crim. P.

[8]    The Second Circuit's due process analysis can also be seen to support the broader notion that, without regard to the need to obtain counsel, a defendant is entitled to a hearing on the restraint of his or her property after the restraint has been imposed. That is the view expressed by the Seventh Circuit in *United States v. Kirschenbaum*, 156 F.3d 784, 793 (7th Cir. 1998). The court of appeals characterized the general due process issue as a "close question," which it ultimately declined to decide.

Nevertheless, should the Court adopt a more restrictive position, the Defendants have made the showing necessary to obtain *a Monsanto* hearing; *see, infra,* at §§ III, IV.

### III.    THE GOVERNMENT LACKED PROBABLE CAUSE TO BELIEVE THAT THE DEFENDANTS COMMITTED ANY CRIMES THAT WOULD PROVIDE THE BASIS FOR FORFEITURE

On May 22, 2007, nearly one month after the execution of the seizure warrants and Post-Indictment Restraining Order, the government first made available to Defendants a copy of the government's affidavit submitted to the Court in support of the seizure warrants issued in these matters.  That affidavit makes clear that the seizure warrants were sought, and issued, solely on the basis of the allegation that the property subject to the Primary Seizure Warrants "was involved in the operation of an unlicensed money transmitting business in violation of Title 18, United States Code, Section 1960.  *See* Affidavit in Support of Seizure Warrant ("Dotson Affidavit"), ¶ 6; see also ¶¶ 4, 22-26.

The affidavit was purportedly prepared and signed by Roy Dotson, a Special Agent with the United States Secret Service who has – at least based on a plain reading of his affidavit – never previously investigated either a licensed or unlicensed money transmitting business; Dotson Affidavit, at ¶ 1.  Strikingly, SA Dotson was either unaware, or, if aware, failed to disclose to the Court, that his conclusion about the supposed illegality of Defendants' operations is rebutted by many other government authorities who have previously stated that existing federal laws and regulations do not apply to digital age businesses such as e-gold and G&SR. For example:

- A January, 2007 United States House of Representatives Energy Committee staff report, addressing digital currencies such as e-gold, concluded that: **"Digital currencies that do business in the United States are not subject to any of the U.S. banking requirements."**  Indeed, the staff report noted **"the lack of**

regulation of digital currencies by any government entity, domestic or foreign."[9]

- A Special Agent of the FBI's Cyber Crimes Unit, when questioned by Fox News about the government's investigation of the e-gold business, stated that: "At this point it is not illegal, **it operates in an area of the law where there is no law**."[10]

- In a December, 2005 report titled U.S. Money Laundering Threat Assessment, issued jointly by a number of government agencies, including the Department of Treasury and Department of Justice, those agencies observed **that "[w]hether an online payment system or digital currency service meets the definition of a money transmitting business pursuant to BSA regulations . . . depends upon its location and the ways in which it participates in or conducts transactions."**[11]

- In its October 13, 2006 *Report on New Payment Methods*, the Financial Action Task Force (FATF) indicated that in the United States, money transmitters are among moneyservices businesses that are required to register with the FIU (FinCEN), they also are subject to AML reporting and recordkeeping requirements and are often required to be licensed on the state level. **"Whether an online payment system or digital precious metals dealer meets the definition of a money transmitter pursuant to the relevant regulations, though, depends upon its location and the ways in which it participates in or conducts transactions."**[12]

Additionally, on May 3, 2007 – the date on which the Defendants were all arraigned in this case based on an indictment which alleged that they conspired to participate in an unlicensed money transmitting business – the Department of Justice announced the release of the 2007

---

[9]      http://republicans.energycommerce.house.gov/108/News/01032007_Report.pdf (last viewed May 15, 2007), pp. 29-30; [Emphasis added].

[10]      Interview available at: http://www.myfoxla.com/myfox/pages/Home/Detail;jsessionid=CE5F83220C1D2F0AA947712455408CDF?contentId=2521038&version=3&locale=EN-US&layoutCode=VSTY&pageId=1.1.1 (last visited May 15, 2007).

[11]      http://www.treasury.gov/press/releases/reports/js3077_01112005_MLTA.pdf (last visited May 15, 2007). p. 27.

[12]      http://www.fatf-gafi.org/dataoecd/30/47/37627240.pdf (last visited May 16, 2007), p.39. While not technically a federal department or agency, the FATF is an inter-governmental body which sets standards and develops and promotes policies to combat money laundering and terrorist financing; see, www.fatf-gafi.org.

National    Money    Laundering    Strategy    (the    "2007    Strategy"); s*ee,*
http://www.usdoj.gov/opa/pr/2007/May/07_opa_325.html; (a copy of the Justice Department's
announcement is attached hereto as Exhibit 1).[13]

The 2007 Strategy, which is signed by the Secretary of the Treasury (Henry Paulson, Jr.),
the Attorney General (Alberto Gonzales), and the Secretary of Homeland Security (Michael
Chertoff), "is a direct response to the first U.S. Government wide money laundering threat
assessment released in December 2005.  In addition to following this new methodology, **the
2007 Strategy for the first time focuses exclusively on money laundering**." 2007 Strategy, at
v; [Emphasis added].[14]  (The 2007 Strategy, in its entirety, is being filed contemporaneously with
this motion under separate cover as a Notice of Filing.)

The 2007 Strategy specifically references e-gold in its discussion of "online payment
systems" and "digital currency dealers;" *id.*, at 43-45.  According to the 2007 Strategy, "[t]he
oldest and best known of the **digital currency services** is e-gold Ltd., licensed in Nevis, with
almost 2 million accounts." *Id.,* at 43-44; [Emphasis added].  The Strategy, in its discussion of
Regulation and Public Policy, continues:

> In the United States, money transmitters are among MSBs required
> to register with FinCEN, are subject to AML reporting and
> recordkeeping requirements, and are often required to be licensed

---

[13]    Given the breadth and depth of the 2007 Strategy,  one must reasonably conclude that its
findings were already available to Department of Justice and Department of Homeland Security
personnel the week previously, when the government submitted the Dotson Affidavit to the
Court.

[14]    The 2007 Strategy was authored jointly by the Drug Enforcement Agency, the National
Drug Intelligence Center, the **Department of Justice**, the Department of the Treasury, the **U.S.
Department of Homeland Security**, the Board of Governors of the Federal Reserve System, the
United States Postal Service, the **Federal Bureau of Investigations**, the Department of State, the
Comptroller of the Currency, the Federal Deposit Insurance Corporation, and the **Internal
Revenue Service**. (The foregoing agencies delineated in bold print each have members on the
team of government agents investigating and prosecuting this case, all of whom have repeatedly
appeared for each proceeding before this Court.

on the state level. **Whether an online payment system or digital currency service meets the definition of a money transmitter pursuant to BSA regulations, though, depends upon its location and the ways in which it participates in or conducts transactions.**

*Id.,* at 45; [Emphasis added].

In each of the above-referenced reports, the authors have expressly stated that they are on notice that **(a)** e-gold exists and that **(b)** money transmitters exist. However, not one such author or report has labeled e-gold as a money transmitting business, licensed or otherwise. Rather, each author states that whether a company like e-gold, Ltd. or G&SR is a money transmitting business depends on the way that it participates in or conducts transactions; *id.*

In fact, the manner in which Defendants conduct their transactions renders them outside the ambit of the statutes and regulations applicable to "money transmitting businesses." Many in the United States government apparently concur. Yet, SA Dotson never addressed the findings, reports, statements and conclusions reached by other government officials on this issue. He and the prosecutors in this case, however, cannot avoid doing so. *See, e.g., United States v. Brown,* 322 F.Supp. 2d 101, 105 (D.Mass. 2004) (citing *United States v. Fiasconaro,* 315 F.3d 28, 35-36 (1st Cir. 2002) (in assessing probable cause, a court will be guided by the "collective knowledge" or "fellow officer" rule, under which the aggregate knowledge of all officers involved in the investigation will be imputed to the officer making the arrest).

Had SA Dotson addressed the findings, reports, statements and conclusions reached by other U.S. government officials – or even simply advised the court that others hold these views – several things would have been clear.

For instance, 18 U.S.C. § 1960 does <u>not</u> define the term "money transmitting business." As such, SA Dotson's description of "money transmitting laws" is inexcusably incomplete; *see,* Dotson Affidavit, at ¶¶ 22 – 23.  According to SA Dotson,

> [t]he term "**money transmitting**" under Section 1960(b)(2) includes "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."

*See,* Dotson Affidavit, at ¶ 23; [Emphasis added].  SA Dotson leads the reader to believe that so long as a person, business or other entity transmits money, that person, business or other entity **automatically** becomes a money transmitting business.  Armored car and courier companies nationwide should heed SA Dotson's caution.

However, what SA Dotson neglected to share with his reader was the collection of laws that govern and truly define the money transmitting business.  To begin, 31 U.S.C. § 5330 is entitled "Registration of money transmitting businesses." That statute alone advises "money transmitting businesses" that if they are such a business then they must register with the Secretary of the Treasury, the state in which they operate, or both; *see,* § 5330(a)(1).[15]

Section 5330 also defines "money transmitting businesses." According to § 5330, in order to be a "money transmitting business," a business must meet the following criteria:

> (d) Definitions.   For purposes of this section, the following definitions shall apply:
>
> (1) **Money transmitting business**.   The term "money transmitting business" means any business other than the United States Postal Service which—

---

[15]      Although SA Dotson never cited to this statute in his affidavit, he was clearly on notice that it existed. In his affidavit, at ¶ 11, he advised the Court that "the federal government requires money transmitting businesses to have registered with the Financial Crimes Enforcement Network (FinCEN), a bureau of the Department of the Treasury, by December 31, 2001 if they were in existence before that date, and, otherwise, within 180 days after the date the business was established."

> (A) provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system;[;]
>
> (B) is required to file reports under section 5313 [*31 USCS § 5313*]; and
>
> (C) is not a depository institution (as defined in section 5313(g) [*31 USCS § 5313(g)*]).

[Emphasis added].

Accordingly, in order to fully articulate probable cause that the Defendants were operating an **unlicensed money transmitting business,** SA Dotson first needed to fully articulate that they were operating a **money transmitting business**.  Because he failed to do so, his affidavit was insufficient and probable cause was never truly established.

To be sure, the Government has long since acknowledged that the Defendants do not accept cash as part of their business.  Consistent with that acknowledgement, SA Dotson wrote in his affidavit as follows:

> To obtain e-gold through OmniPay, a customer is required to wire national currency, in an amount greater than $1,000, to a bank account specified by the e-gold operation. Thereafter, the customer's e-gold account would be credited for the amount of the wire, minus an exchange fee collected by OmniPay.

Dotson Affidavit, at ¶ 29.[16]  Therefore, even had SA Dotson attempted to take the Court through § 5330's three-prong definition of "money transmitting business," he could never have done so.

---

[16]     SA Dotson's use of the word "currency" in this paragraph, while colloquially acceptable, is legally inapt. 31 C.F.R. § 103.11(h) defines "currency" as "[t]he coin and paper money of the United States or of any other country that is designated as legal tender and that circulates and is

Per SA Dotson's own writing, the Defendants are not required to file reports under 31 U.S.C. § 5313.

Section 5313 is entitled "Reports on domestic coins and currency transactions." In its opening paragraph, that statute provides as follows:

> (a) When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, **the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes.**

[Emphasis added].   In other words, § 5313 provides that when a person is engaged in a transaction involving currency, a certain form must be filed.

