# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | **:** | |
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | **Criminal No. 07-109 (RMC)** |
| **v.** | **:** | |
| | **:** | |
| **E-GOLD, LTD.** | **:** | |
| **GOLD & SILVER RESERVE, INC.,** | **:** | |
| **DOUGLAS L. JACKSON,** | **:** | |
| **BARRY K. DOWNEY, and** | **:** | |
| **REID A. JACKSON,** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |
| | **:** | |

## GOVERNMENT'S RESPONSE TO DEFENDANTS'
## MOTION TO VACATE SEIZURE WARRANT
## AND TO MODIFY RESTRAINING ORDER AND
## REQUEST FOR AN EVIDENTIARY HEARING

The United States of America, by and through its attorneys, the United States Attorney

for the District of Columbia and the United States Department of Justice, hereby files its

response to Defendants' Motion to Vacate Seizure Warrant and to Modify Restraining Order and

Request for an Evidentiary Hearing ("Defendant's Motion").  For the reasons set forth below,

Defendants' Motion is without merit and should be denied.

## INTRODUCTION

A.     Procedural History

Defendants e-gold, Ltd., Gold & Silver Reserve, Inc. ("GSR"), Douglas Jackson, Barry

Downey, and Reid Jackson were indicted by a federal grand jury in this district on April 24, 2007

for money laundering conspiracy in violation of 18 U.S.C. §1956; conspiracy to operate an

unlicensed money transmitting business in violation of 18 U.S.C. §§ 371 and 1960; operation of

an unlicensed money transmitting business in violation of 18 U.S.C. § 1960; and, money

transmitting without a license in violation of D.C. Code § 2-1002.  The indictment contains a forfeiture allegation seeking forfeiture of all assets of the defendant corporations on the basis of the money laundering and operation of an unlicensed money transmitting business violations.

On April 25, 2007, this Court issued a restraining order in this criminal case and civil seizure warrants for numerous e-gold accounts, including accounts 544179 and 109243, both of which belong to the corporate defendants.  The funds in those two e-gold accounts, amounting to $1,481,976.38, were received by the Government on May 11, 2007.  The criminal restraining order required the defendants to provide information about assets subject to forfeiture and comply with certain notice and approval requirements before disposing of their physical precious metal holdings.  On June 1, 2007, defendants filed their Motion to Vacate Seizure Warrant and to Modify Restraining Order[1] and Request for an Evidentiary Hearing.

B.    Legal Standard

A criminal defendant has no Sixth Amendment right to use property subject to forfeiture to pay attorney's fees, *Caplin & Drysdale, v. United States*, 491 U.S. 617, 624-33 (1989) ("[T]here is strong governmental interest in obtaining full recovery of all forfeitable assets, an interest that overrides any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense"), and the "pre-trial restraint of a criminal defendant's assets does not violate the Consitution as long as the assets are restrained based upon a finding of probable cause that they are subject to forfeiture." *United States v. Farmer*, 274 F.3d 800, 802-03 (4th Cir. 2001) (citing *United States v. Monsanto*, 491 U.S. 600, 615-16 (1989)).

---

[1] While Defendants' Motion is caption as requesting a modification of the restraining order, no specific request regarding the restraining order is made in the motion.

The seizure of property subject to civil forfeiture is authorized by 18 U.S.C. § 981(b)(2), which provides that "[s]eizures pursuant to this section shall be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure." Accordingly, seizures of property under section 981 must be made upon a showing of probable cause that the property sought for seizure is subject to forfeiture. Generally, once the Government files its civil complaint against the property subject to seizure, direct notice of the forfeiture action is provided to potential interested parties. Upon receiving notice, those parties may file a verified statement of interest pursuant to Rule C(6) of the Supplemental Rules for Certain Admiralty and Maritime Cases, which govern civil forfeiture actions. Thereafter, a claimant to the property may file a motion for release of the property pursuant to 18 U.S.C. § 983(f).

But, as this Court has previously recognized, a motion for return of seized property under section 983(f) cannot properly be brought if the seized property "is contraband, currency, or other monetary instrument, or electronic funds, unless such currency or other monetary instrument or electronic funds constitutes *the assets of a legitimate business which has been seized*." In this case, the business has not been seized and, moreover, the indictment of the business establishes probable cause to believe that it is not, in fact, legitimate.

Nevertheless, because of the parallel criminal case and defendants' allegations that the funds seized for civil forfeiture are necessary for criminal proceedings (defense costs), it is appropriate for the Court to follow the procedure that has developed governing the post-indictment restraint of property in the criminal context. *See United States v. Michelle's Lounge (Michelle's Lounge I)*, 39 F.3d 684, 693 (7th Cir. 1994); *United States v. Michelle's Lounge*

(*Michelle's Lounge II*), 126 F.3d 1006, 1008-09 (7th Cir. 1997); *United States v. Farmer*, 274

F.3d 800, 804-05 (4th Cir. 2001).

        1.     Defendants Required Showing To Obtain A Hearing

      While there is some variation among Circuits regarding whether and under what

circumstances a defendant may challenge the pre-trial restraint of assets after it has been issued,

most courts follow what has emerged as the "*Jones-Farmer* rule," which allows the defendant a

post-restraint, pre-trial hearing if s/he makes the following two threshold showings: (1) that s/he

has no  assets other than those subject to a restraining order (or seizure) with which to exercise

his or her Sixth Amendment right to counsel or to pay for living expenses; and (2) that there is a

bona fide reason to believe that the grand jury (or court, in cases of seizure warrants) erred in

finding probable cause to believe that the restrained property should be subject to forfeiture if the

defendant is convicted.  *United States v. Jones*, 160 F.3d 641, 647-48 (10th Cir. 1998); *United

States v. Farmer*, 274 F.3d 800, 804-05 (4th Cir. 2001).  Notably, the defendant's burden to

establish his or her lack of available funds must be met before the Court conducts an inquiry into

the second factor.  *See United States v. Wingerter*, 369 F. Supp. 2d 799, 808 (E.D. Va. 2005).

      As mentioned, there are some courts that have taken positions not aligned with the *Jones-

Farmer* rule.  The Eleventh Circuit, for example, holds that the defendant has *no* right to a post-

restraint, pre-trial hearing under *any* circumstances, finding that the trial itself provides sufficient

opportunity for the defendant to contest the forfeitability of the restrained property.  *United States

v. Bissell*, 866 F.2d 1343, 1354 (11th Cir. 1989) (no post-restraint hearing required, even if Sixth

Amendment is implicated).  The Fifth Circuit, on the other hand, established in *United States v.

Thier*, 801 F.2d 1463 (5th Cir. 1986) that a hearing is required in all cases based on its view that

restraining orders are governed by Rule 65 of the Federal Rules of Civil Procedure.  *See also*

*United States v. Holy Land Foundation for Relief and Development*, 445 F.3d 771, 772 (5th Cir.

2006).  However, the Fifth Circuit itself has raised the question of whether this holding is still

valid given the case law that has developed since *Thier* was decided.  *See United States v.*

*Melrose East Subdivision*, 357 F.3d 493 (5th Cir. 2004) (noting that whether *Thier* is still good

law is an open question); *United States v. Causey*, 309 F. Supp. 2d 917 (S.D. Tex. 2004) (in light

of *Melrose East*, district court is free to follow *Jones-Farmer* and holds that there is no longer a

right to an automatic hearing under Rule 65).