Attached hereto as Exhibit 2 is that form: a "Currency Transaction Report," a/k/a FinCEN Form 104.  FinCEN form 104 provides as follows:

> **Who Must File**.  Each financial institution (other than a casino, which instead must file FinCEN Form 103, and the U.S. Postal Service for which there are separate rules) must file FinCEN Form 104 (formerly 4789) (CTR) *for each deposit, withdrawal, exchange of currency, or other payment or transfer, by, through, or to the financial institution which involves a transaction in currency of more than $10,000.*  Multiple transactions must be treated as a single transaction if the financial institution has knowledge that (1) they are by or on behalf of the same person, and (2) they result in either currency received (Cash In) or currency disbursed (Cash Out) by the financial institution totaling more than $10,000 during any one business day.  For a bank, a business day is the day on which transactions are routinely posted to customers' accounts, as normally communicated to depository

---

customarily used and accepted as a medium of exchange in the country of issuance. Currency includes U.S. silver certificates, U.S. notes and Federal Reserve notes. Currency also includes official foreign bank notes that are customarily used and accepted as a medium of exchange in a foreign country." By its very definition, currency cannot be wired. This issue is crucial and must neither be confused nor overlooked.

> customers.  For all other financial institutions, a business day is a
> calendar day.

FinCEN Form 104, at p.3; [Emphasis added].  The form also provides the following definitions:

> **Currency.**  The coin and paper money of the United States or any
> other country, which is circulated and customarily used and
> accepted as money.

> **Transaction in currency.** The **physical** transfer of currency from
> one person to another.  This does not include a transfer of funds by
> means of bank check, bank draft, wire transfer or other written
> order that does not involve the physical transfer of currency.

*Id.;* [Emphasis in original].

Pursuant to 31 U.S.C. § 5313, currency transaction reports need only be filed when a ***transaction in currency*** is performed.  It naturally follows that entities that do not – as a matter of practice – engage in transactions in currency need not file reports under 31 U.S.C. § 5313; *see, United States v. Talebnejad*, 460 F.3d 563, 565 (4th Cir. 2006) ("A money transmitting business is one that, for a fee, accepts **currency** for transfer within or outside the United States through foreign currency exchanges and financial institutions.") [Emphasis added].   Therefore, the Defendants in this case – who, as a matter of practice, do not engage in transactions in currency and are therefore **not required** to file reports under § 5313 – cannot be defined as a money transmitting business under 31 U.S.C. § 5313.

Accordingly, so long as e-gold, Ltd. and G&SR do not deal in currency, they cannot be required to file currency transaction reports under § 5313.  And, so long as neither company is required to file currency transaction reports under § 5313, they cannot be described as "money transmitting businesses" under § 5330, the sole federal statute which actually defines that term.  SA Dotson and the prosecutors in this case, who travel under an overly-narrow reading of the law, stand alone in their contentions.  The Defendants in this case do not operate a money

transmitting business and do not purport to do so and the government cannot establish that it does.[17]

## IV.   THE DEFENDANTS – AS THE NECESSARY AND PROXIMATE RESULT OF THE PRE-TRIAL RESTRAINTS LEVIED UPON THEM IN THIS CASE – HAVE BEEN RENDERED UNABLE TO PAY FOR COUNSEL AND FOR REASONABLE LIVING AND OPERATING EXPENSES

As previously stated, without so much as a hearing, and based on a legitimate question of law which would be far more appropriately resolved in a declaratory judgment action, the government has seized from the Defendants e-gold Ltd. and G&SR bank accounts and e-gold accounts with an aggregate value of approximately USD $3,055,816.  In this case, attorneys fees, together with litigation, discovery management, travel and related expenses, will cost the companies far in excess of $3.5 million.  Attached hereto as Exhibits 3 through 7 are affidavits of each of the Defendants which – when studied together – reveal how severely these pre-trial restraints have affected the Defendants' Sixth Amendment right to counsel and abilities live and operate on an ongoing basis.

Exhibit 3:     Affidavit on behalf of e-gold Ltd.

Exhibit 4:     Affidavit on behalf of Gold & Silver Reserve, Inc.

Exhibit 5:     Affidavit of Dr. Douglas Jackson

Exhibit 6:     Affidavit of Mr. Barry Downey

Exhibit 7:     Affidavit of Mr. Reid Jackson

---

[17]   In *Talebnejad*, the court articulated that 18 U.S.C. § 1960 "is not a strict liability offense." *Talebnejad*, 460 F.3d at 570 n. 5.  Rather, § 1960 "is a general intent crime, as to which the *mens rea* of 'knowledge' attaches to all factual elements of the offense." *Id.* Accordingly, to be convicted of a § 1960 charge, a defendant must, at the very least, know that he was operating a money transmitting business. In this case, the Defendants have repeatedly asserted that they have always believed themselves to be issuers and exchangers of the base money of a privately issued, alternative global currency for which – as previously stated by FBI Special Agent Ken McGuire – there are no applicable laws. *See, supra.*, p. 12, n. 10. SA Dotson never even raised the issue of intent in his affidavit.

A.    **Gold & Silver Reserve, Inc.**

i.    <u>**Assets**</u>

As required by the Court, G&SR disclosed its available liquid assets in a letter to the government signed by undersigned counsel on May 3, 2007.  (Dr. Douglas Jackson, on behalf of G&SR, attested to the accuracy of that letter in an Affidavit.  As of that date, G&SR had a total of 2,470.329527 troy ounces of e-gold (the equivalent of USD $1,653,885.62) in its e-gold accounts.  (That figure included G&SR's seized e-gold account, and was based on the May 2, 2007 P.M. London Fix of $669.50 per troy ounce; *see*, www.lbma.org.uk/2007dailygold.htm)

As of May 28, 2007, G&SR had the equivalent of USD $523,678.77 in its remaining e-gold accounts, with a $166,193.55 balance of unfilled InExchange orders. G&SR also has $164.22 in an HSBC bank account in Australia (to which it has little or no access) and $135,965.08 in a Colonial Bank bank account (which is used exclusively for purposes of paying payroll and payroll taxes).

In its May 3, 2007 disclosure to the Government, G&SR indicated that it had an SEB (Estonia) Bank account with the following types and amounts of money located therein:

```
EEK:  277,007.22
USD:  740,114.18
AUD:  63,118.04
CAD:  787,791.34
CHF:  30,103.49
GBP:  72,147.95
JPY:  7,149,503.96
EUR:  1,402.62
```

However, as of the date of that disclosure, approximately 98% of the money contained in G&SR's SEB bank account was dedicated to the processing of the OutExchange orders of G&SR's customers.

As of May 28, 2007, G&SR had the equivalent of $347,935.01 (USD) in the SEB account and unfulfilled OutExchange orders totaling the equivalent value of $349,850.04 (USD).

However, citing the press release published by the government upon the unsealing of the indictment in this case, SEB Bank terminated its relationship with G&SR effective May 25, 2007 at 10:00 a.m. EST.[18]  (Attached hereto as Exhibit 8 is a copy of the notice provided to G&SR by SEB.)  Additionally, because banks around the world have refused to allow G&SR to open an account, G&SR has no way to earn an income in the foreseeable future (other than the fees it receives from e-gold, Ltd.).

G&SR has no other liquid assets.  G&SR does, however, have 22,784.5104 troy ounces of e-silver (the equivalent of $294,603.73 USD); 46.180766 troy ounces of e-platinum (the equivalent of $58,788.11 USD); and 65.635473 troy ounces of e-palladium (the equivalent of $24,153.86 USD).  **But these assets are illiquid.**  To be sure, in order for G&SR to liquidate its e-silver, G&SR must first redeem its e-silver for physical silver with e-gold Ltd. and specify delivery of physical bullion to a bullion dealer with whom G&SR has placed a trade.[19]  All of the

---

[18]     *See*, *National Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 204 (D.C. Cir. 2001) ("Like the parties in [*Wisconsin v. Constantineau*, 400 U.S. 433, 27 L. Ed. 2d 515, 91 S. Ct. 507 (1971)], and unlike the parties in [*Paul v. Davis*, 424 U.S. 693, (1976)], petitioners here have suffered more than mere stigmatization. Rather than being posted as drunkards, the petitioners have been designated as foreign terrorist organizations under the AEDPA. Rather than being deprived of the previously held right to purchase liquor, they have been deprived of the previously held right to--for example--hold bank accounts, and to receive material support or resources from anyone within the jurisdiction of the United States. Many people, presumably including the members of the Council and the PMOI, would consider these to be rights more important than the right to purchase liquor. We consider at least one of them equally entitled to constitutional protection."); *see also, Constantineau,* 400 U.S. at 437 ("**Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and opportunity to be heard are essential**.") [Emphasis added].

[19]     In order to liquidate e-silver, G&SR must sell silver bullion to a bullion dealer. In order to deliver bullion to the bullion dealer, G&SR must redeem a certain amount of e-silver from its own e-gold account and instruct e-gold, Ltd. to deliver physical silver to the bullion dealer. However, it must be noted that  the bullion is an asset of the e-gold Bullion Reserve Special Purpose Trust, not an asset of either e-gold, Ltd., G&SR, Dr. Jackson, Mr. Jackson, or Mr. Downey. Accordingly, any disposition of physical bullion from the account of the e-gold Bullion Reserve Special Purpose Trust requires written, signed instructions from e-gold, Ltd. and the

physical silver backing e-silver is located in a Transguard storage facility in Dubai. However, before there can be any disposition of the metal held by the e-gold Bullion Reserve Special Purpose Trust in the Transguard facility, Mr. Hil de Frias – a trustee of the Trust residing in Bermuda – must sign off on any such transaction. Mr. de Frias, however, has been completely uncooperative with the Defendants' substantial efforts to comply with the seizure warrants and has refused to perform any of the tasks that he is to perform under the terms of the e-gold Bullion Reserve Special Purpose Trust.

All of the physical palladium and platinum backing the e-palladium and e-platinum, respectively, is likewise stored in the Transguard facility in Dubai, and is illiquid for the same reason explained above regarding the e-silver. Additionally, because G&SR does not have access to enough e-palladium to warrant the sale of a full bar of palladium, it cannot liquidate its e-palladium. Furthermore, because the physical platinum backing G&SR's e-platinum holdings is currently the subject of ongoing litigation in Canada, G&SR cannot liquidate its e-platinum. Accordingly, as of May 28, 2007, G&SR has $377,545.70 worth of e-metal (e-silver, e-palladium and e-platinum) which can neither be liquidated, sold, traded or used to pay attorneys fees.

### ii.    Costs and Liabilities

As stated in G&SR's attached affidavit, G&SR requires approximately $186,569.74 **per month** to pay for ordinary expenses, including rent, salaries and wages, taxes, telephone charges, office supplies, travel expenses and other related costs. Additionally, as of May 28, 2007, G&SR

---

Escrow Agent. "The safekeeping arrangements with secure repositories shall require dual signature (i.e., authorization by both e-gold Ltd. and by the designated third party contracted to serve as Escrow Agent) before any bullion may be removed for any purpose;" *see,* e-gold Bullion Reserve Special Purpose Trust, at ¶ 4.1.

had a $2,015,432.80 total balance of notes payable and a **$203,048.00** total balance of accounts payable.  Ultimately, G&SR has an insufficient sum of liquid assets as compared to its costs and liabilities which would allow it to remain in business and pay for its attorneys fees; *but see,* Post-Indictment Restraining Order, at ¶ 7 ("…the order requested is narrowly tailored to allow orderly continuation of defendants' business activities, as well as the ability of the defendants' customers to access their funds.")

          **B.**        **e-gold, Ltd.**

              **i.**        **Assets**

e-gold, Ltd. promptly acted in conformity with the seizure warrants and Post-Indictment Restraining Order entered in this case as soon as e-gold, Ltd. received them.  Immediately prior to freezing its own operating assets as instructed by the Court, e-gold, Ltd. had 1,122.52 troy ounces of e-gold in its primary operating account (Account No. 544179).  At the close of business on April 26, 2007, gold had a value of $673.00 per troy ounce,  giving e-gold account no. 544179 a USD value of $755,455.96. e-gold, Ltd. froze the account and turned over its USD equivalent as soon as the liquidation could occur.