    While these divergent extremes do exist regarding the issue of a post-restraint hearing,

the *Jones-Farmer* rule is widely recognized as the established rule, and balances both the

defendant's interest in being heard regarding his or her restrained property and the Government's

interest in not exposing its case beyond what is required in pre-trial discovery.  Accordingly, the

Court should follow the broadly-accepted practice and apply the *Jones-Farmer* rule.

                    2.    Scope of a Hearing

    If a defendant satisfies the *Jones-Farmer* requirements, s/he is entitled to what is

generally referred to as a *Monsanto* hearing based upon the Supreme Court's decision in *United*

*States v. Monsanto*, 491 U.S. 600 (1989).  At this hearing, the Government must establish

probable cause to believe the property will be forfeited if the defendant is convicted, *see Farmer*,

274 F.3d at 805; *Jones*, 160 F.3d at 647, but, if probable cause is established, the property

remains restrained even if the defendant needs the money to retain counsel.  *See Monsanto*, 491

U.S. 600; *United States v. Yusuf*, 199 Fed. Appx. 127, 132 n.3 (3d Cir. 2006) (holding property

remains restrained if Government establishes probable cause; defendant's Sixth Amendment

right to obtain counsel of his choice applies only to the use of his own legitimate, nonforfeitable

funds); *United States v. Thomas*, 2004 WL 3059794, at *11-12 (S.D. Ind. 2004) (court grants

defendant probable cause hearing but finds Government has met its burden; therefore property remains under restraint even if defendant has no other funds to hire counsel). If a district court finds that probable cause is lacking, the restraining order must be vacated as to the asset needed for that purpose. *See United States v. Riley*, 78 F.3d 367, 370-71 (8th Cir. 1996); *United States v. Wittig*, 333 F. Supp. 2d 1048, 1054 (D. Kan. 2004).

Further, courts generally consider the scope of the hearing to be limited to determining if there is probable cause *as to the forfeiture of the property*, and do not allow the defendant to challenge the grand jury's (or, in this case, Court's) probable cause as to the underlying criminal offense. *See Jones*, 160 F.3d at 647-48; *United States v. Moya-Gomez*, 860 F.2d 706, 729 (7th Cir. 1988); *United States v. 250 Lindsay Lane*, 2005 WL 1994762, at *6 (W.D. Ky. 2005); *United States v. Jamieson*, 189 F. Supp. *But see United States v. Monsanto*, 924 F.2d 1186, 1200 (2d Cir. 1991) (allowing district court to reconsider grand jury's finding of probable cause as to the offense). The Federal Rules of Evidence do not apply in a *Monstanto* hearing, and the Government may rely on hearsay to establish probable cause. *Monsanto*, 924 F.2d 1186, 1199 (2d Cir. 1991); *Jamieson*, 189 F. Supp. 2d 754, 757-58 (N.D. Ohio 2002); *Wittig*, 2004 WL 1490406, at *3 (D. Kan. June 30, 2004).

<u>ARGUMENT</u>

A.     <u>The Defendants Have Not Met Their Burden To Establish That<br>They Are Without Assets to Pay For Counsel or Living Expenses</u>

Addressing the first prong of the *Jones-Farmer* rule, it is clear that defendants have not demonstrated that they lack assets other than the two seized e-gold accounts to pay for counsel or living expenses. As an important initial note, although a basis to do so exists, the Government did not ask the Court to seize or restrain *all* of the assets of the defendant corporations. Nor did

6

it seek to restrain any assets of the individual defendants (to the extent they are not also assets of the corporations). Forfeiture is sought in the civil case encompassing the two e-gold accounts at issue here based upon 18 U.S.C. § 981, which provides for forfeiture of *all* property involved in a violation of 18 U.S.C. § 1956 (money laundering) or of 18 U.S.C. § 1960 (operation of an unlicensed money transmitting business). Taking the Court's finding of probable cause that these crimes were committed as established for purposes of this motion, upon conviction, the forfeiture would encompass all assets of both corporate defendants on the basis of either money laundering or operation of an unlicensed money transmitting business.

However, the Government's seizure warrants, while including two e-gold accounts and two bank accounts (seized previously), did not affect numerous other bank accounts owned by defendants, other e-gold accounts of the defendants, or physical property used to conduct the operation. Similarly, the restraining order issued by the Court is limited in that it did not require transfer of any property to the Government, but, rather, established  monitoring and control measures to assure that e-gold customers were able to obtain the value of their funds in national currency and that assets subject to forfeiture were not intentionally wasted.

In any event, in determining whether a defendant meets the first prong of the *Jones-Farmer* rule, the scope of the inquiry can include whether family members or friends have funds that could be made available for these expenses, *see United States v. Jamieson*, 189 F. Supp. 2d 754, 757 (N.D. Ohio 2002); *United States v. Wittig*, 2004 WL 1490406 (D. Kan.), and is based on an examination of the particular facts submitted by the defendant. In this case, Affidavits have been submitted by each defendant setting forth the defendants' view of the assets available to each of them to pay for counsel and living expenses. The individual defendants assert that the

corporate defendants are obligated to pay for the individuals' attorney's fees as well as the corporations' fees.

       1.     <u>Assets of e-gold, Ltd. and Gold & Silver Reserve, Inc.</u>

At the outset, it is clear that, with respect to the corporate defendants, e-gold, Ltd. and Gold & Silver Reserve, Inc., an artificial separation is being drawn, making it appear as if each entity's assets are smaller than they are and that each entity's liabilities are larger than they are, and generally confusing the issue. In fact, the corporate defendants are owned and operated by the exact same people who control the internal accounting of both companies. Specifically, e-gold, Ltd. is a corporation registered in Nevis, BVI, owned by the Jackson Family Trust (75% ownership), whose beneficiaries are Douglas Jackson, his wife, children, Reid Jackson, and Barry Downey, and the Downey Family Trust (25%), whose beneficiaries are Barry Downey, his wife, children, brother, and Douglas Jackson. The directors of e-gold, Ltd. are Douglas Jackson, Barry Downey, and Reid Jackson.

Similarly, Gold & Silver Reserve, Inc. is a Delaware corporation owned by Douglas Jackson (57% owned jointly with his wife), Barry Downey (20% owned jointly with his wife), and Reid Jackson (owned 3.65%). As with e-gold, Ltd., the directors of GSR are Douglas Jackson, Barry Downey, and Reid Jackson. Both e-gold, Ltd. and GSR are operated out of office space in Melbourne, Florida, where all employees of both companies work.

With respect to assets, on May 22, 2007, the defendants filed a letter with attachments outlining the holdings of GSR and e-gold, Ltd ("Defendants' May 22, 2007 Affidavit"). According to this information, GSR held, as of the date of the letter, approximately

$2,607,538.00[2] worth of precious metals (primarily gold) in approximately 22 different e-gold accounts, while e-gold, Ltd. held approximately $1,372,622.80 worth of precious metals (primarily gold) in approximately 26 different e-gold accounts. These e-gold holdings total $3,980,160.80 and are balances that existed after the funds in the two e-gold accounts at issue in Defendants' Motion were transferred to the Government pursuant to the seizure warrant.