Pursuant to the Post-Indictment Restraining Order, e-gold, Ltd. disclosed its available liquid assets in a letter to the government signed by undersigned counsel on May 3, 2007.  (Dr. Douglas Jackson, on behalf of e-gold, Ltd., attested to the accuracy of that letter in an Affidavit.).  As of that date, e-gold, Ltd. had a total of 1931.580932 troy ounces of e-gold in its e-gold accounts, the equivalent of $1,293,193.43.  (This amount included e-gold Ltd.'s seized e-gold account and is based on the May 2, 2007 P.M. London Fix of $669.50 per troy ounce; *see*, www.lbma.org.uk/2007dailygold.htm) As of May 28, 2007, e-gold, Ltd. had the equivalent of $745,386.05 in its remaining e-gold accounts.

ii.       <u>**Costs and Liabilities**</u>

e-gold Ltd., on an average monthly basis, makes the following expenditures:

| | |
|---|---:|
| Super Originator Expense: | $76,651.75 |
| Operator Fee: | $70,900.00 |
| Professional Fees: | $3,879.77 |
| Software Engineering: | $6,567.00 |
| Spread Expense: | $280.66 |
| Storage Fees: | $7,119.89 |
| Bullion Storage: | $852.60 |
| <u>Web Hosting</u>: | <u>$3,543.22</u> |
| Total Expense: | $169,795.08 |

The fees that e-gold, Ltd. pays to G&SR as the operator of e-gold system is G&SR's primary source of revenue. In other words, if not for e-gold, Ltd., G&SR could not afford to pay the costs and fees outlined in paragraph IV-A of this motion.

**C.       Dr. Jackson, Mr. Jackson and Mr. Downey ("The Individual Defendants")**

The charges against the Individual Defendants in this case all relate to their duties as officers and directors of G&SR. G&SR's corporate policy – consistent with the law of the state of Delaware, where G&SR is incorporated  – has always been to pay the attorneys fees of officers, directors and employees when the action in which they are involved arises from the exercise of their duties on behalf of G&SR. This is specifically authorized by Delaware law, which provides in pertinent part:

> A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense

> or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation…

8 *Del. C.* § 145(b). *See also, VonFeldt v. Stifel Financial Corp.*, 714 A.2d 79, 84 (Del. 1998) ("We have long recognized that Section 145 serves the dual policies of: (a) allowing corporate officials to resist unjustified lawsuits, secure in the knowledge that, if vindicated, the corporation will bear the expense of litigation; and (b) encouraging capable women and men to serve as corporate directors and officers, secure in the knowledge that the corporation will absorb the costs of defending their honesty and integrity."); *citing, Hibbert v. Hollywood Park, Inc.,* 457 A.2d 339, 344 (Del. 1983).

During the grand jury investigation and forfeiture action which proceeded this case, G&SR paid for the attorneys fees of the Individual Defendants **and** each of the G&SR employees who were subpoenaed to testify before the grand jury in Washington, D.C. Indeed, it is G&SR's corporate policy to do so, and each of the directors of the G&SR believe that it is in G&SR's best interest for G&SR to advance the legal fees of each of the Individual Defendants at this time; *see,* 8 Del. C. § 145(d). G&SR will similarly continue to pay for the attorneys fees of all of its employees and contractors as such employees and contractors are subpoenaed by the government to testify in this case.

Nevertheless, to the extent that the Court believes that the individuals should be responsible for their own attorneys fees, the Individual Defendants have each prepared affidavits (attached hereto as Exhibits 5, 6 and 7) which demonstrate how each is financially incapable of paying for the attorneys fees and related expenses required to defend a case of this magnitude.

V.     **CONCLUSION**

Based upon an incomplete and at times inaccurate *ex parte* presentation, the government has persuaded the Court in this case and in the stayed civil action to legitimize the seizure from the Defendants of more than Three Million Dollars ($3,000,000) of their assets without any opportunity for the Defendants to be heard on the merits of those seizures. Those seizures are rapidly precipitating the ruin of two legitimate and innovative businesses, creating substantial hardship on the Individual Defendants and their families and will leave Defendants unable to retain counsel to respond to the baseless charges brought in this action.

The seizures and pre-trial restraints are particularly shocking and inappropriate in this case where (a) there is a substantial good faith disagreement about the applicability of the law – the very law upon which the government sought the seizure warrants -- to the Defendants' businesses; (b) other government authorities have themselves questioned the applicability of that law to the Defendants' businesses; (c) Defendants have since the inception of the businesses worked hand-in-hand with government agents to root out fraud and illicit activity perpetuated by people using the e-gold system for improper purposes; and (d) have fully cooperated with the investigators and prosecutors in this case during the course of the government's nearly three-year investigation.

For all of these reasons, and the reasons more fully set forth above, the Court should grant Defendants an evidentiary hearing through which Defendants may challenge the seizures and pre-trial restraints in place in this case. Following that hearing, the Defendants request that the Court enter an order vacating the seizure warrant and modifying the post indictment restraining order.

WHEREFORE, for the foregoing reasons, the Defendants respectfully request that this Court hold a hearing whereby the Defendants may challenge the seizures and pre-trial restraints in place in this case, and, upon holding such a hearing, enter an order vacating the seizure warrant in Case No. 07-167-M-01 and modifying the post indictment restraining order.

Respectfully submitted,

/s/ *Andrew S. Ittleman*
Mitchell S. Fuerst, Esq.
Florida Bar No. 264598
Andrew S. Ittleman, Esq.
Florida Bar No. 802441
FUERST HUMPHREY ITTLEMAN, PL
1001 Brickell Bay Drive, Suite 2002
Miami, Florida 33131
Telephone: 305-350-5690
Fax: 305-371-8989


/s/ *Aron U. Raskas*
Aron U. Raskas
District of Columbia Bar No. 422939
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202-3201
Telephone: 410-752-6030
Fax: 410-539-1269
araskas@kg-law.com


/s/ *David B. Smith*
David B. Smith
VA Bar No. 25930
ENGLISH & SMITH
526 King Street, Suite 213
Alexandria, Virginia 22314
Telephone: 703-548-8911
Fax: 703-548-8935
dsmith@englishandsmith.com


*Counsel for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing

**DEFENDANTS' MOTION TO VACATE SEIZURE WARRANT AND TO MODIFY
RESTRAINING ORDER AND REQUEST FOR AN EVIDENTIARY HEARING**

was served on June 1, 2007 on all counsel of record via the Court's Electronic Case Filing
system.

*/s/ Andrew S. Ittleman*
Mitchell S. Fuerst, Esq.
Florida Bar No. 264598
Andrew S. Ittleman, Esq.
Florida Bar No. 802441
Fuerst Humphrey Ittleman, PL
1001 Brickell Bay Drive, Suite 2002
Miami, FL  33131
(305) 350-5690 (o)
(305) 371-8989 (f)

**DEFENDANTS' MOTION TO VACATE SEIZURE
WARRANT AND TO MODIFY RESTRAINING ORDER
AND REQUEST FOR AN EVIDENTIARY HEARING**

# EXHIBIT 1



# Department of Justice

FOR IMMEDIATE RELEASE
THURSDAY, MAY 3, 2007
HTTP://WWW.USDOJ.GOV/

**TREASURY CONTACT: MOLLY MILLERWISE**
**(202) 622-2960**
**DOJ OPA (202) 514-2007**

### 2007 National Money Laundering Strategy Released

WASHINGTON – The U.S. Departments of Justice, Treasury and Homeland Security today joined together in issuing the 2007 National Money Laundering Strategy, a report detailing continued efforts to dismantle money laundering and terrorist financing networks and bring these criminals to justice.

"The 2007 National Money Laundering Strategy is a direct result of close cooperation by the Departments of Justice, Treasury and Homeland Security, along with our foreign counterparts, and signifies our collective commitment to fight money laundering," said Assistant Attorney General Alice S. Fisher of the Justice Department's Criminal Division. "Implementation of this strategy will greatly assist in efforts to seize and forfeit millions in illegal proceeds that flow through the international financial system."

The 2007 strategy addresses the priority threats and vulnerabilities identified by the Money Laundering Threat Assessment released in 2006, the product of an extremely valuable investigation into the current and emerging trends and techniques used by criminals to raise, move and launder proceeds. The Assessment – the first government-wide analysis of its kind – brought together the expertise of regulatory, law enforcement and investigative officials from across the government, culminating in a comprehensive analysis of specific money laundering methods, patterns of abuse, geographical concentrations, and the associated legal and regulatory regimes.

"The 2007 National Money Laundering Strategy builds upon the groundbreaking work of the Money Laundering Threat Assessment," said Pat O'Brien, Treasury's Assistant Secretary for Terrorist Financing. "Focusing on well-established money laundering methods and emerging trends identified in the Assessment, we have created a robust strategy for combating money laundering, deterring criminals, and addressing areas vulnerable to exploitation."

The 2007 strategy builds on initiatives and programs pioneered in preceding National Money Laundering Strategies. The constant searching by criminals for new ways to launder and hide dirty money is evidence of our successful regulatory and law enforcement efforts to safeguard the banking system. With an aim at continuing these robust efforts, the 2007 strategy places an emphasis on bolstering the efficiency of the anti-money laundering processes currently in place.

"In every type of case, from human smuggling and drug trafficking to intellectual property rights violations and illegal alien employment schemes, the need to hide and move ill-gotten gains is a constant. ICE's anti-money laundering initiatives are at the forefront of attacking existing and emerging money laundering threats," said Julie L. Myers, Assistant Secretary for Immigration and Customs Enforcement at the Department of Homeland Security. "ICE's trade transparency unit, bulk cash smuggling initiative, and programs targeting illegal

- 2 -

money service businesses and stored value card schemes are making it less profitable to commit these crimes."

Additionally, the 2007 strategy focuses on leveling the playing field internationally, helping to ensure U.S. financial institutions are not disadvantaged through the implementation of controls and standards to combat money laundering and terrorist financing. Indeed, money laundering is a global threat the United States is working to address through international bodies, including the Financial Action Task Force (FATF), and through direct private sector outreach in regions around the world.

###

07-325

**DEFENDANTS' MOTION TO VACATE SEIZURE
WARRANT AND TO MODIFY RESTRAINING ORDER
AND REQUEST FOR AN EVIDENTIARY HEARING**

# EXHIBIT 2

FINCEN Form **104**
(Eff. December 2003)
Department of the Treasury
FinCEN

## Currency Transaction Report
▶ Previous editions will not be accepted after August 31, 2004.
▶ Please type or print.
*(Complete all parts that apply--See Instructions)*



OMB No. 1506-0004

**1** Check all box(es) that apply:  a ☐ Amends prior report    b ☐ Multiple persons    c ☐ Multiple transactions

### Part I  Person(s) Involved in Transaction(s)

**Section A—Person(s) on Whose Behalf Transaction(s) Is Conducted**

**2** Individual's last name or entity's name | **3** First name | **4** Middle initial

**5** Doing business as (DBA) | **6** SSN or EIN

**7** Address (number, street, and apt. or suite no.) | **8** Date of birth   MM   DD   YYYY

**9** City | **10** State | **11** ZIP code | **12** Country code (if not U.S.) | **13** Occupation, profession, or business

**14** If an individual, describe method used to verify identity:  a ☐ Driver's license/State I.D.  b ☐ Passport  c ☐ Alien registration

d ☐ Other _____  e Issued by: _____  f Number: _____

**Section B—Individual(s) Conducting Transaction(s) (if other than above).**
If Section B is left blank or incomplete, check the box(es) below to indicate the reason(s)

a ☐ Armored Car Service  b ☐ Mail Deposit or Shipment  c ☐ Night Deposit or Automated Teller Machine  d ☐ Multiple Transactions  e ☐ Conducted On Own Behalf