Additionally, the defendants listed various bank accounts containing different national currencies, worth approximately $1,755,294.44[3] in United States dollars. Further, GSR holds approximately $169,861.54 worth of fixed assets, while e-gold, Ltd. holds $40,413.61 worth of fixed assets. Not counting the fixed assets, the defendant companies' e-gold and bank account holdings amounted to more than $5.7 million as of the date of their submissions. Finally, both GSR and e-gold, Ltd. earn income from their operations, *although the amount of that income has not been supplied by the defendants*. While the Government does not doubt that income has been affected by the fact of this criminal prosecution, an accounting of income should be provided before a determination of the availability of funds can properly be made.

The defendants have also failed to inform the Court of their efforts to move part of their operation outside of the United States. As explained in the Affidavit of Special Agent Eggland, attached to this response, Defendants are transferring their exchange operation to "OmniPay Africa," which they state is owned by third parties, but appears to be a subsidiary of a Bermuda corporation owned by the Jackson and Downey family trusts. Further, it may involve the movement of assets outside of the jurisdiction of the Court. In any event, if defendants are

---

[2] Using the exchange rates defendants list in Exhibit 4 (GSR's Affidavit) to their motion.

[3] Using the exchange rate applicable to May 2, 2007, the date that these balances were provided by defendants.

leasing OmniPay Africa to outside investors as they state in Exhibit 2 to Agent Eggland's Affidavit, that would be additional income not described in defendants' submissions.

Looking at the liabilities of both entities, it is clear that a large part of the debt and expenses of each company is simply created and owed to the defendants themselves. Defendants assert that e-gold, Ltd. requires $169,795.08[4] per month to operate. However, of this amount, $147,551.75 is payable to the defendants themselves, and $3,879.77 in monthly "Professional Fees" is simply unexplained. The $147,551.75 per month is comprised of "Super Originator Expense," which is an amount paid by e-gold, Ltd. to GSR based upon the activity by e-gold, Ltd.'s customers, and of an "Operator Fee," which is an amount that e-gold, Ltd. pays GSR to run the e-gold operation. Without the above-discussed "expenses," which given the joint ownership issues are not true third-party liabilities, e-gold, Ltd.'s monthly expenses would be reduced to $18,363.37.

With respect to GSR, defendants assert that $186,569.74[5] is required to operate per month and that GSR has notes payable in the amount of $2,015,432.80. The largest expenses listed in its Affidavit, however, are discretionary amounts that could be made available to pay counsel:

| Claimed Expense | Monthly Amount | |
|---|---|---|
| Outside IT Services | $15,720.00 | Discretionary. Possibly related to growing/expanding business. |
| Professional Fees | $50,810.97 | Discretionary. No explanation of the nature of expense, who is receiving funds, or reason for amount. |

---

[4] This number is different than the number listed in Defendants' May 22, 2007 Affidavit, which lists a monthly expense amount of $277,839.85.

[5] This number is different than the number listed in Defendants' May 22, 2007 Affidavit, which lists a monthly expense amount of $233,629.41.

| PR Support | $18,000.00 | Discretionary. Related to growing business. |
| Travel | $19,963.23 | Discretionary. Related to growing business; Douglas Jackson is currently restricted from foreign travel. |
| Spread Expense on Outexchange | $2,426.05 | Payment to other defendants. |

Subtracting these amounts, GSR's monthly expenses would be $79,649.49. Given the monthly amounts GSR/e-gold, Ltd. earns from customer transactions, ranging from $108,000 to $137,000 according to the Defendants' May 22, 2007 Affidavit, the defendant should have substantial funds available. Further, defendants have wholly failed to inform the Court regarding the income earned by GSR for the e-gold exchange services it provides through its OmniPay website.

Similarly, of the $2,015,432.80 in notes payable listed in GSR's Affidavit, not counting amounts allocated to 401(k) programs and third parties, approximately $1,705,872.89 of that amount is apparently owed to the defendants themselves.

Finally, in paragraph 13 of GSR's Affidavit attached to Defendants' Motion, defendants state to the Court that, as of May 28, 2007, GSR had approximately $1,007,743.08 in liquid assets comprised of $484,064.31 in its bank accounts and $523,678.77 worth of e-gold (which is backed by gold bullion that could be sold for United States dollars). In paragraph 15, defendants state that GSR had $349,850.04 in "pending OutExchange liabilities" (funds due customers converting their e-gold back into national currency), and $166,193.55 in "pending InExchange liabilities" (the amount needed to purchase gold bullion to back new e-gold orders, assuming bullion reserves aren't available). Even subtracting those pending amounts, defendants are left with $491,699.49 available in their accounts.

The Affidavits of e-gold, Ltd. and GSR show that the defendants prefer to operate their

business using reserves of both e-gold and national currency such as United States dollars. However, the reserves are not necessary to operate the business. Rather, while it may slow down the rate and volume of transactions, they could buy and sell gold bullion as needed for incoming and outgoing transactions, a process, while not immediate, that can be accomplished in a period of days.

2.    Assets of Douglas Jackson

Defendant Douglas Jackson states in his Affidavit that he has practically no assets outside of the e-gold operation and the amounts owed him by GSR. Jackson does not state whether his wife holds any assets in her name, or whether his parents or other family members have assets that may be available to assist him in paying attorney's fees and living expenses. He does state that he is owed $134,485.48 (as of May 28, 2007) by GSR. Douglas Jackson does not mention in his Affidavit that he owns approximately 41 e-gold accounts in his name, with a total approximate value of $196,590.15, as is explained in the Affidavit of Agent Eggland attached to this response to Defendants' Motion.

3.    Assets of Barry Downey

Defendant Downey states in his Affidavit that his principal income is from his practice of law, which, along with his e-gold holdings, has resulted in approximately $600,000 in gross earnings per year, or $250,000 to $300,000 net earnings for year. It is not clear whether some amounts reducing the gross earnings may be deductions for retirement accounts or other assets. Further, Downey states his share of his law firm's profits is being reduced as a result of this criminal action, but does not explain the reason for the reduction, leaving open the question of whether the reduction is a means of shielding his assets, or because of the time that he will be devoting himself to his defense. Analysis of the e-gold database showed that, as of May 2, 2007,

Downey held 11 e-gold accounts in his name or the name of his family members, worth approximately $22,065.22. Further, Downey does not state whether his wife holds any assets in her name, or whether his parents or other family members have assets that may be available to assist him in paying attorney's fees and living expenses.

### 4. Assets of Reid Jackson

Defendant Reid Jackson states in his Affidavit that he has assets worth approximately $119,684.91 (approximately $27,347.97 in a checking account; $34,810.47 worth of e-gold; $11,312.83 in a 401(k) plan; and, an IRA valued at $46,213.64). GSR's Affidavit indicates that the value of the Jackson & Escher 401(k) plan is actually $103,279.98, which would raise the total value of Reid Jackson's available assets to $211,652.06. However, an analysis of the e-gold, Ltd. database shows 21 e-gold accounts in Reid Jackson's name (one jointly with Richard Escher), worth approximately $543,123.65. Further, Reid Jackson does not indicate whether his domestic partner, Richard Escher, his parents, or any other family member has assets or income that may also be available for his use. In any event, these funds should be sufficient, along with the funds available to the corporate defendants to cover necessary attorney fees and living expense.