**15** Individual's last name | **16** First name | **17** Middle initial

**18** Address (number, street, and apt. or suite no.) | **19** SSN

**20** City | **21** State | **22** ZIP code | **23** Country code (if not U.S.) | **24** Date of birth   MM   DD   YYYY

**25** If an individual, describe method used to verify identity:  a ☐ Driver's license/State I.D.  b ☐ Passport  c ☐ Alien registration

d ☐ Other _____  e Issued by: _____  f Number: _____

### Part II  Amount and Type of Transaction(s).  Check all boxes that apply.

**26** Total cash in $ _____ 0.00 | **27** Total cash out $ _____ 0.00 | **28** Date of transaction   MM   DD   YYYY

**26a** Foreign cash in _____ 0.00 *(see instructions, page 4)* | **27a** Foreign cash out _____ 0.00 *(see instructions, page 4)*

**29** ☐ Foreign Country _____ | **30** ☐ Wire Transfer(s) | **31** ☐ Negotiable Instrument(s) Purchased

**32** ☐ Negotiable Instrument(s) Cashed | **33** ☐ Currency Exchange(s) | **34** ☐ Deposit(s)/Withdrawal(s)

**35** ☐ Account Number(s) Affected (if any): | **36** ☐ Other (specify)

### Part III  Financial Institution Where Transaction(s) Takes Place

**37** Name of financial institution | Enter Regulator or BSA Examiner code number (see instructions) ▶

**38** Address (number, street, and apt. or suite no.) | **39** EIN or SSN

**40** City | **41** State | **42** ZIP code | **43** Routing (MICR) number

**Sign Here** ▶

**44** Title of approving official | **45** Signature of approving official | **46** Date of signature   MM   DD   YYYY

**47** Type or print preparer's name | **48** Type or print name of person to contact | **49** Telephone number  ( )

▶ For Paperwork Reduction Act Notice, see page 4. | Cat. No. 37683N | FinCEN Form 104 (Rev. 08-03)

FinCEN Form 104 (Eff. 12-03)                                                                                                    Page 2

## Multiple Persons
Complete applicable parts below if box 1b on page 1 is checked

**Part I**  Person(s) Involved in Transaction(s)

### Section A--Person(s) on Whose Behalf Transaction(s) Is Conducted

| 2 Individual's last name or entity's name | 3 First name | 4 Middle initial |
|---|---|---|

| 5 Doing business as (DBA) | 6 SSN or EIN |
|---|---|

| 7 Address (number, street, and apt. or suite no.) | 8 Date of birth |
|---|---|
| | MM   DD   YYYY |

| 9 City | 10 State | 11 ZIP code | 12 Country code (if not U.S.) | 13 Occupation, profession, or business |
|---|---|---|---|---|

14 If an individual, describe method used to verify identity:  **a** ☐ Driver's license/State I.D.   **b** ☐ Passport   **c** ☐ Alien registration

**d** ☐ Other _____   **e** Issued by: _____   **f** Number: _____

### Section B--Individual(s) Conducting Transaction(s) (if other than above).

| 15 Individual's last name | 16 First name | 17 Middle initial |
|---|---|---|

| 18 Address (number, street, and apt. or suite no.) | 19 SSN |
|---|---|

| 20 City | 21 State | 22 ZIP code | 23 Country code (if not U.S.) | 24 Date of birth |
|---|---|---|---|---|
| | | | | MM   DD   YYYY |

25 If an individual, describe method used to verify identity:  **a** ☐ Driver's license/State I.D.   **b** ☐ Passport   **c** ☐ Alien registration

**d** ☐ Other _____   **e** Issued by: _____   **f** Number: _____

**Part I**  Person(s) Involved in Transaction(s)

### Section A--Person(s) on Whose Behalf Transaction(s) Is Conducted

| 2 Individual's last name or entity's name | 3 First name | 4 Middle initial |
|---|---|---|

| 5 Doing business as (DBA) | 6 SSN or EIN |
|---|---|

| 7 Address (number, street, and apt. or suite no.) | 8 Date of birth |
|---|---|
| | MM   DD   YYYY |

| 9 City | 10 State | 11 ZIP code | 12 Country code (if not U.S.) | 13 Occupation, profession, or business |
|---|---|---|---|---|

14 If an individual, describe method used to verify identity:  **a** ☐ Driver's license/State I.D.   **b** ☐ Passport   **c** ☐ Alien registration

**d** ☐ Other _____   **e** Issued by: _____   **f** Number: _____

### Section B--Individual(s) Conducting Transaction(s) (if other than above).

| 15 Individual's last name | 16 First name | 17 Middle initial |
|---|---|---|

| 18 Address (number, street, and apt. or suite no.) | 19 SSN |
|---|---|

| 20 City | 21 State | 22 ZIP code | 23 Country code (if not U.S.) | 24 Date of birth |
|---|---|---|---|---|
| | | | | MM   DD   YYYY |

25 If an individual, describe method used to verify identity:  **a** ☐ Driver's license/State I.D.   **b** ☐ Passport   **c** ☐ Alien registration

**d** ☐ Other _____   **e** Issued by: _____   **f** Number: _____

## Suspicious Transactions

This Currency Transaction Report (CTR) should NOT be filed for suspicious transactions involving $10,000 or less in currency OR to note that a transaction of more than $10,000 is suspicious. Any suspicious or unusual activity should be reported by a financial institution in the manner prescribed by its appropriate federal regulator or BSA examiner. (See the instructions for Item 37). If a transaction is suspicious and in excess of $10,000 in currency, then both a CTR and the appropriate Suspicious Activity Report form must be filed.

In situations involving suspicious transactions requiring immediate attention, such as when a reportable transaction is ongoing, the fianacial institution shall immediately notify, by telephone, appropriate law enforcement and regulatory authorities in addition to filing a timely suspicious activity report.

### General Instructions

**Who Must File.** Each financial institution (other than a casino, which instead must file FinCEN Form 103, and the U.S. Postal Service for which there are separate rules) must file FinCEN Form 104 (CTR) for each deposit, withdrawal, exchange of currency, or other payment or transfer, by, through, or to the financial institution which involves a transaction in currency of more than $10,000. Multiple transactions must be treated as a single transaction if the financial institution has knowledge that (1) they are by or on behalf of the same person, and (2) they result in either currency received (Cash In) or currency disbursed (Cash Out) by the financial institution totaling more than $10,000 during any one business day. For a bank, a business day is the day on which transactions are routinely posted to customers' accounts, as normally communicated to depository customers. For all other financial institutions, a business day is a calendar day.

Generally, financial institutions are defined as banks, other types of depository institutions, brokers or dealers in securities, money transmitters, currency exchangers, check cashers, and issuers and sellers of money orders and traveler's checks. Should you have questions, see the definitions in 31 CFR Part 103.

**When and Where To File. This form should be e-filed through the Bank Secrecy Act E-filing System. Go to http: //bsaefiling.fincen.treas.gov/index.jsp to register.** This form is also available for download on the Financial Crimes Enforcement Network's Web site at www.fincen.gov, or may be ordered by calling the IRS Forms Distribution Center at (800) 829-3676. File this CTR by the 15th calendar day after the day of the transaction with the:

> Enterprise Computing Center - Detroit
> ATTN: CTR
> P.O. Box 33604
> Detroit, MI 48232-5604

Keep a copy of each CTR for five years from the date filed.

A financial institution may apply to file the CTRs magnetically. To obtain an application to file magnetically, write to the:

> Enterprise Computing Center - Detroit
> ATTN: CTR Magnetic Media Coordinator
> P.O. Box 33604
> Detroit, MI 48232-5604

**Identification Requirements.** All individuals (except a employees of armored car services) conducting a reportable transaction(s) for themselves or for another person, must be identified by means of an official

document(s). Acceptable forms of identification include driver's license, military and military/dependent identification cards, passport, state issued identification card, cedular card (foreign), non-resident alien identification cards, or any other identification document or documents, which contain name and preferably address and a photograph and are normally acceptable by financial institutions as a means of identification when cashing checks for persons other than established customers.

Acceptable identification information obtained previously and maintained in the financial institution's records may be used. For example, if documents verifying an individual's identity were examined and recorded on a signature card when an account was opened, the financial institution may rely on that information. In completing the CTR, the financial institution must indicate on the form the method, type, and number of the identification. Statements such as "known customer" or "signature card on file" are not sufficient for form completion.

**Penalties.** Civil and criminal penalties are provided for failure to file a CTR or to supply information or for filing a false or fraudulent CTR. See 31 U.S.C. 5321, 5322 and 5324.

**For purposes of this CTR, the terms below have the following meanings:**

**Currency.** The coin and paper money of the United States or any other country, which is circulated and customarily used and accepted as money.

**Person.** An individual, corporation, partnership, trust or estate, joint stock company, association, syndicate, joint venture or other unincorporated organization or group.

**Organization.** Entity other than an individual.

**Transaction in Currency.** The physical transfer of currency from one person to another. This does not include a transfer of funds by means of bank check, bank draft, wire transfer or other written order that does not involve the physical transfer of currency.

**Negotiable Instruments.** All checks and drafts (including business, personal, bank, cashier's and third-party), money orders, and promissory notes. For purposes of this CTR, all traveler's checks shall also be considered negotiable instruments whether or not they are in bearer form.

**Foreign exchange rate.** If foreign currency is a part of a currency transaction that requires the completion of a CTR, use the exchange rate in effect for the business day of the transaction to compute the amount, in US dollars, to enter in item 26/27. The source of the exchange rate that is used will be determined by the reporting institution.

### Specific Instructions

Because of the limited space on the front and back of the CTR, it may be necessary to submit additional information on attached sheets. Submit this additional information on plain paper attached to the CTR. Be sure to put the individual's or entity's name and identifying number (items 2, 3, 4, and 6 of the CTR) on any additional sheets so that if it becomes separated, it may be associated with the CTR.

**Item 1a. Amends Prior Report.** If this CTR is being filed because it amends a report filed previously, check Item 1a. Staple a copy of the original CTR to the amended one, complete Part III fully and only those other entries which are being amended.

**Item 1b. Multiple Persons.** If this transaction is being conducted by more than one person or on behalf of more than one person, check Item 1b. Enter information in Part I for one of the persons and provide information on any other persons on the back of the CTR.

**Item 1c. Multiple Transactions.** If the financial institution has knowledge that there are multiple transactions, check Item 1c.

### PART I - Person(s) Involved in Transaction(s)

Section A **must** be completed. If an individual conducts a transaction on his own behalf, complete Section A and leave Section "B" BLANK. If an individual conducts a transaction on his own behalf and on behalf of another person(s), complete Section "A" for each person and leave Section "B" BLANK. If an individual conducts a transaction on behalf of another person(s), complete Section "B" for the individual conducting the transaction, and complete Section "A" for each person on whose behalf the transaction is conducted of whom the financial institution has knowledge.

**Section A. Person(s) on Whose Behalf Transaction(s) Is Conducted.** See instructions above.

**Items 2, 3, and 4. Individual/Organization Name.** If the person on whose behalf the transaction(s) is conducted is an individual, put his/her last name in Item 2, first name in Item 3, and middle initial in Item 4. If there is no middle initial, leave item 4 BLANK. If the transaction is conducted on behalf of an entity, enter the name in Item 2 and leave Items 3 and 4 BLANK.

**Item 5. Doing Business As (DBA).** If the financial institution has knowledge of a separate "doing business as" name, enter it in Item 5. For example, Smith Enterprise DBA MJ's Pizza.

**Item 6. SSN/ITIN or EIN.** Enter the Social Security Number (SSN) or Individual Taxpayer Identification Number (ITIN) or Employer Identification Number (EIN) of the person or entity identified in Item 2. If none, write NONE.