### B. Even If The Court Were To Find That Defendants Lacked Sufficient Assets to Pay For Counsel Or Living Expenses, Probable Cause Exists For The Restraint Of Defendants' Assets

Defendants have failed entirely to address the second prong of the *Monsanto* analysis – whether the Court erred in finding probable cause to believe that the restrained property should be subject to forfeiture if the defendant is convicted. Instead, defendants base their motion on an argument that there is a lack of probable cause "to believe that the defendants *committed any*

*crimes* that would provide the basis for forfeiture." Defendant's Motion at 10 (emphasis added).

While the Second Circuit alone has allowed inquiry during the hearing into the probable cause

supporting the offense charged, *see Monsanto*, 924 F.2d at 1200, the general rule is that the

Court's inquiry should be directed to the probable cause to believe the restrained property is

traceable to the offense. *Jones*, 160 F.3d at 647-48. Because defendants have failed to address

this point, the have not made the requisite prima facie showing required to be entitled to a

*Monsanto* hearing.

       1.      <u>There Is Probable Cause That The Seized e-gold</u>
                 <u>Accounts Are Subject To Forfeiture</u>

Here, pursuant to 18 U.S.C. 982(a)(1), which also covers money laundering violations, a

defendant convicted of operation of an unlicensed money transmitting business in violation of

18 U.S.C. 1960 must forfeit "any property, real or personal, involved in such offense, or any

property traceable to such property." This broad forfeiture provision would encompass the funds

involved in the violation, the fees and commissions earned from the violation, and any property

facilitating the operation of the business. *See United States v. Huber*, 404 F.3d 1047, 1056 (8th

Cir. 2005) ("Forfeiture under section 982(a)(1) in money laundering case allows Government to

obtain money judgment representing value of all property 'involved in' offense, including money

or other property being laundered [the corpus], and 'any property used to facilitate the laundering

offense'"); *United States v. Wyly*, 193 F.3d 289, 302 (5th Cir. 1999); *United States v. Baker*, 227

F.3d 955, 967 (7th Cir. 2000); *United States v. Matai*, 173 F.3d 426, 1999 WL 61913 (4th Cir.

1999) (Table); *United States v. Reiner*, 397 F. Supp. 2d 101, 112 n.26 (D. Me. 2005) (collecting

cases holding that forfeiture in a money laundering case includes the subject matter of the

offense, commissions, and facilitating property); *United States v. Schlesinger*, 396 F. Supp. 2d

267, 271-72 (E.D.N.Y. 2005) (collecting cases and citing legislative history); *United States v.*

*McGauley*, 279 F.3d 62 (1st Cir. 2002) (distinguishing forfeiture under section 982(a)(1) from a

proceeds forfeiture; the money laundering forfeiture is broader and is not limited to the proceeds

being laundered).

       With regard to forfeitures involving businesses, the entire business may be subject to

forfeiture if it is substantially entwined with the offense. *See United States v. Baker*, 227 F.3d

955 (7th Cir. 2000) (all proceeds of business used to bankroll money laundering operation,

including portions derived from legitimate business activities, and business premises, as the

location from which money laundering scheme was directed, forfeitable as property used to

facilitate offense); *United States v. South Side Finance, Inc.*, 755 F. Supp. 791, 797-98 (N.D. Ill.

1991) (bank accounts into which laundered money deposited, and business through which such

money moved, forfeitable under section 981 as property involved in money laundering offense);

*United States v. All Assets of G.P.S. Automotive Corp.*, 66 F.3d 483, 487 (2d Cir. 1995) (business

used to sell stolen auto parts and launder proceeds forfeited under section 981); *United States v.*

*Schlesinger*, 396 F. Supp. 2d 267 (E.D.N.Y. 2005) (following *G.P.S. Automotive*; factory that

was "focal point" of defendant's fraud offense was forfeitable under section 982(a)(1) not

because it facilitated fraud but because it facilitated laundering of fraud proceeds through

business's operating accounts); *United States v. Swank Corp.*, 797 F. Supp. 497, 502 (E.D. Va.

1992) (proceeds of mail fraud scheme cleared through corporate bank accounts; if there is a

substantial connection between business and laundering activity, entire business and all of its

assets are forfeited regardless of amount of money laundered); *United States v. Eleven Vehicles*,

15

836 F. Supp. 1147, 1155-56 (E.D. Pa. 1993) (because entire business was forfeitable as property involved in a money laundering offense, any property derived from the business was forfeitable as well).

Accordingly, because the two e-gold accounts (one belonging to GSR and one belonging to e-gold, Ltd.) at issue here – described in Defendants' Motion as the "primary operating accounts of the defendant corporations" – are uncontestedly involved in the activity the Court concluded was operation of an unlicensed money transmitting business, the second prong of the *Jones-Farmer* test has not been met.

       2.     <u>There Is Probable Cause That Defendants Violated 18 U.S.C. 1960</u>

Even if the probable cause supporting the charges in the indictment were properly before the Court at this time, there is probable cause to believe that defendants are operating, as the Court previously found, an unlicensed money transmitting business in violation of 18 U.S.C. § 1960. Section 1960 provides that:

> (a) Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.

> (b) As used in this section-
> (1) the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and-

>> (A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable;

>> (B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or

> regulations prescribed under such section; or
>
> (C) otherwise involves the transportation or transmission of funds that are
> known to the defendant to have been derived from a criminal offense or
> are intended to be used to promote or support unlawful activity;

The term "money transmitting" is defined in section 1960(b)(2) to include "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." The term "funds" is not further described in section 1960, but is defined in Black's Law Dictionary (Sixth Edition) as: "A generic term and all-embracing as compared with term 'money,' etc., which is specific. A sum of money or other liquid assets set apart for a specific purpose, or available for the payment of general debts, claims, or expenses."

Pursuant to section 1960, the defendants are operating an unlicensed money transmitting business because they are engaged in the transmissions of funds for the public. The entire basis for defendants' assertion to the contrary is their reading of 1960(b)(1)(B)'s reference to 31 U.S.C. § 5330. Defendants believe that no person, unless they fall within the definition of "money transmitting businesses" contained in 31 U.S.C. 5330(d)(1), which they read as being limited to those who deal in "currency" (as opposed to wire, checks, or other funds), can be considered to have violated 18 U.S.C. 1960.

First, while 31 U.S.C. 5330 does define a "money transmitting business" for the purpose of establishing those that are required to register as such with the Federal government under section 1960(b)(1)(B), it does not define that term for the purpose of establishing those required to be licensed by a State pursuant to section 1960(b)(1)(A), or those that fall within 1960(b)(1)C) and are defined as an unlicensed money transmitting business based upon their dealing in

unlawful funds.

In fact, the defendants are operating without a State license to do so in both the District of

Columbia and Florida, among other States.  The District of Columbia Money Transmitters Act,

D.C. Stat. §§ 26-1001 - 26-1026, prohibits a person from engaging in the business of money

transmission without obtaining a license from the Superintendent.  D.C. Stat. § 26-1002.

Violation of the money transmitter statute is a felony with penalties of up to a $25,000 fine and

five years imprisonment.  D.C. Stat. § 26-1023.  Under the D.C. Money Transmitters Act, the

term "money transmission" is defined as

> the sale or issuance of payment instruments or engaging in the
> business of receiving money for transmission or transmitting
> money within the United States, or to locations abroad, by any and
> all means, including but not limited to payment instrument, wire,
> facsimile, or electronic transfer.