**Items 7, 9, 10, 11, and 12. Address.** Enter the permanent address including ZIP Code of the person identified in Item 2. Use the U.S. Postal Service's two letter state abbreviation code. A P.O. Box should not be used by itself, and may only be used if there is no street address. If a P.O. Box is used, the name of the apartment or suite number, road or route number where the person resides must also be provided. If the address is outside the U.S., provide the street address, city, province or state, postal code (if known), and the two letter country code. For country code list go to www.fincen.gov/reg_bsaforms.html or telephone 800-949-2732 and select option number 5. If U.S., leave item 12 blank.

**Item 8. Date of Birth.** Enter the date of birth. Eight numerals must be inserted for each date. The first two will reflect the month, the second two the day, and the last four the year. A zero (0) should precede any single digit number. For example, if an individual's birth date is April 3 1948, Item 8 should read 04 03 1948.

**Item 13. Occupation, profession, or business.** If known, identify the occupation, profession or business that best describes the individual or entity in Part I (e.g., attorney, car dealer, carpenter, doctor, farmer, plumber, truck driver, etc.). Do not use nondescript terms such as businessman, merchant, store owner (unless store's name is provided), or self employed. If unemployed, or retired are used enter the regular or former occupation if known.

**Item 14. If an Individual, Describe Method Used To Verify Identity.** If an individual conducts the transaction(s) on his/her own behalf, his/her identity must be verified by examination of an acceptable document (see **General Instructions**). For example, check box **a** if a driver's license is used to verify an individual's identity, and enter the state that issued the license and the number in items **e** and **f**. If the transaction is conducted by an individual on behalf of another individual not present, leave item 14 blank. Also leave item 14 blank if the transaction is conducted on behalf of an entity.

FinCEN Form 104 (Eff. 12-03)

**Section B. Individual(s) Conducting Transaction(s) (if other than above).** Financial institutions should enter as much information as is available. However, there may be instances in which Items 15-25 may be left BLANK or incomplete. If Items 15-25 are left BLANK or incomplete, check one or more of the boxes provided to indicate the reasons.

**Example:** If there are multiple transactions that, if only when aggregated, the financial institution has knowledge the transactions exceed the reporting threshold, and therefore, did not identify the transactor(s), check box **d** for Multiple Transactions.

**Items 15, 16, and 17. Individual's Name.** Complete these items if an individual conducts a transaction(s) on behalf of another person. For example, if John Doe, an employee of XY Grocery Store, makes a deposit to the store's account, XY Grocery Store should be identified in Section A and John Doe should be identified in section B.

**Items 18, 20, 21, 22, and 23. Address.** Enter the permanent street address including ZIP Code of the individual. (See the instructions for Items 7 and 9 through 12.) Enter country code if not U.S. (Reference item 12).

**Item 19. SSN/ITIN.** If the individual has a Social Security Number, or Individual Taxpayer Indentification Number, enter it in Item 19. If the individual does not have an SSN/ITIN, enter NONE.

**Item 24. Date of Birth.** Enter the individual's date of birth. (See the instructions for Item 8.)

**Item 25. If an Individual, Describe Method Used To Verify Identity.** Enter the method used to identify the individual's identity. (See **General Instructions** and the instructions for Item 14.)

**PART II - Amount and Type of Transaction(s)**
Complete Part II to identify the type of transaction(s) and the amount(s) involved.

**Items 26 and 27. Total Cash In/Total Cash Out.** In the spaces provided, enter the total amount of currency received (Total Cash In) or total currency disbursed (Total Cash Out) by the financial institution. If foreign currency is exchanged, use the U.S. dollar equivalent on the day of the transaction (See "Foreign exchange rates"), and complete item 26a or 27a, whichever is appropriate.

If less than a full dollar amount is involved, increase that figure to the next highest dollar. For example, if the currency totals $20,000.05, show the total as $20,001.00.

**Items 26a and 27a. Foreign cash in/Foreign cash out.** If foreign currency is exchanged, enter the amount of foreign currency (Do not convert to U.S. dollars) in items 26a and 27a. Report country of origin in item 29.

**Item 28. Date of Transaction.** Insert eight numerals for each date. (See instructions for Item 8.)

**Item 29. Foreign Country.** If items 26a and/or 27a are completed indicating that foreign currency is involved, check Item 29 and identify the country. If multiple foreign currencies are involved, check box 36 and identify the additional country(s) and/or currency(s) involved.

**Determining Whether Transactions Meet the Reporting Threshold.**

Only cash transactions that, if alone or when aggregated, exceed $10,000 should be reported on the CTR. Transactions shall not be offset against one another.

If there are both Cash In and Cash Out transactions that are reportable, the amounts should be considered separately and not aggregated. However, they may be reported on a single CTR.

If there is a currency exchange, it should be aggregated separately with each of the Cash In and Cash Out totals.

**Example 1:** A person deposits $11,000 in currency to his savings account and withdraws $3,000 in currency from his checking account. The CTR should be completed as follows:

Cash In $11,000 and no entry for Cash Out. This is because the $3,000 transaction does not meet the reporting threshold.

**Example 2:** A person deposits $11,000 in currency to his savings account and withdraws $12,000 in currency from his checking account. The CTR should be completed as follows:

Cash In $11,000, Cash Out $12,000. This is because there are two reportable transactions. However, one CTR may be filed to reflect both.

**Example 3:** A person deposits $6,000 in currency to his savings account and withdraws $4,000 in currency from his checking account. Further, he presents $5,000 in currency to be exchanged for the equivalent in French Francs. The CTR should be completed as follows:

Cash In $11,000 and no entry for Cash Out. This is because in determining whether the transactions are reportable, the currency exchange is aggregated with each of the Cash In and Cash Out amounts. The result is a reportable $11,000 Cash In transaction. The total Cash Out amount is $9,000, which does not meet the reporting threshold. Therefore, it is not entered on the CTR.

**Example 4:** A person deposits $6,000 in currency to his savings account and withdraws $7,000 in currency from his checking account. Further, he presents $5,000 in currency to be exchanged for the equivalent in French francs. The CTR should be completed as follows:

Cash In $11,000, Cash Out $12,000. This is because in determining whether the transactions are reportable, the currency exchange is aggregated with each of the Cash In and Cash Out amounts. In this example, each of the Cash In and Cash Out totals exceed $10,000 and must be reflected on the CTR.

**Items 30-33.** Check the appropriate item(s) to identify the following type of transaction(s):
**30.** Wire Transfer(s)
**31.** Negotiable Instrument(s) Purchased
**32.** Negotiable Instrument(s) Cashed
**33.** Currency Exchange(s)

**Item 34. Deposits/Withdrawals.** Check this item to identify deposits to or withdrawals from accounts, e.g. demand deposit accounts, savings accounts, time deposits, mutual fund accounts, or any other account held at the financial institution. Enter the account number(s) in Item 35.

**Item 35. Account Numbers Affected (if any).** Enter the account numbers of any accounts affected by the transactions that are maintained at the financial institution conducting the transaction(s). If necessary, use additional sheets of paper to indicate all of the affected accounts.

**Example 1:** If a person cashes a check drawn on an account held at the financial institution, the CTR should be completed as follows:

Indicate negotiable instrument(s) cashed and provide the account number of the check.

If the transaction does not affect an account, make no entry.

**Example 2:** A person cashes a check drawn on another financial institution. In this instance, negotiable instrument(s) cashed would be indicated, but no account at the financial institution has been affected. Therefore, Item 35 should be left BLANK.

**Item 36. Other (specify).** If a transaction is not identified in Items 30-34, check Item 36 and provide an additional description. For example, a person presents a check to purchase "foreign currency." If multiple (more than one) foreign currencies are involved in the transaction, enter the amount of the largest foreign currency transaction in item 26a or 27a and that currency's country-code of origin in item 29. Then check box 36 and enter the additional foreign currencies amount(s) and country-code(s) of origin in the space provided.

**PART III - Financial Institution Where Transaction(s) Take Place**

**Item 37. Name of Financial Institution and Identity of Regulator or BSA Examiner.** Enter the financial institution's full legal name and identify the regulator or BSA examiner, using the following codes:

**Regulator or BSA Examiner                              CODE**
Comptroller of the Currency (OCC)..........................1
Federal Deposit Insurance Corporation (FDIC)..........2
Federal Reserve System (FRS)...............................3
Office of Thrift Supervision (OTS)............................4
National Credit Union Administration (NCUA)...........5
Securities and Exchange Commission (SEC).............6
Internal Revenue Service (IRS)................................7
U.S. Postal Service (USPS)....................................8
Commodity Futures Trading Commission (CFTC).......9
State Regulator...................................................10

**Items 38, 40, 41, and 42. Address.** Enter the street address, city, state, and ZIP Code of the financial institution where the transaction occurred. If there are multiple transactions, provide information of the office or branch where any one of the transactions has occurred.

**Item 39. EIN or SSN.** Enter the financial institution's EIN. If the financial institution does not have an EIN, enter the SSN of the financial institution's principal owner.

**Item 43. Routing (MICR) Number.** If a depository institution, enter the routing (Magnetic Ink Character Recognition (MICR)) number.

**SIGNATURE**

**Items 44 and 45. Title and signature of Approving Official.** The official who reviews and approves the CTR must indicate his/her title and sign the CTR.

**Item 46. Date of Signature.** The approving official must enter the date the CTR is signed. (See the instructions for Item 8.)

**Item 47. Preparer's Name.** Type or print the full name of the individual preparing the CTR. The preparer and the approving official may not necessarily be the same individual.

**Items 48 and 49. Contact Person/Telephone Number.** Type or print the name and telephone number of an individual to contact concerning questions about the CTR.

**Paperwork Reduction Act Notice.** The requested information is useful in criminal, tax, and regulatory investigations and proceedings. Financial institutions are required to provide the information under 31 U.S.C. 5313 and 31 CFR Part 103, commonly referred to as the Bank Secrecy Act (BSA). The BSA is administered by the U.S. Department of the Treasury's Financial Crimes Enforcement Network (FinCEN). You are not required to provide the requested information unless a form displays a valid OMB control number. The time needed to complete this form will vary depending on individual circumstances. The estimated average time is 19 minutes. If you have comments concerning the accuracy of this time estimate or suggestions for making this form simpler, you may write to the **Financial Crimes Enforcement Network, P. O. Box 39, Vienna, VA 22183. Do not** send this form to this office. Instead, see **When and Where to File** in the instructions.

**DEFENDANTS' MOTION TO VACATE SEIZURE
WARRANT AND TO MODIFY RESTRAINING ORDER
AND REQUEST FOR AN EVIDENTIARY HEARING**


# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Criminal No. 07-109 - RMC |
| E-GOLD LIMITED, | : | |
| GOLD & SILVER RESERVE, INC., | : | |
| DOUGLAS L. JACKSON, | : | |
| BARRY K. DOWNEY and | : | |
| REID A. JACKSON | : | |
| _____/ | : | |
| related case: | : | |
| | : | |
| In the Matter of the Seizure of | : | |
| Any and all property in/underlying E-GOLD | : | |
| Account **544179** and in/underlying E-GOLD | : | CASE NUMBER: |
| account **109243**, held by E-GOLD, Ltd. or | : | 07-167-M-01 |
| Gold & Silver Reserve, Inc. on behalf | : | |
| of **E-GOLD, Ltd.** | : | |
| _____/ | | |

## AFFIDAVIT ON BEHALF OF E-GOLD, LTD.

I, DR. DOUGLAS JACKSON, hereby affirm under penalties of perjury that the matters and facts set forth herein are true and correct to the best of my knowledge:

1.      I am over 18 years of age and I am competent to testify.

2.      I am a director of e-gold Ltd. and authorized to give statements on behalf of e-gold Ltd. The other two directors of e-gold Ltd. are Reid Jackson and Barry Downey.

3.      e-gold Ltd. is owned by two trusts: The Jackson Family Trust and The Downey Family Trust. I have no control over any disbursements made from either trust, and I have never received any such disbursements.