D.C. Stat. § 26-1001(10).

Similarly, the Florida Money Transmitter's Code, Fla. Stat. §§ 560.101-560.408,

prohibits a person from engaging in the business of a money transmitter without registering with

the Office of Financial Regulation.  Fla. Stat. § 560.125(1).  Violation of the money transmitter

statute is a felony.  Under Florida Money Transmitters' Code, the term "money transmitter"

includes any person located in or doing business in Florida who acts as a payment instrument

seller, foreign currency exchanger, check casher, funds transmitter, or deferred presentment

provider."  Fla. Stat. § 560.103(11).  The term "funds transmitter" includes "any person who

engages in the receipt of currency or payment instruments for the purpose of transmission by any

means, including transmissions within this country or to or from locations outside this country,

by wire, facsimile, electronic transfer, courier, or otherwise."  Fla. Stat. § 560.103(10).

Defendants admittedly have not applied for or received a license in either the District of Columbia or Florida, and thus violate 18 U.S.C. 1960(b)(1)(A).

Alternatively, with respect to the Federal registration requirement in section 1960(b)(1)(B), defendants are operating an unlicensed money transmitting business because they have not registered with the Department of Treasury (FinCEN). Defendants do not deny that they are in the business of transferring funds for customers and would, in fact, be hard pressed to do so. Instead, defendants claim that only businesses that deal in "currency" must register, because only such businesses are required to file the currency transaction reports ("CTRs") referenced in 31 U.S.C. 5330. However, it is not sufficient for a money transmitting business to rely on their practice or policy of not taking cash as a means of opting out of this requirement.

Rather, the definition of "money transmitting business" in 31 U.S.C. 5330(d)(1), which encompasses a condition that the business "(B) is required to file reports under section 5313," includes businesses that, while they may have chosen not to accept currency at any given moment, would be required to file the reports if they did accept currency. That is, 31 U.S.C. 5313 encompasses "financial institutions," and requires that "*when* a financial institution is involved in a transaction" involving currency, it is required to file a CTR. 31 U.S.C. 5313(a) (emphasis added). A "financial institution" is defined in 31 U.S.C. 5312(a)(2) as including at least two definitions that apply here: "(N) a dealer in precious metals, stones, or jewels," and "(R) a licensed sender of money *or any other person who engages as a business in the transmission of funds*." Accordingly, defendants are violating section 1960(b)(1)(B) by operating without registering with FinCEN.

Finally, because of their extensive involvement in transferring funds they know to be

either the proceeds of criminal activity or promoting criminal activity, defendants are also an

unlicensed money transmitting business pursuant to section 1960(b)(1)(C).  Specifically, as

explained in Agent Eggland's Affidavit, the defendants and their employees regularly recognized

that certain e-gold accounts were being used for criminal purposes.  Routinely, defendants or

their employees would indicate in the account records contained in the e-gold, Ltd. computer

database the type of criminal activity that the account-holder was engaged in, including, among

other things, "child porn," "Scammer," and "CC fraud."  Further, the design of the e-gold system

and its practices and policies allowed and even encouraged anonymous and criminal use of the

system.  Knowing that these accounts contained proceeds or funds being used for criminal

activity, the defendants continued to conduct transactions for these customers, in violation of not

only 18 U.S.C. 1960(b)(1)(C), but also 18 U.S.C. 1956.

<u>CONCLUSION</u>

For the foregoing reasons, particularly the fact that Defendants submissions indicate the availability of funds other than those seized for the payment of attorney's fees, and because Defendants have not fully disclosed income that may be available to them, the Government respectfully requests that the Court deny defendants' Motion to Vacate Seizure Warrant and to Modify Restraining Order and Request for an Evidentiary Hearing.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY


By:     \_\_/s/ _____
        LAUREL LOOMIS RIMON
        Assistant United States Attorney
        U.S. Attorney's Office
        Criminal Division
        555 Fourth Street, N.W., Rm. 5830
        Washington, D.C.   20530
        (202) 514-7788
        Laurel.Loomis.Rimon@usdoj.gov

        KIMBERLY KIEFER PERETTI
        Senior Counsel
        MICHELLE KANE
        Trial Attorney
        U.S. Department of Justice
        Computer Crime and Intellectual Property
        Section, Criminal Division
        1301 New York Ave., NW, Suite 600
        Washington, D.C.  20530
        (202) 353-4249
        kimberly.peretti@usdoj.gov

Dated: June 15, 2007

CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of June, 2007, a copy of the foregoing Government's

Response To Defendants' Motion to Vacate Seizure Warrant and to Modify Restraining Order

and Request for an Evidentiary Hearing was served via ECF on counsels for the defendants,


Mitchell Fuerst, Esq.
Andrew Ittleman, Esq.
Fuerst Humphrey Ittleman
1001 Brickell Bay Drive
Suite Two Thousand Two
Miami, FL 33131
mfuerst@fuerstlaw.com
aittleman@fuerstlaw.com

Aron Raskas, Esq.
Kramon & Graham, P.A.
One South Street, Suite 2600
Baltimore, MD 21202-3201
araskas@kg-law.com

David B. Smith
English & Smith
526 King Street, Suite 213
Alexandria, VA 22314
dsmith@englishandsmith.com


___/s/_____
Laurel Loomis Rimon
Assistant United States Attorney

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### AFFIDAVIT

I, Ryan Eggland, ("your Affiant"), being duly sworn, depose and state as follows:

1.      I am a Special Agent ("SA") of the Internal Revenue Service Criminal

Investigation Division ("IRS-CI"), and have been so employed for approximately six and one

half years.  I am currently assigned to the Orlando Field Office.  Among my duties as an SA, I am

charged with the investigation of money laundering and its predicate offenses, violations of

currency/money transmission reporting and registration requirements, and violations of United

States Tax Code.  Prior to my employment with the IRS-CI, I was employed by Merrill Lynch

Credit Corporation for approximately three years.  My last assignment was that of an underwriter

of residential and small commercial mortgages.  Among my duties as an underwriter, I performed

extensive income and credit investigations and analysis including that of high net worth clients

that exhibit complex financial pictures.  I obtained a Master's Degree of Business Administration

from the University of North Florida in May 2000.

2.      The facts set forth in this affidavit are based on my own personal knowledge;

knowledge obtained from other law enforcement officers; review of documents and computer

records related to this investigation; communications with others who have personal knowledge

of the events and circumstances described herein; and information gained through my training

and experience.

3.      This affidavit is being submitted in support of the Government's response to

Defendants' Motion to Vacate Seizure Warrant And To Modify Restraining Order and Request

Request For An Evidentiary Hearing, filed with the Court on June 1, 2007.