4.      On April 26, 2007, e-gold Ltd. received a seizure warrant ordering the liquidation of e-gold account number 544179. That account was e-gold Ltd.'s operating account, and contained 1122.52 troy ounces of e-gold, 3204.97 troy ounces of e-silver, 14.29 troy ounces of e-platinum and 3.5 troy ounces of e-palladium.

5.  At the close of business on April 26, 2007, gold had a value of $673.00 per troy ounce, giving the e-gold in e-gold account no. 544179 a USD value of $755,455.96.

6.  At the close of business on April 26, 2007, silver had a value of $13.66 per troy ounce, giving the e-silver in e-gold account no. 544179 a USD value of $43,779.89.

7  At the close of business on April 26, 2007, platinum had a value of $1,300.00 per troy ounce, giving the e-platinum in e-gold account no. 544179 a USD value of $18,577.00.

8.  At the close of business on April 26, 2007, palladium had a value of $374.00 per troy ounce, giving the e-gold in e-palladium account no. 544179 a USD value of $1,309.00.

9.  The total value of the e-metal in e-gold account 544179 at the time of the freeze was $819,121.85.

10.  The e-gold in e-gold account no. 544179 was liquidated and turned over to the Secret Service via bank wire as soon as possible. However, the other forms of e-metal in that account could not be liquidated.

11.  First of all, all of the silver backing e-silver is located in a Transguard storage facility in Dubai. Mr. Hil de Frias – a trustee of the Trust residing in Bermuda – must sign off on the liquidation of any such silver. Mr. de Frias, however, has been completely uncooperative with the Defendants' substantial efforts to comply with the seizure warrants and has refused to perform any of the tasks assigned to him under the terms of the e-gold Bullion Reserve Special Purpose Trust.

12.  Second, the platinum backing e-platinum is currently the subject of ongoing litigation in Canada. It therefore cannot be liquidated.

13.  Finally, like the silver backing e-silver, the palladium backing e-palladium is located in the Transguard storage facility and cannot be liquidated because of the problems related to Mr. de Frias. Additionally, because the seizure did not call for the liquidation of enough e-palladium to warrant the sale of a full bar of palladium, the company could not perform such a transaction.

2

14.    As of May 28, 2007, e-gold Ltd. had 1136.779078 troy ounces of e-gold in its remaining e-gold accounts, worth a total of USD $745,386.05. e-gold Ltd. does not maintain any bank accounts and never has.

15.    E-gold, on an average monthly basis, makes the following average monthly expenditures:

| | |
|---|---|
| Super Originator Expense: | $76,651.75 |
| Operator Fee: | $70,900.00 |
| Professional Fees: | $3,879.77 |
| Software Engineering: | $6,567.00 |
| Spread Expense: | $280.66 |
| Storage Fees: | $7,119.89 |
| Bullion Storage: | $852.60 |
| Web Hosting: | $3,543.22 |
| Total Expense: | $169,795.08 |

On a monthly basis, the majority of those expenditures – including the majority of the Super Originator Expense and all of the Operator Fee – is paid to Gold & Silver Reserve, Inc. e-gold Ltd. is now Gold & Silver Reserve, Inc.'s primary source of income.

16.    The law firms participating in the defense of this case are Fuerst Humphrey Ittleman, PL, Kramon & Graham, PA, and Lankford, Coffield & Reed. However, as articulated by Mr. Fuerst during the status conference held before the Court on May 18, 2007, as a result of the seizures and Post-Indictment Restraining Order at issue in this case, e-gold Ltd will not be able to afford its attorneys fees.

17.    The lawyers in this case have advised e-gold Ltd. that the total cost of defending this case will exceed $3.5 million. As a direct result of the seizures of a) G&SR's Regions Bank bank account, b) G&SR's SunTrust bank account, c) G&SR's operating account, and d) e-gold Ltd.'s operating account, e-gold Ltd. will not be able to afford to pay that sum.

FURTHER AFFIANT SAYETH NOT.

6/1/07
Date

DR. DOUGLAS JACKSON
Director, e-gold Ltd.

**DEFENDANTS' MOTION TO VACATE SEIZURE
WARRANT AND TO MODIFY RESTRAINING ORDER
AND REQUEST FOR AN EVIDENTIARY HEARING**

# EXHIBIT 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Criminal No. 07-109 - RMC |
| E-GOLD LIMITED, | : | |
| GOLD & SILVER RESERVE, INC., | : | |
| DOUGLAS L. JACKSON, | : | |
| BARRY K. DOWNEY and | : | |
| REID A. JACKSON | : | |
| _____/ | : | |
| related case: | : | |
| | : | |
| In the Matter of the Seizure of | : | |
| Any and all property in/underlying E-GOLD | : | |
| Account **544179** and in/underlying E-GOLD | : | CASE NUMBER: |
| account **109243**, held by E-GOLD, Ltd. or | : | 07-167-M-01 |
| Gold & Silver Reserve, Inc. on behalf | : | |
| of **E-GOLD, Ltd.** | : | |
| _____/ | : | |

### AFFIDAVIT ON BEHALF OF GOLD & SILVER RESERVE, INC.

I, DR. DOUGLAS JACKSON, hereby affirm under penalties of perjury that the matters and facts set forth herein are true and correct to the best of my knowledge:

1.    I am over 18 years of age and I am competent to testify.

2.    I am an officer and director of Gold & Silver Reserve, Inc. (G&SR) and authorized to give statements on behalf of G&SR. The other two directors of G&SR are Reid Jackson and Barry Downey.

3.    G&SR is a closely held corporation of which I (jointly with my wife) am approximately a 57% shareholder. The three directors of G&SR own approximately 80% of the shares of stock that G&SR has issued.

4.    On April 26, 2007, G&SR received a seizure warrant ordering the liquidation of e-gold account number 109243. That account was G&SR's operating account, and contained 1084.48 troy ounces of e-gold, 25,835.44 troy ounces of e-silver, 218.73 troy ounces of e-platinum and 55.32 troy ounces of e-palladium.

5.   At the close of business on April 26, 2007, gold had a value of $673.00 per troy ounce, giving the e-gold in e-gold account number 109243 a USD value of $729,855.04.

6.   At the close of business on April 26, 2007, silver had a value of $13.66 per troy ounce, giving the e-silver in e-gold account no. 109243 a USD value of $352,912.11.

7   At the close of business on April 26, 2007, platinum had a value of $1,300.00 per troy ounce, giving the e-platinum in e-gold account no. 109243 a USD value of. $284,349.00.

8.   At the close of business on April 26, 2007, palladium had a value of $374.00 per troy ounce, giving the e-gold in e-palladium account no. 109243 a USD value of $20,689.68.

9.   The total USD value of the e-metal in e-gold account 109243 at the time the account was frozen was $1,387,805.83.

10.   G&SR has two primary sources of income. First, G&SR receives payments from e-gold Ltd. (also a defendant in this case) in the form of Operator fees and Super Originator fees. Cumulatively, these fees, paid on a monthly basis, have been in the range of $108,000 to $137,000 per month. (G&SR receives these fees in e-gold.) G&SR also generates revenue in the form of e-gold when it (doing business as OmniPay) processes InExchanges and OutExchanges for its customers.

11.   However, as of today, both sources and forms of income have already been, and will continue to be, substantially impaired. First, without so much as a hearing, the government has seized e-metal and U.S. Dollars valued at the time of the seizures at approximately $3.055 million from G&SR and e-gold Ltd. Second, because of the announcement of this criminal action, numerous e-gold account holders world-wide abandoned the e-gold system. Consequently, as demand for e-gold and e-gold in circulation diminishes, so too does e-gold Ltd.'s ability to earn an income and pay G&SR for services rendered. Additionally, following the government's announcement of the indictment, SEB Bank closed the sole bank account that GSR had available for the processing of InExchanges and OutExchanges.

12.   G&SR has been unable to find another bank to use for purposes of processing the InExchanges and OutExchanges necessary for the operation of its OmniPay business. Without such a bank account, G&SR cannot perform its function as the primary dealer for e-gold Ltd. issued currencies. This revenue is critical to G&SR., and the role that G&SR serves is critical to e-gold Ltd. G&SR has been forced to lease the OmniPay brand to a group of African investors while G&SR and its directors clear themselves of the charges sponsored by the government in

this case. G&SR has contracted to serve as the Operator of OmniPay but will not be a party to actual exchanges.

13.   As of May 28, 2007, G&SR had the USD equivalent of $484,064.31 in its remaining bank accounts. Additionally, as of May 28, 2007, G&SR had the USD equivalent of $523,678.77 of e-gold (798.656035 troy ounces) in its remaining e-gold accounts.

14.   As of May 28, 2007, G&SR had the following illiquid assets:

| Illiquid Asset | USD Equivalent | Why Illiquid |
|---|---|---|
| e-silver (22,784.5104 troy ounces) | $294,603.73 | All of the physical bullion backing the e-metals is located in a Transguard storage facility in Dubai. Mr. Hil de Frias – a trustee of the Trust residing in Bermuda – must sign off on the disposition of any such bullion. Mr. de Frias, however, has been completely uncooperative with the Defendants' substantial efforts to comply with the seizure warrants and has refused to perform any of the tasks that he is to perform under the terms of the e-gold Bullion Reserve Special Purpose Trust. Additionally, the amount of e-palladium held by G&SR is insufficient to warrant the liquidation of a full bar of palladium. Finally, the platinum backing e-platinum is currently the subject of ongoing litigation in Canada. |
| e-palladium (65.635473 troy ounces) | $24,153.86 | |
| e-platinum (46.180766 troy ounces) | $58,788.11 | |

15.   As of May 28, 2007, G&SR's available liquid assets were immediately offset by (USD Equivalent) $349,850.04 in pending OutExchange liabilities and (USD Equivalent) $166,193.55 in pending InExchange liabilities.

16.   Although G&SR's prospective income is shrinking, its liabilities and average monthly expenses are not. G&SR requires approximately $186,569.74 per month to pay for ordinary expenses (not including attorneys fees). These expenses are as follows:

| Expense | Cost per month |
|---|---|
| Support | $141.35 |
| Penalties | $100.00 |
| Advertising | $533.08 |
| Bank Service Charges | $105.67 |
| Business Development | $148.33 |

| Computer Supplies | $522.48 |
|---|---|
| Outside IT Services | $15,720.00 |
| Copier Contract | $109.35 |
| Dues and Subscriptions | $452.50 |
| Equipment Rental | $124.13 |
| Insurance | $479.12 |
| Interest Expense | $473.41 |
| Internet Connection/Protection | $7,174.05 |
| Licenses and Permits | $160.60 |
| Maintenance | $270.30 |
| Miscellaneous Costs and Expenses | $1,979.53 |
| Office Supplies | $573.03 |
| Payroll Taxes | $4,937.14 |
| Postage and Delivery | $1,884.71 |
| Professional Fees[1] | $50,810.97 |
| PR Support | $18,000.00 |
| Rent | $10,210.72 |
| Repairs | $47.33 |
| Salaries and Wages | $38,244.72 |
| Suspense | $4,363.18 |
| Taxes | $416.67 |
| Telephone | $1,900.00 |
| Travel | $19,963.23 |
| Utilities | $950.35 |
| Web Hosting | $3,347.74 |
| Spread Expense on OutExchanges | $2,426.05 |
| **Total Average Monthly Expenses** | **$186,569.74** |

---

[1] These professional fees do not include attorneys fees related to the forfeiture action, the criminal action or the government's investigation into e-gold or G&SR.