Assets Of The Defendants

      4.    On May 1, 2007, the e-gold operation provided an update of the SQL database information (by copying the database to a hard drive), for the period of March 2007 to April 2007, in response to the Restraining Order issued by the Court on April 25, 2007. An analysis was conducted regarding the transactions and account activity of e-gold account holders and customers through examination the e-gold operation's computer databases. On May 7, 2007, your Affiant conducted searches within this newest update to identify e-gold accounts in the names, or with point of contact information for, the following individuals: Douglas L. Jackson (Douglas Jackson); Barry K. Downey (Barry Downey); and, Reid A. Jackson (Reid Jackson). The analysis showed the following results: Douglas L. Jackson had 41 e-gold accounts with the approximate total value of $$196,590.15; Barry K. Downey had 11 e-gold accounts with the approximate total value of $22,065.22; and Reid A. Jackson had 21 e-gold accounts with the approximate value of $543,123.65 (a copy of the spreadsheet showing the accounts located as a result of the above analysis is attached hereto as Exhibit 1).

Income Of The Defendants

      5.    The defendants post e-gold transaction statistics, described for a 24 hour period, as well as the total balance of their e-metals in circulation on their website. Also included on their website are schedules of how fees are calculated and collected by them. Your Affiant collected samples of the data provided after May 22, 2007 to verify the amount of revenue being collected by the defendants post-indictment. Eleven representative examples have been taken since that time. The most conservative calculations were applied to the data collected

based upon the formulas published on the defendants' website. If business continues on the same level as the data collected, it is estimated that the defendants will collect the equivalent of $203,676 average monthly revenue in transaction fees and $48,937 average monthly revenue in storage fees. It is reasonable to conclude that the greatest impact of the indictment would be felt during the time period immediately following the indictment (the time period in which data was collected), and that business would trend back toward normal levels the longer time passes from the last incident of negative press.

1)    Another major component of the total revenue collected by the defendants are exchange fees collected through exchange rate margins applied to exchanges into and out of the e-gold system. The defendants also publish these daily "bid" and "ask" exchange rates on their website. Generally, the defendants appear to charge an average margin of 2% for every exchange into or out of the e-gold system. It is likely that the rate of exchanges into the e-gold system experienced a decline immediately following the indictment. However, this should have been counter balanced by the increased demand for exchanges out of the system. The defendants have not provided an accounting of revenues collected from their exchange functions, and the Government does not have an accurate way of tracking this from the outside.

6.    However, the defendants requested and were approved to sell 800oz of gold on May 22, 2007 and 1200oz of gold on May 23, 2007, for example. The exchange of the corresponding e-gold previously in circulation would have brought them $25,904.00 in revenue for just these two days. Based on the latest balance of e-gold in circulation, in a worst case scenario, the defendants would collect $1,087,832 in exchange fees alone (not including transactions fees) if every customer elected to exchange all of their e-gold out of the system. The

3

defendants have elected to close their exchange functions for a short period of time and forego this significant source of revenue while they expend other business resources to expand their business overseas to Africa. This is not indicative of a business crippled by a lack of assets.

7.     Additionally, defendants are in the process of moving the exchange service that has been provided by Gold & Silver Reserve, Inc. d/b/a OmniPay to an offshore location – OmniPay Africa. Defendants advise customers of this fact and the reasons they assert for doing so on their omnipay.com website, *see* Exhibit 2, and state that OmniPay Africa will be majority owned by third parties. Review of documents obtained from Bermuda, however, indicates that OmniPay Africa is being established as a subsidiary of Ancien, Ltd., which is a Bermuda corporation owned 75% by the Jackson Family Trust and 25% by the Downey Family Trust.

The Defendants' Dealings In Unlawful Funds

8.     A valid email address was the only information required to open an e-gold account. Although other contact information was requested, this information was not verified. During the regular course of business, thousands of e-gold users opened their accounts with obviously bogus and false contact information, including accounts opened in the name of "Mickey Mouse," "Donald Duck," "Anonymous Man," "bud weiser," "No Name," and others.

9.     Unlike other Internet payment systems, e-gold did not include any statement in its User Agreement prohibiting the use of "e-gold" for criminal activity. Because of the lack of controls as compared to those present with other payment systems, e-gold has been a highly-favored method of payment by operators of investment scams, which generally refers to pyramids, ponzis, HYIPs (*i.e.*, high-yield investment programs) and other "get-rich-quick"schemes. These scams typically promise abnormally high short-term returns on

investments, but rather than paying investors any actual returns on real investments, the scams

pay investors with new, incoming investment money from other investors in the scam.

Eventually, the operators of the scam either disappear with all the investment money or the scam

collapses because investment naturally slows as the scam grows and the operators are unable to

continue paying out the promised returns. e-gold has been favored in this area particularly

because of a user's ability to operate accounts anonymously, and e-gold's policy of making all

transfers of "e-gold" irrevocable and not subject to reversal.

10.    Thousands of e-gold accounts have been opened using the term "hyip" in

either the account-owner's name or e-mail address, or where "hyip" appears in the "memo" field

of the transaction record. e-gold employees knew and understood that these accounts were used

to fund investment scams, yet took no proactive measures to prevent the use of the e-gold system

for this activity.

11.    "e-gold" has been a highly-favored method of payment on websites

operating to facilitate credit card and identity fraud – so-called "carding" websites. Carding

websites operate as bulletin boards and are dedicated to the promotion and facilitation of a wide

variety of criminal activities including, among others, electronic theft of personal identifying

information, credit card and debit card fraud, and the production and sale of false identification

documents. On these websites, criminals around the world meet virtually and advertise

and sell their contraband, including stolen credit card numbers, compromised identities,

and false identifications, using "e-gold" as a method of payment.

12.    "e-gold" has been a highly-favored method of payment for sellers

of child pornography over the Internet. In some instances, "e-gold" has been the only

5

method of payment available on websites offering child pornography for sale.

13.   · With few exceptions, the employees hired to operate the e-gold payment system had no experience in conducting financial transactions and no background in financial matters at all.  Employees of the e-gold operation received no training regarding financial transactions or avoiding criminal transactions, nor were they provided any written materials on these matters.

14.   Regularly, during the course of conducting the e-gold operation, the defendants and their employees recognized that certain accounts were being used for criminal purposes.  On numerous occasions, the e-gold operation indicated in the account records contained in the "e-gold" computer database the type of criminal activity that the account-holder was engaged in, including, among other things, "child porn," "Scammer," and "CC fraud."  The defendants nevertheless allowed transactions in these accounts to continue.

2)   The e-gold operation regularly received complaints from customers that they had been the victim of a crime and also regularly received notification from customers of specific "e-gold" accounts that were involved in criminal activity.  It was not the e-gold operation's practice to either close these accounts or, as is required by law for certain financial institutions, report the activity to law enforcement.  In certain cases, the e-gold operation sent messages to customers who reported investment scams advising them to "educate" themselves about certain types of investment fraud.

15.   On numerous occasions when the e-gold operation discovered that its customers were involved in activity that appeared to be unlawful, it would require that customer to submit paperwork establishing that the customer was not an affiliate of the e-gold operation,

6

but then allow the customer to continue operating once the paperwork was received rather than closing the account and refusing to engage in conducting further criminal financial transactions.

16.    Knowing that "e-gold" was being used for criminal activity, including child exploitation, wire fraud (investment scams), and access device fraud (credit card and identity theft), the e-gold operation continued to allow accounts to be opened without verification of user identity, assigned only a single employee with no relevant experience to monitor hundreds of thousands of accounts for criminal activity, and encouraged users whose criminal activity had been discovered to transfer their criminal proceeds among other "e-gold" accounts.