17. As of May 28, 2007, G&SR also had the following notes payable:

| Note | Total Amount Payable |
|---|---|
| Barry Downey (USD) | $61,317.40 |
| Douglas Jackson (USD) | $134,485.48 |
| Jackson & Escher (USD) | $2.09 |
| Reid Jackson and Richard Escher (USD) | $17,656.50 |
| e-gold Ltd. | $812,403.96 |
| Jackson & Escher 401(k) | $103,279.98 |
| Reid Jackson and Richard Escher XAU | $646,076.99 |
| Barry Downey 401(k) | $206,279.94 |
| SunTrust Bank | $33,930.47 |
| **Total Notes Payable** | **$2,015,432.80** |

18. As of May 28, 2007, G&SR also had the following accounts payable:

| Account Payable | Amount |
|---|---|
| AT&T | - $2.51 |
| Baxter, Baker, Sidle & Jones, PA | $215.15 |
| CityNet | $411.20 |
| Drinker, Biddle & Reath LLP | $33,168.04 |
| Express Personnel Services | $1,044.00 |
| K&K Office Supply of Brevard, Inc. | $115.37 |
| FP&L (Florida Power and Light) | $0.01 |
| Ken Williams Air Conditioning | $96.00 |
| McBride Woodbridge Marketing LLC | $825.50 |
| Fuerst Humphrey Ittleman, PL | $159,223.68 |
| Paul J. Pape, Esq. | - $8.93 |
| Purchase Power | - $4.00 |
| Reed, Henzell & Shott, PA | $2,552.39 |
| Rhonda Reed | $3,014.00 |
| TelCove Operations | $1,619.68 |

| Sheppard, Brett, Steward, Hersch & Kinsey | $778.42 |
|---|---|
| **Total Accounts Payable** | **$203,048.00** |

19. Consistent with the laws of the state of Delaware, it is G&SR's corporate policy to advance attorneys fees to G&SR directors and employees when such fees are incurred and when such fees relate to a matter where the director or employee was acting on behalf of the company and in the company's best interests.

20. During the forfeiture proceeding that proceeded this case, G&SR paid for the attorney's fees for Reid Jackson, Barry Downey, and me, as well as each of the G&SR employees who were subpoenaed to testify before the grand jury in Washington, D.C.

21. In this case, the shareholders of G&SR have elected to continue to advance attorneys fees for Reid Jackson, Barry Downey, and me, and have also – once again – elected to pay for the attorneys fees for each of the G&SR employees and contractors who will be subpoenaed by the government to testify during the government's case-in-chief.

22. The law firms participating in the defense of this case are Fuerst Humphrey Ittleman, PL, Kramon & Graham, PA, and Lankford, Coffield & Reed. However, as articulated by Mr. Fuerst during the status conference held before the Court on May 18, 2007, as a result of the seizures and Post-Indictment Restraining Order at issue in this case, G&SR does not know how – or whether – it will be able to afford its attorneys fees.

23. The lawyers in this case have advised G&SR that the total cost of defending this case – including attorneys fees for the principal defendants, attorneys fees for G&SR employees who will be called to testify at trial by the government, and the storage and management of more than 3 terabytes of information – will cost in excess of $3.5 million. As a direct result of the seizures of a) G&SR's Regions Bank bank account, b) G&SR's SunTrust bank account, c) G&SR's operating account, and d) e-gold Ltd.'s operating account, G&SR cannot afford to pay that sum.

FURTHER AFFIANT SAYETH NOT.

6|11|07

Date

DOUGLAS JACKSON, M.D.
Director, Gold & Silver Reserve, Inc.

**DEFENDANTS' MOTION TO VACATE SEIZURE
WARRANT AND TO MODIFY RESTRAINING ORDER
AND REQUEST FOR AN EVIDENTIARY HEARING**


**EXHIBIT 5**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : |
| | : Criminal No. 07-109 - RMC |
| E-GOLD LIMITED, | : |
| GOLD & SILVER RESERVE, INC., | : |
| DOUGLAS L. JACKSON, | : |
| BARRY K. DOWNEY and | : |
| REID A. JACKSON | : |
| | / |

| | |
|---|---|
| related case: | : |
| | : |
| In the Matter of the Seizure of | : |
| Any and all property in/underlying E-GOLD | : |
| Account 544179 and in/underlying E-GOLD | : CASE NUMBER: |
| account 109243, held by E-GOLD, Ltd. or | : 07-167-M-01 |
| Gold & Silver Reserve, Inc. on behalf | : |
| of E-GOLD, Ltd. | : |
| | / |

## AFFIDAVIT OF DOUGLAS JACKSON

I, Douglas Jackson, hereby, affirm under the penalties of perjury that the facts set

forth herein are true and correct upon personal knowledge:

1.    I am over 18 years of age and competent to testify.

2.    I am the founder and Chairman of the Board of Gold & Silver Reserve,

Inc. ("G&SR") d/b/a Omnipay. I am also a director of e-gold Limited ("e-gold Ltd."). e-

gold Ltd. is owned by two trusts: The Jackson Family Trust and The Downey Family

Trust. I have no control over any disbursements made from these (or any other) trusts, and

I have never received any disbursements from them. I am simply one of several potential

beneficiaries under the Jackson Family Trust, along with other members of my family.

06676/0/00276905.WPDv1

3.    I am a physician, board-certified in Radiation Oncology. I received my

M. D. from the Hershey Medical Center of Pennsylvania State University in 1982.

Following Internship in General Surgery at the Eisenhower Army Medical Center, I

completed my residency (on active duty in the Army) at the National Cancer Institute

(NIH) in 1986. I continued to practice medicine in the United States Army Medical Corps

as Chief of Radiation Oncology at the Brooke Army Medical Center until my honorable discharge

in 1992. I then entered private practice as the Medical Director for Radiation Oncology at

the Holmes Regional Medical Center in Melbourne, Florida.

4.    In 1995, I began the creative process and work necessary to establish

e-gold. To do so, I began to contribute all of my income in excess of my living expenses

to G&SR, the company that created and initially ran the e-gold system.  In 1999, e-gold

Ltd. was established to serve as the General Contractor responsible for the performance

of the e-gold Account User Agreement.

5.    In 1998, at the peak of my medical career, I left the practice of medicine in

order to devote my full-time attention to building and improving the e-gold system. I

allowed my medical license to lapse in 2000 because I did not have sufficient time to

pursue the continuing medical education necessary to sustain my license. Thus, I no

longer had any independent source of income other than any money that I was paid,

when income allowed, from G&SR..

06676/0/00276905.WPI7v1                    2

6.      After leaving the practice of medicine in 1998, I began to liquidate every asset that I owned. These included a second home (from which I had to relocate my parents, who were living in that home at that time), my interest in my medical practice; my retirement account and the IRAs that I owned jointly with my wife; and any other investments that we had.

7.      Since liquidating all of those assets, I began to accrue debt on my credit cards to pay for my living expenses and to loan money to G&SR when and as necessary. At the moment, my personal credit card debt stands at approximately $130,000, and I am being charged interest on that debt by the credit card companies at rates approaching 40% interest.

8.      In February 2007, the bank at which I had been a customer since 1992 closed my account because of excessive overdrafts and my increasing debt.

9.      In May 2004, I was left with no alternative but to sell my primary residence, as I was unable to continue making my mortgage payments and needed the equity to pay down my increasing credit card debt.

10.     After selling my home, we rented a house. However, after some time I could no longer afford that rent and, in May 2006, I moved my family to a much smaller home with a monthly rent of $1,750. The annual lease on that home expired in May 2007 and I am still uncertain about how long, if at all, we may be able to extend that lease. We

are currently living in the house on a month-to-month rental basis, so long as I am able to continue paying that rent. I am not certain how much longer I will be able to do so.

11.    Having liquidated all of my significant assets, my wife and I do not have any other assets of much value. We have old furniture and other household accessories. All of them are old; we have not bought anything of any significant value new in more than five years. My wife has a Ford Explorer with 135,000 miles on it. It currently needs mechanical work. I drive a Chrysler 300C, but the balance of the car loan - $22,000 - exceeds the current value of the car.

12.    The only asset that I have is the approximately $150,000 that G&SR owes to me and my wife and the stock ownership interests that I hold together with my wife in G&SR. We jointly own approximately 57% of the outstanding stock of G&SR. Thus, the only assets that my wife and I have, beyond the few measly ones described above, are dependent solely upon the viability of G&SR and e-gold Ltd.

13.    The primary income that I have received since leaving my medical practice in 1998 has been a meager salary draw paid by G&SR – just enough to cover the minimal living expenses that we needed. Beginning in 2005 I also began to receive a revenue stream derived from e-gold's Referral Incentive Program. This secondary income stream, in e-gold, averaged about $1000 (worth) per month, with a maximum of about $2000 per month. In 2006, G&SR was able to service its debt to me with monthly payments ranging from $1000 to $4000. This debt service has of course ceased with the latest

seizures and any e-gold I continue to accrue is also illiquid because of G&SR's being driven from the OmniPay exchange business. My wife, also performs part-time work for G&SR, and received a bi-weekly paycheck from G&SR of about $300. Together, since 2001, my wife and I have never received more than $150,000 per year from G&SR [less than a third of my income ten years ago], in fact most years the combined total has been around $80,000, an amount insufficient to allow me to cover all of our mounting expenses and accruing debt. .

14.    If my wife and I cease to receive our paychecks from G&SR, we will not have funds to even pay our rent or to otherwise support our family. My wife and I have two sons, ages 11 and 15, who are wholly dependent upon us for their support. There are no assets in their names, aside from perhaps small savings accounts of no more than $500 of value that one has in an e-gold account. We have no college savings plans for them and we no longer have any retirement, pension or 401(k) accounts for ourselves. Also, our medical insurance exists through G&SR and would terminate if G&SR ceases to operate..

15.    My wife and I are simply destitute and will have absolutely no prospects to provide even food or shelter for our family if the ability of G&SR and e-gold Ltd. to continue operating is ended. I certainly do not have assets to pay counsel to retain me in this baseless action.

6 | 1 | 07
_____
Date

_____
Douglas Jackson, M.D.

**DEFENDANTS' MOTION TO VACATE SEIZURE
WARRANT AND TO MODIFY RESTRAINING ORDER
AND REQUEST FOR AN EVIDENTIARY HEARING**

# EXHIBIT 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA              :
                                      :
            v.                        :
                                      :   Criminal No. 07-109 - RMC
E-GOLD LIMITED,                       :
GOLD & SILVER RESERVE, INC.,          :
DOUGLAS L. JACKSON,                   :
BARRY K. DOWNEY and                   :
REID A. JACKSON                       :
_____/
                                      :
related case:                         :
                                      :
In the Matter of the Seizure of       :
Any and all property in/underlying E-GOLD :
Account **544179** and in/underlying E-GOLD :   CASE NUMBER:
account **109243**, held by E-GOLD, Ltd. or :   07-167-M-01
Gold & Silver Reserve, Inc. on behalf :
of **E-GOLD, Ltd.**                   :
_____/

## AFFIDAVIT OF REID A. JACKSON

I, Reid A. Jackson, hereby, affirm under the penalties of perjury that the facts set

forth herein are true and correct upon personal knowledge:

1.     I am over 18 years of age and competent to testify.

2.     I am a stockholder of Gold & Silver Reserve, Inc. ("G&SR"). I own

approximately 150,000 shares of stock of G&SR (about 3.65% of the corporation). If

G&SR ceases to operate, my stock ownership interest in G&SR will be rendered

valueless.

3.     I am also a 50% stockholder and employee of Jackson & Escher, Inc.

Jackson & Escher, Inc. performs services for G&SR. I receive a salary from Jackson &

Escher, Inc. averaging approximately $4,166.67 monthly before taxes. That salary is paid

from monies that Jackson & Escher, Inc. receives from G&SR, which is Jackson &

Escher, Inc.'s only client. If G&SR ceases to operate, Jackson & Escher, Inc. will have no

other source of business, and in turn neither Richard Escher or myself will receive any

salary.

4.      Richard Escher and I have jointly made USD and XAU denominated loans

to G&SR totaling approximately USD 672,846.10 in principal and unpaid interest. If

G&SR ceases to operate and is unable to repay these loan, we will lose the overwhelming

majority of our life savings.