17.    When a specific account was determined to be engaged in criminal activity, defendants would regularly place a "value-limit" on that account, a procedure whereby an entry would be made in the e-gold database limiting the incoming "e-gold" funds that could be received by that account (sometimes to $5,000, sometimes to $500, and sometimes to $0), but not limiting the ability of the account-holder to spend the funds already in the account. Thus, even in circumstances in which the defendants knew that the account contained the proceeds of crime, the defendants allowed the funds to be exchanged out into national currency or transferred to another account.

18.    On some occasions, when an e-gold customer was informed that a "value-limit" had been placed on his or her account, it was also suggested that an alternative to providing further documentation for the existing account would be to open another e-gold account. A single person or entity was able to open numerous "e-gold" accounts, without any verification of identity or the source and purpose of the funds in question.

19.    In some instances where a "value-limit" had been placed on an account,

the e-gold operation would inform the customer subject to the "value-limit" that s/he was still free to move funds out of the e-gold account. In these circumstances, no limit was placed on the customer's ability to transfer their "e-gold" funds to another account they controlled or to another individual engaged in criminal activity, or to use those funds to purchase further contraband, such as child pornography. Similarly, even if the "e-gold" funds involved were criminal proceeds, the customer was free to exchange the "e-gold" for United States or other national currencies without restriction. The customer was also free to open a new account and transfer the funds to that account.

20.    In various instances, the e-gold operation, at the request of its customer, transferred funds from an account known to be engaged in criminal activity to another operated by the same individual(s), who was then allowed to continue the same criminal activity.

_____

Special Agent Ryan Eggland, IRS-CI

Sworn to and subscribed before me on this 15th day of June, 2007.

_____

Notary Public
Orange County, Florida
My commission expires 08/23/2010

Notary Public State of Florida
Tonya C Roberts
My Commission DD588308
Expires 08/23/2010

8



# EXHIBIT 1

| Account_ID | Name | Gold | Silver | Platinum | Paladium | Total |
|---|---|---|---|---|---|---|
| 101113 | Doug Jackson | 0.000016 | 0.000006 | | | $ 0.01 |
| 101452 | Douglas Jackson | 0.084648 | | | | $ 93.10 |
| 101661 | Douglas Jackson | | 2.645345 | | | $ (0.68) |
| 102314 | Douglas Jackson | 0.035506 | -0.049832 | | | $ 23.90 |
| 102868 | Douglas Jackson | | | | | $ - |
| 133795 | Douglas Jackson | 0.000101 | | | | $ 0.07 |
| 136008 | Douglas Jackson | 0.00004 | | | | $ 0.03 |
| 136550 | Douglas Jackson | -0.001597 | | | | $ (1.07) |
| 143680 | Douglas Jackson ***Not in FIFO***** | | | | | $ - |
| 168705 | Douglas Jackson | 0.895322 | | | | $ 602.55 |
| 168708 | Douglas Jackson | 0.855824 | | | | $ 575.97 |
| 185558 | Douglas Jackson | 0 | | | | $ - |
| 201692 | Douglas Jackson | | 0.000006 | | | $ 0.00 |
| 212880 | Douglas Jackson | 38.327559 | 2.537905 | 0.014427 | 0.007289 | $ 25,850.39 |
| 212890 | Douglas Jackson | 44.400297 | 2.341105 | 0.015081 | 0.011571 | $ 29,937.31 |
| 212893 | Douglas Jackson | 46.339123 | 2.23366 | 0.01626 | 0.012157 | $ 31,243.11 |
| 212897 | Douglas Jackson | 45.122609 | 1.355257 | 0.026974 | 0.008783 | $ 30,424.38 |
| 212901 | Douglas Jackson | 40.34203 | 1.919932 | 0.010485 | 0.014506 | $ 27,195.47 |
| 212902 | Douglas Jackson | 59.63127 | 2.140383 | 0.063221 | 0.009816 | $ 40,246.94 |
| 253192 | Douglas Jackson | 4.932813 | 66.097339 | 0.193682 | 0.31429 | $ 4,591.87 |
| 348640 | Douglas Jackson | 5.649663 | 1.611166 | 0.009045 | 0.022573 | $ 3,844.43 |
| 486285 | Douglas Jackson ***Not in FIFO***** | 0.044027 | 0.000006 | | | $ 29.63 |
| 587797 | douglas jackson | | | | | $ - |
| 600136 | Douglas Jackson | 0.002404 | 0.000006 | | | $ 1.62 |
| 602879 | Douglas Jackson | 0.000089 | | | | $ 0.06 |
| 623108 | Douglas Jackson | 0.00002 | 0.000006 | | | $ 0.01 |
| 623110 | Douglas Jackson | 0.000006 | | | | $ 0.00 |
| 626285 | Douglas Jackson | 0.000827 | 0.000012 | | | $ 0.56 |
| 634684 | Douglas Jackson | 0.000894 | 0.000006 | | | $ 0.60 |
| 733204 | Douglas Jackson | 0.00003 | 0.000012 | | | $ 0.02 |
| 733206 | Douglas Jackson | 0.000097 | 0.000012 | | | $ 0.07 |
| 745211 | Douglas Jackson | 0.00003 | 0.000012 | | | $ 0.02 |
| 1361726 | Douglas Jackson | 0.000006 | 0.000627 | | 0.000003 | $ 0.01 |
| 1971543 | Douglas Jackson ***Not in FIFO***** | | | | | $ - |
| 1972840 | Douglas Jackson ***Not in FIFO***** | | | | | $ - |
| 2030073 | Douglas Jackson | 0.942567 | 0.70673 | 0.016232 | 0.005318 | $ 667.09 |

| | | | Rate | Gold 673 | Silver 13.66 | Platinum 1300 | Paladium 374 | |
|---|---|---|---|---|---|---|---|---|
| 2212397 | Douglas Jackson | ***Not in FIFO***** | | | | | | $ - |
| 2332707 | Douglas Jackson | | 0.005409 | | | | | $ 3.64 |
| 2442394 | Douglas Jackson | ***Not in FIFO***** | | | | | | $ - |
| 2442703 | Douglas Jackson | | 0.000052 | | | | | $ 0.03 |
| 684121 | las. Jackson, c/o G&SR/OmniPay | | | | | | | $ - |
| 533848 | Douglas Jackson, Director | | 0.000006 | 28.79128 | 0 | | | $ 393.29 |
| 100052 | Douglas L Jackson | | 0.502853 | 10.005439 | 0.074295 | | | $ 587.71 |
| 100057 | Douglas L Jackson | | 0.157255 | 3.825366 | 0.039391 | 0.042861 | | $ 219.79 |
| 100059 | Douglas L Jackson | | -0.000136 | -0.611153 | 0.000887 | 0.02806 | | $ (7.29) |
| 100140 | Douglas L Jackson | | 0.013615 | 0.156517 | 0.014731 | | | $ 30.45 |
| 100141 | Douglas L Jackson | | 0.009245 | 0.007539 | 0.020261 | | | $ 32.66 |
| 101233 | Douglas L Jackson | | 0.003538 | | | | | $ 2.38 |
| 2517823 | Jackson, Doug | ***Not in FIFO***** | | | | | | $196,590.15 |