5.      The only other assets that I have are the following:

   a.   A 50% interest in a joint checking account that I own jointly with
        Richard Escher. The value of that checking account is currently
        USD 54,695.95.

   b.   A 50% interest in several e-gold accounts that I own jointly with
        Richard Escher. The current value of those accounts is USD
        69,620.94.

   c.   A 50% interest in a 1992 Infiniti, the value of which is
        approximately USD 2,000.00.

   d.   A Jackson & Escher, Inc. 401(k) plan currently valued at USD
        11,312.83.

   e.   An IRA currently valued at USD 46,213.64.

6.      My monthly expenses include USD 1,114 of rent, as well as miscellaneous

{06676/0/00285623.DOCvl}

2

other expenses of approximately USD 6,000.

7.      The charges that the government has brought against me, while unfounded, are serious and complex. Throughout the government's investigation, I have been represented in this matter, by Mitchell S. Fuerst and Andrew S. Ittleman, currently of the law firm of Fuerst Humphrey Ittleman P.L. These attorneys are intimately familiar with the businesses of e-gold Ltd. and G&SR and my relationship with them. Their continued representation is critical to me being able to defend myself in this action from the government's unfounded charges. I do not have the funds available to pay for their ongoing representation.

6/1/2007
_____
Date

Reid A. Jackson

**DEFENDANTS' MOTION TO VACATE SEIZURE
WARRANT AND TO MODIFY RESTRAINING ORDER
AND REQUEST FOR AN EVIDENTIARY HEARING**

# EXHIBIT 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA                    :

           v.                                          :
                               :

E-GOLD LIMITED,                             : Criminal No. 07-109 - RMC
GOLD & SILVER RESERVE, INC.,                :
DOUGLAS L. JACKSON,                         :
BARRY K. DOWNEY and                         :
REID A. JACKSON                             :
_____/   :

related case:                              :
                                           :
In the Matter of the Seizure of            :
Any and all property in/underlying E-GOLD  :
Account **544179** and in/underlying E-GOLD :
account **109243**, held by E-GOLD, Ltd. or  :  **CASE NUMBER:**
Gold & Silver Reserve, Inc. on behalf      :      07-167-M-01
of **E-GOLD, Ltd.**                          :
_____/

## AFFIDAVIT OF BARRY K. DOWNEY

    I, Barry K. Downey, hereby affirm under the penalties of perjury that the matters

and facts set forth herein are true and correct upon personal knowledge:

    1.    I am over 18 years of age and competent to testify.

    2.    I am an attorney licensed to practice law in the State of Maryland and the

District of Columbia.

    3.    I am a principal/shareholder in the law firm of Smith & Downey, P.A. in

Towson, Maryland, where I maintain my practice.

    4.    My wife and I jointly own approximately twenty percent of the outstanding

06676/0/00285038.WPDv1

shares of stock of Gold & Silver Reserve, Inc., a Delaware corporation. G&SR. While I am an officer and director of G&SR, I have been to G&SR's office less than two times per year on average.

5.    I am a director of e-gold Limited ("e-gold Ltd."). e-gold Ltd. is owned by two trusts: The Downey Family Trust and The Jackson Family Trust. I have no control over any disbursements made from that trust, and I have never received any disbursements from it. I am one of several potential beneficiaries under the Downey Family Trust, along with other members of my family.

6.    My sole source of income and means of earning a livelihood for myself and my family (aside from the income described at the end of this paragraph) are the earnings that I receive from my practice of law. My wife does not work outside the home and, thus, does not receive any independent income. In addition, I own an e-gold account that receives "originator" shares of "spend fees" from the accounts for which it is the originator. This account has generated annual e-gold income equivalent to no more than approximately $20,000 to $30,000 per year.

7.    We have two children: a daughter, age 20, who is attending nursing school, and a son, age 14, who is a high school sophomore.

8.    Before my indictment in this case, the monthly expenses that I was responsible for paying on behalf of my family totaled nearly $27,000. They include: a mortgage payment of $3,690.63; payment on a home-equity loan in the amount of $2,000; real estate taxes and homeowners insurance of $650; automobile leases totaling $1,885;

06676/0/00285038.WPDv1

automobile insurance of $300; payments for credit card debt of $10,000; life and
disability insurance payments of $723; and miscellaneous other payments and living
expenses. In addition to all of the above, I am also incurring monthly fees of
approximately $10,000 to sustain litigation that I have been forced to undertake to clarify
the property lines and property rights on my family's home. Until that litigation is
concluded, I will be unable to sell my home, certainly not for anything near its fair market
price.

9.      The charges that the government has brought against me, while unfounded,
are serious and complex. Throughout the government's investigation, I have been
represented in this matter, initially by Mitchell S. Fuerst and Andrew S. Ittleman,
currently of the law firm of Fuerst Humphrey Ittleman P.L. and now by Aron U. Raskas
of Kramon & Graham, P.A. in Baltimore, Maryland. These attorneys are intimately
familiar with the businesses of e-gold Ltd. and G&SR and my relationship with them, and
it is therefore important that Mr. Raskas and his partner, James P. Ulwick, of Kramon &
Graham, P.A. represent me in defending against these charges. Any new lawyers coming
into this case would be at a distinct disadvantage and would not be able to provide me
with adequate representation such as that which my current lawyers can provide.

10.     To represent me in this case on a going-forward basis, Kramon & Graham,
P.A. has advised that it would require a retainer in the amount of $1,000,000. I do not
have the funds available to pay such a retainer.

11.     My gross income over recent years (from my law firm and my e-gold
06676/0/00205028.WPD+1                              3

_____

originator account) has been approximately $600,000 per year. After taxes and other
deductions, my net income has ranged from approximately $250,000 to approximately
$300,000. This year, given the action that the government has taken against me – and,
particularly, the highly publicized manner in which it has done so, such as by issuing an
inflammatory press release that generated subsequent articles in the media alleging
criminal liability on my part – my income will be substantially less. As an initial matter,
the other shareholders in my firm met after learning of the government's action and voted
to change the manner in which my law firm's profits are split. While previously I
received 1/3 of the firm's profits, as of May 1, 2007, my share of the profits has been
reduced to an estimated 1/6 of the firm's profits. Furthermore, the charges that the
government has brought against me will require me to spend substantial amounts of my
time consulting with my lawyers and otherwise assisting in my defense. This will reduce
the amount of time that I can spend on billable law firm matters, and that will, in turn,
drastically affect and reduce my compensation. Finally, unless the charges against me are
promptly dismissed, it is likely that some of my clients will seek counsel elsewhere.

12.     Even if my income this year would not be reduced – which it certainly will
– I would not have funds to hire counsel to defend me in this action. My income in past
years has been sufficient to meet the monthly expenses listed above, but I have not had
excess income to use for savings or investments.

13.     The only assets that I hold in my own name are a life insurance policy with
a cash value of approximately $30,000 and my retirement account. As of this date, the
06676/0/00205028.WPD+1                              4

total value of my retirement account is approximately $400,000. However, $206,279.94 of that balance is in the form of a note payable from G&SR.

14.    Any other assets in which I have an interest are owned jointly with my wife. They are 882,400 shares of G&SR; and a loan in the amount of $61,317,40 due and payable to us from G&SR. Obviously, these assets are quickly becoming worthless because the government's seizures are causing the demise of e-gold, Ltd. and G&SR. My wife and I also own time share points worth approximately $15,000; and personal property of approximately $75,000.

15.    I estimate that the value of our home is approximately $850,000. Yet, at the moment, until the cloud on our title is resolved in the ongoing civil litigation, it would be impossible to sell or refinance our home at anything close to its actual value. Furthermore, the home is encumbered by substantial debt. There is a first mortgage in the amount of $613,659 and a second, home equity loan in the amount of $72,481.

16.    I am currently indebted for legal fees of approximately $70,000 relating to the ongoing litigation concerning our home. I will be required to pay the amounts noted above to pay off the debt and sustain the litigation.

Date: June 1 2007                               Barry K. Downey

**DEFENDANTS' MOTION TO VACATE SEIZURE WARRANT AND TO MODIFY RESTRAINING ORDER AND REQUEST FOR AN EVIDENTIARY HEARING**

**EXHIBIT 8**

SEB Account closure.WTROTTER 050807.txt
From: Wanda Trotter [wtrotter@g-sr.com]
Sent: Tuesday, May 08, 2007 9:51 AM
To: Andrew Ittleman
Cc: 'Reid Jackson'
Subject: SEB Account closure

Importance: High

   Settings
Logout


   Mailbox    Payments    Queries    Contracts    Investments    e-Services
Main page

Domestic_Cross-border.._Other.._E-bills.._Beneficiaries_Confirmation of
payments_Import.._ Balance_Account statement_Bank cards_Pending
payments_Currency rates_Other.._
Cards.._Orders.._Accounts/deposits.._Loans.._Mobile phone.._Other
contracts.._Reports_ Statement_Portfolio_Performance of
portfolio_Transactions.._Balancing of Liquidity Fund_
E-Maksuamet_Elion_Haigekassa_Eesti Energia E-Net_IF-kindlustus_iPlanner_
Buy-sell funds

Buy-sell shares

Transactions with third parties

Buy-sell options

Change of fund units

Subscription
Bank cards

Debit card application

U-Kaart application

Credit card application
Current account opening

Securities safekeeping account opening

Deposits                                   .

Term deposit

Operating deposit

Investment Deposit
Loans

Guaranteed loans

Leasing

Factoring

Loan and leasing applications

Guaraantees/Collections
Mobile bank

SEB Account closure.WTROTTER 050807.txt

Notification
Interest CAP
Direct payments

Standing payments

Staggering of commision fees
EU payment

Cross-border
E-bills

E-bill subscription
Imported payments

Load File
Consolidated payment

Currency exchange

Cross-border payments declaration
Authorised users

Cross-border payments declaration

History of activities



GOLD & SILVER RESERVE INC

Tuesday, 08.05.2007, time:16.41
Inbox


Inbox


Outbox


New message


Date 08.05.2007
Sender KERLY KUKK
Subject Notice of current account closure
Message Our 08.05.2007

Dear customer,

Page 2

SEB Account closure.WTROTTER 050807.txt
To comply with the Money Laundering and Terrorist Financing
Prevention Act, effective in the Republic of Estonia, the credit
institutions, operating in Estonia are obliged to possess
thorough information on the customer's field of activity and
business.

Based on the information, published on the Internet at
http://www.zone-h.org/content/view/14732/31/, which refers to
connection of Gold & Silver Reserve Inc with money laundering,
SEB Eesti Ühispank has decided, aiming at avoidance of
reputation risk, to terminate the current account(s), concluded
with Gold & Silver Reserve Inc and close the current account(s)
opened in the name of Gold & Silver Reserve Inc, starting from
May 15th 2007, on the grounds stipulated in Clause 10.2.2 of the
General Terms and Conditions of SEB Eesti Ühispank.

According to Clause 10.2.2 of the General Terms and Conditions
of SEB Eesti Ühispank, the bank has the right to unilaterally
terminate a contract concluded with the customer without
following the term of advance notice, if the client materially
violates his contractual obligation; the violation includes also
suspicions about legitimacy of the customer's business activity
or suspected money laundering for some other reason.

Please end settlements in the accounts, opened with SEB Eesti
Ühispank in the name of Gold & Silver Reserve Inc by the said
term and transfer the funds in the account to another account
manager.


Yours sincerely,


Tarmo Kährik
Head of Security Analysis department


Taavi Eplik 66 55 500


--------------------------------------------------------------------------------
----

    Back

     New message

     Delete


    —

» Account statement from acount No. 10220051104013 (01/03/06 - 31/03/06)
Open >>

SEB Account closure.WTROTTER 050807.txt


-----------------------------------------------------------------------
----

SEB Eesti Ühispank, Tornimäe 2, Tallinn 15010 BIC: EEUHEE2X
Business-customers' advisory phone: (+372) 66 55 444, e-mail: info@seb.ee

-----