| Account_ID | Name | Gold | Silver | Platinum | Palladium |
|---|---|---|---|---|---|
| 100055 | Barry Downey | 0.000006 | | | $ 0.00 |
| 100060 | Barry K Downey, Trustee | 16.925093 | -0.239903 | | $ 11,387.31 |
| 100068 | Barry K Downey | 0.007314 | 1.677306 | | $ 27.83 |
| 100136 | Barry K Downey | 0.006859 | 5.42886 | | $ 78.77 |
| 111175 | Barry K. Downey | 0.005679 | 0.007545 | | $ 3.93 |
| 220541 | Barry Downey | -0.005317 | | | $ (3.58) |
| 244983 | Barry K. Downey, Esq. | 0 | | | $ - |
| 312078 | Barry K. Downey | 0.002476 | 0.000006 | | $ 0.00 |
| 518220 | Barry Downey, Smith & Downey, P.A. | 0.000000 | 0.000006 | | $ 1.67 |
| 667280 | Barry K. Downey | 10.542149 | 0.343043 | 0.044726 | 0.001274 | $ 7,094.87 |
| 2030081 | Barry K. Downey | 5.068509 | 0.000006 | 0.044726 | 0.001274 | $ 3,474.41 |
| | Weight | 32.552768 | 7.216869 | 58.14 | 0.48 | $ 22,065.22 |
| | | $21,908.01 | $ 98.58 | | $22,065.22 |
| | Metal values (per oz) $ | 673.00 | $ 13.66 | $ 1,300.00 | $ 374.00 |

| Account_ID | Name | Gold | Silver | Platinum | Paladium | Total |
|---|---|---|---|---|---|---|
| 100064 | Reid A Jackson | -0.00438 | -0.146077 | | | $ (4.94) |
| 100081 | Reid A Jackson | 89.266637 | | 0 | | $ 60,076.45 |
| 593073 | Reid A Jackson | 0.17696 | 8.230323 | | | $ 231.52 |
| 637219 | Reid A Jackson | 74.794879 | 0.000006 | | | $ 50,336.95 |
| 100932 | Reid A Jackson or Richard P Escher | 35.797085 | 0.795876 | | | $ 24,118.86 |
| 100985 | Reid A Jackson, Trustee | 195.902185 | 5888.241608 | | | $ 212,275.55 |
| 100988 | Reid A Jackson, Trustee | 17.097275 | | 0.00428 | 0.029367 | $ 11,506.47 |
| 101490 | Reid A. Jackson, Trustee | 0.00252 | 0.00252 | | | $ 1.76 |
| 8 | Reid Jackson | 0.003375 | | | | $ 2.27 |
| 393474 | Reid Jackson | 0.29396 | 0.000623 | 0.000025 | | $ 197.84 |
| 448433 | Reid Jackson | | 0.000006 | | | $ 0.00 |
| 448435 | Reid Jackson | | 0.000006 | | | $ 0.00 |
| 448436 | Reid Jackson | | 0.000006 | | | $ 0.00 |
| 448437 | Reid Jackson | | 0.000006 | | | $ 0.00 |
| 448438 | Reid Jackson | | 0.000006 | | | $ 0.00 |
| 448439 | Reid Jackson | | 0.000006 | | | $ 0.00 |
| 448440 | Reid Jackson | | 0.000006 | | | $ 0.00 |
| 593007 | Reid Jackson | 0.3511 | | 0.054679 | | $ 236.29 |
| 593059 | Reid Jackson | 65.562315 | 43.121771 | | | $ 44,783.56 |
| 552909 | Reid Jackson c/o G&SR | 0.740401 | 0.000017 | | | $ 498.29 |
| 547136 | Reid Jackson c/o OmniPay | 205.730912 | 16.286676 | 0.110739 | 0.110782 | $ 138,864.77 |
| | | | | | | $ 543,125.65 |

| Rate | | | |
|---|---|---|---|
| Gold 673 | Silver 13.66 | Platinum 1300 | Paladium 374 |

# EXHIBIT 2



Home          Exchange          Contact Us          Profile          Log In

## OmniPay temporarily suspends exchange to transition to OmniPay Africa

Effective immediately, G&SR will be leasing the OmniPay business to OmniPay Africa. All OmniPay exchanges will now involve e-gold transfers and money payments into/out of OmniPay Africa's e-gold and bank accounts respectively. G&SR has contracted to serve as the Operator of OmniPay but will not be a party to actual exchanges.

In terms of immediate impacts:

- The OmniPay exchange service will suspend operation pending provisioning of a suitable bank account for OmniPay Africa. It is anticipated this service interruption will start May 24, 2007 with service resuming on or about June 18, 2007.
- With resumption, all bank wires from customers must be directed to
  the new bank coordinates which will be posted on the omnipay.com website.

The original plan was for OmniPay Africa to organize as a licensee of G&SR, the US company that owns OmniPay. A substantial development effort was underway to support the additional requirements for over-the-counter exchange operations such as biometric validation. However, recent actions of the US government, originating from a long-standing and misguided animus on the part of the US Secret Service, necessitate immediate action. Specifically, SEB Bank in Estonia has notified G&SR it is closing its bank account at close of business May 25, 2007 explicitly because of the Press Release from the US DOJ.

We regret the temporary interruption of OmniPay services. Just as the US government's recent actions in seizing e-gold accounts of e-gold Ltd., G&SR, The Bullion Exchange, AnyGoldNow, IceGold, GitGold, The Denver Gold Exchange, GoldPouch Express and 1MDC (and forcing G&SR to liquidate the seized assets!) have severely damaged not only these exchange businesses but also their innumerable customers, their forcing this complex transition to be performed on an

emergency basis is simply shameful.

We do not however regret the transfer of OmniPay responsibilities to OmniPay Africa. As will become abundantly clear in coming months, the OmniPay Africa team is highly qualified to guide OmniPay to a higher level, a genuinely global service that will foster a beneficial surge in e-gold's emergence while bringing significant advantages to emerging economies.

## Strategic Background

A major strategic emphasis for e-gold is to provide sophisticated remote payments capabilities to the majority of mankind underserved by or excluded by the banking system. An important focus is international remittances - payments from migrant workers living in advanced economies sending a portion of their earnings to their home country. For many developing economies, migrant remittances constitute a significant portion of foreign exchange income and even GDP. Traditional remittance mechanisms, however, are expensive and inflexible. It is estimated that lowering the net cost of remittances by a few percentage points could measurably enhance economic development. There is also increasing awareness that non-traditional banking such as micro-credit facilities can also aid in bootstrapping lesser developed economies.

OmniPay Africa, an entirely non-US company, majority owned by prominent business leaders from the Francophone countries of West Africa, was therefore organized to extend the usefulness of e-gold by providing support for over-the-counter exchange and by fostering the integration of e-gold into micro-credit lending institutions. The combination of e-gold (settling the international transfer of value with no need for a financial intermediary) and OmniPay (offering standardized, reliable, low cost exchange to/from local currency) will serve as a flexible low cost alternative to the traditional systems.

---

Home | Privacy Policy | Terms and Conditions | About Us | Contact Us

Copyright © 2000-2005 G&SR. All rights reserved
OmniPay is a trademark of Gold & Silver Reserve, Inc.
e-gold, e-silver, e-platinum, Better Money, AUG, AGG, PTG, PDG are trademarks of e-gold Ltd.