UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Criminal No. 07-109 - RMC |
| E-GOLD LIMITED, | : | |
| GOLD & SILVER RESERVE, INC., | : | |
| DOUGLAS L. JACKSON, | : | |
| BARRY K. DOWNEY and | : | |
| REID A. JACKSON | : | |
| _____/ | : | |
| related case: | : | |
| | : | |
| In the Matter of the Seizure of | : | |
| Any and all property in/underlying E-GOLD | : | |
| Account **544179** and in/underlying E-GOLD | : | CASE NUMBER: |
| account **109243**, held by E-GOLD, Ltd. or | : | 07-167-M-01 |
| Gold & Silver Reserve, Inc. on behalf | : | |
| of **E-GOLD, Ltd.** | : | |
| _____/ | : | |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
MOTION TO VACATE SEIZURE WARRANT AND TO MODIFY RESTRAINING
ORDER AND REQUEST FOR AN EVIDENTIARY HEARING**

Defendants e-gold Limited, Gold & Silver Reserve, Inc., Douglas L. Jackson, Barry K. Downey and Reid A. Jackson, have demonstrated a right, under applicable legal precedent, to a pre-trial evidentiary hearing at which they will establish the grounds for the Court to vacate certain seizure warrants issued in conjunction with this matter. The government, in contrast, has not even addressed that case law offered by Defendants, nor has it otherwise shown why Defendants should be deprived of their assets without due process and an opportunity to be heard. Accordingly, the Court should hold the previously scheduled evidentiary hearing to determine (a) whether probable cause exists to believe that the Defendants have operated an unlicensed money transmitting business and (b) whether the Defendants are presently capable of paying for their attorneys fees and reasonable living expenses.

## I.    LEGAL STANDARD

### A.    Required Showing to Obtain an Evidentiary Hearing

The government would have this Court believe that "most courts follow...the '*Jones-Farmer*' rule." *See* Government Response, p. 4.  And the government urges the Court to do the same.  However, the government cites decisions from just <u>two</u> circuits, namely the Tenth Circuit (*Jones*) and the Fourth Circuit (*Farmer*), in support of this proposition.  Two circuits do not constitute a majority by our reckoning.  Nor is there any reason to find the *Jones-Farmer* reasoning any more persuasive.

In support of their request for an evidentiary hearing,  Defendants cited cases from <u>four</u> circuits, including the D.C. Circuit, demonstrating that a court should conduct a post-restraint hearing without requiring a showing that the restrained assets are needed to pay counsel or for necessary living expenses.  Strangely, the government does not deign to discuss or even cite any of these cases in its Response (except for the Fifth Circuit cases), or to explain why it believes the *Jones-Farmer* test is superior to the tests adopted by the Second, Fifth, Eighth, Ninth and D.C. Circuits.  It merely asks the Court to accept on faith the plainly incorrect proposition that "the *Jones-Farmer* rule is widely recognized as the established rule." Government Response, p. 5.  We challenge the government to cite one case stating that the *Jones-Farmer* rule is "the established rule."

Most importantly, the rule in the Fifth, Eighth and Ninth Circuits, which  Defendants respectfully urge the Court to follow, is most consistent with the persuasive due process analysis of this Circuit in *National Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192 (D.C. Cir. 2001).  In *National Council*, the D.C. Circuit afforded far greater due process consideration to a foreign terrorist organization's relatively insignificant property rights than the government

would afford to Defendants in this case. The government's failure to discuss or even attempt to distinguish that key case is striking.

### B.    Scope of the Probable Cause Hearing

In its response at pp. 5-6 and 13-14, the government contends that the scope of any evidentiary hearing should be limited to whether there is probable cause to believe that the property is subject to forfeiture, and **not** whether there is probable cause to believe that the defendants violated §1960, as charged in the indictment. However, while there is support for the government's general position in some circuits, in this case the two probable cause issues are inextricably intertwined. Defendants contend that there is no probable cause for the forfeiture of any of their seized and restrained property **because** there is no probable cause to believe that they committed a §1960 money transmitting offense.

The restrictive rule for which the government argues is based on the asserted notion that a grand jury's finding of probable cause (a factual question) should suffice to bring the case to trial. But the grand jury assesses only the facts; it does not "find" the law applicable to the case.[1] Probable cause is just as lacking when there is simply no legal basis to support the charges.

Courts routinely decide such issues on pre-trial motions to dismiss. And that is what Defendants are asking the Court to determine here: purely a *legal* question. The Court will have to decide that question when Defendants submit a motion to dismiss the indictment on precisely the same ground, which is a motion that Defendants fully expect to present in due course. Thus, the Court would hardly be usurping the role of the grand jury to decide that legal issue now.

---

[1]    Of course, the grand jury was never instructed on the legal issue now before this Court. Assuming it was instructed at all with respect to the actual definition of "money transmitting business," (which, given the papers filed by the government, is extremely unlikely), the prosecutor would simply have advised the grand jury that the term encompassed the defendants' business activities.

Accordingly, because the cases relied upon by the government have no actual application in this case, and the issue of probable cause is based on a question of law, as opposed to a question of fact, the Court should find here and now that there is no probable cause to support the seizure warrants pursued under §1960.[2]

## II. THE GOVERNMENT COULD NOT POSSIBLY HAVE ALLEGED LEGALLY SUFFICIENT PROBABLE CAUSE TO BELIEVE THAT THE DEFENDANTS WERE OPERATING AN UNLICENSED MONEY TRANSMITTING BUSINESS WITHOUT FIRST SUFFICIENTLY ESTABLISHING THAT THE DEFENDANTS WERE A MONEY TRANSMITTING BUSINESS.

31 U.S.C. § 5330 is the only statute in the United States Code that defines the term "money transmitting business." Therefore, any discussion concerning whether an entity is an *unlicensed* money transmitting business and may have violated either 18 U.S.C. §§ 1960(b)(1)(A), 1960(b)(1)(B) or 1960(b)(1)(C) is necessarily premature until there has been a determination that the entity is a "money transmitting business" under § 5330.

In this case, even if it tried, the government cannot show that Defendants meet the definition of a "money transmitting business" under § 5330. Nevertheless, the government pushes forward – all the while seeking to ignore that critical preliminary fact – in an effort to

---

[2]    The rule for which the government argues is incorrect even in cases where the defendant wishes to challenge the *factual* basis for the indictment. In its leading and well reasoned *en banc* decision in *Monsanto*, the Second Circuit held that, at the adversary hearing, the government must establish probable cause for the offenses underlying the forfeiture allegations as well as for the forfeiture of the property, because there can be no forfeiture without a conviction. *Monsanto*, 924 F.2d at 1200; *accord, Aronson v. City of Akron*, 116 F.3d 804, 810 (6th Cir. 1997)(upholding constitutionality of Ohio RICO statute's "corrupt activity lien" provision because it allowed the grand jury's probable cause determination to be reconsidered by the court at the defendant's request); *see also, Krimstock v. Kelly,* 306 F.3d 40 (2d Cir. 2002) (holding that there is a due process right to a prompt post-seizure, probable cause hearing in civil forfeiture cases involving vehicles, and that court must consider availability of less drastic means of safeguarding government's interest than seizure *pendente lite*).

charge  Defendants as an "unlicensed money transmitting business" under § 1960.  Such a quixotic position necessarily leads to this question:

> **How can probable cause exist to believe that the Defendants are an "<u>unlicensed</u> money transmitting business" when there is no probable cause to find  that Defendants are a "money transmitting business"?**

The Government writes in its reply that "the defendants are operating an unlicensed money transmitting business because they are engaged in the transmission of funds for the public." *See,* Government's Reply, at p.17.  In so doing, the government substitutes its *ipsa dixit* for the United States Code's definition of "money transmitting business," contained in three parts at 31 U.S.C. § 5330.  The government's attack is flawed for several reasons:

**FIRST,** the government's *ipsa dixit* definition of "money transmitting business" is overly broad and encompasses too much business activity.  Most notably, under the government's definition of money transmitting business – i.e. a business that transmits money – depository institutions would have to register as money transmitting businesses, because they remit wires as a common practice.  However, § 5330(d)(1)(C) specifically provides that the third of the three elements of a money transmitting business is that the business is "not a depository institution."

**SECOND,** without actually defining the defendants as a "money transmitting business" under § 5330, the government's end-run attempt – i.e. to label the defendants as an "unlicensed money transmitting business" although unable to label them as a "money transmitting business" – is thwarted by logic and the black letter of the statutes; *see,* § 1960(b)(1) (defining an

"unlicensed money transmitting business" as "**a money transmitting business which...**")
[Emphasis added].3

**THIRD,** the government's position in this case also strikes against the well established doctrine of statutory construction which provides that "statutes *in pari materia* should be interpreted harmoniously," *Sullivan v. Finkelstein,* 496 U.S. 617, 632 (1990) (Scalia, J. Concur), or that "all acts *in pari materia* are to be taken together, as if they were one law." *See, e.g. United States v. Stewart,* 311 U.S. 60, 64 (1940); *United States v. Spillane*, 913 F.2d 1079, 1084 (4th Cir. 1990). *In pari materia*, according to Blacks Law Dictionary, refers to "statutes relating to the same person or thing or having a common purpose." In this case, § 5330 and § 1960 – the former defining money transmitting businesses and the latter proscribing unlicensed ones – are unquestionably *pari materia*. In that light, the government's proposition that § 5330 defines "money transmitting business" for the purpose of § 1960(b)(1)(B) but that it does not for either § 1960(b)(1)(A) or § 1960(b)(1)(C), is absurd.

**FOURTH,** the Government's position cuts directly against the conclusions of numerous other departments and law enforcement officials within the Federal government, all of which Defendants previously quoted in their papers, and none of which have been contested by the government. *See,* Defendant's Status Report and Notice of Compliance with this Court's Seizure Warrants and Post-Indictment Restraining Order [Paper 28] , pp.2-4 and Defendants' Motion to Vacate Seizure Warrant and to Modify Restraining Order and Request for an Evidentiary Hearing [Paper 35], pp. 10-12. The government's assertions in this case, that there is probable

---

3    The Government's comment, at p.19 of its Response, that "it is not sufficient for a money transmitting business to rely on their practice or policy of not taking cash as a means of opting out of [its currency transaction reporting] requirement" flows out of this same twisted logic.

   To be sure, one way to avoid a speeding ticket is to avoid speeding. Likewise, one way to avoid being a "money transmitting business" is to avoid accepting cash.

cause to find that Defendants operated an illegal "money transmitting business" – because a "money transmitting business" is no more than a business that transmits money – is unsupportable in the face of contrary conclusions by the United States House of Representatives Energy Committee; a Special Agent of the FBI's Cyber Crimes Unit; the Department of Treasury and Department of Justice and other agencies which issued the December, 2005 U.S. Money Laundering Threat Assessment;  the Financial Action Task Force's  October 13, 2006 *Report on New Payment Methods*; and the Department of Justice and the Internal Revenue Service and other agencies in their 2007 National Money Laundering Strategy. *Id.*

**FIFTH,** to the extent that this Court perceives any ambiguity in the statutory regime at issue in this case, i.e. the relationship between § 1960 and § 5330, the Court should not follow the government's interpretation.  Such a reading runs afoul of the well-recognized rule of statutory construction known as the "rule of lenity."

In *United States v. Bass*, 404 US 336, 347-348 (1971), for example, the Court considered a statute which made it a criminal act for a felon to "receive[], possess[], or transport[] in commerce or affecting commerce" a firearm.  In interpreting that statute, the Court held:

> [A]s we have recently reaffirmed, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812 (1971); *see also, Ladner v. United States*, 358 U.S. 169, 177 (1958); *Bell v. United States,* 349 U.S. 81 (1955); *United States v. Five Gambling Devices*, 346 U.S. 441 (1953) (plurality opinion for affirmance).  In various ways over the years, we have stated that "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States v. Universal C. I. T. Credit Corp.*, 344 U.S. 218, 221-222 (1952).  This principle is founded on two policies that have long been part of our tradition.  First, "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.  To make the warning fair, so far as possible the line should

be clear." *McBoyle v. United States*, 283 U.S. 25, 27 (1931) (Holmes, J.). *See also, United States v. Cardiff*, 344 U.S. 174 (1952). Second, because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity.4 This policy embodies "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." H. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes*, in Benchmarks 196, 209 (1967). Thus, where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant. Here, we conclude that Congress has not "plainly and unmistakably," *United States v. Gradwell*, 243 U.S. 476, 485 (1917), made it a federal crime for a convicted felon simply to possess a gun absent some demonstrated nexus with interstate commerce.

*Id.*

Here, as in *Bass,* the Court must apply the rule of lenity and find that § 1960 does not criminalize Defendants' conduct.

For all of these reasons, the Court can not find that Defendants are a "money transmitting business." There can therefore not be any probable cause to believe that Defendants are an "unlicensed money transmitting business." Consequently, the seizure warrants entered in this case should be vacated. Defendants look forward to further discussing this matter with the Court in the upcoming, in-court proceedings.

### III. THE DEFENDANTS HAVE SATISFIED THEIR BURDEN OF ESTABLISHING THAT THEY ARE WITHOUT ASSETS TO PAY FOR COUNSEL AND REASONABLE LIVING EXPENSES.

In their motion, at pp. 23-24, Defendants established that G&SR – a Delaware corporation – has chosen to exercise the rights afforded by Delaware state statute and has elected to advance to the individual defendants their necessary attorneys fees. G&SR and the individual

---

4    Certainly, as the government seeks to do in this case, the person defining the criminal activity **should not be the prosecuting attorneys** – particularly where numerous others in both the Executive and Legislative branches have already concluded that the charged conduct does not fall under the alleged definition. *See, supra, pp. 6-7.*

defendants are plainly entitled to exercise this right, and the government has not disputed that in its Response.  Accordingly, to the extent that the Court wishes to inquire into Defendants' ability to pay for their attorneys fees in this case, that inquiry should be limited to G&SR's financial condition.

Nevertheless, to the extent that the Court wishes to broaden the scope of its inquiry, the individual Defendants will offer the Court any information the Court requires.  They have already done so by submitting sworn affidavits addressing their respective financial conditions in precise detail, and have now elaborated upon those initial affidavits with supplemental ones filed herewith, which demonstrate that the government's assertions in the Response about Defendants' financial circumstances are entirely misplaced.5

A brief review of Defendants' available liquid assets reveals that as a direct result of the warrant ordering the seizure of the e-gold Ltd. and G&SR operating accounts, Defendants have been left unable to pay for their attorneys fees and reasonable living expenses.  For purposes of judicial economy, each of the Defendants – via their attached supplemental affidavits – has addressed each of the questions raised by the government concerning each defendant's ability to pay for fees and expenses in this case.  They establish that they have insufficient assets, and that assets gratuitously charged to them by the government in its Response were all either previously

_____

5  The following supplemental affidavits are being filed as exhibits to this memorandum:

Exhibit 1 – Supplemental Affidavit of  e-gold Ltd..
Exhibit 2 – Supplemental Affidavit of  Gold & Silver Reserve, Inc
Exhibit 3 – Supplemental Affidavit of  Douglas L. Jackson
Exhibit 4 – Supplemental Affidavit of  Barry K. Downey
Exhibit 5 – Supplemental Affidavit of  Reid  A. Jackson

(Due to the fact that Dr. Douglas Jackson and Mr. Reid Jackson were in transit to Washington for the June 21, 2007 hearing before this Court, the supplemental affidavits for their signatures are being filed today in an unexecuted form but will be executed by them tomorrow in court. )

and forthrightly accounted for by Defendants in their initial affidavits or are assets held by persons other than Defendants. Defendants respectfully refer the Court to their attached supplemental affidavits, where these matters are described in greater detail. Defendants further look forward to elaborating upon these issues at the evidentiary hearing scheduled by the Court.

## IV.   CONCLUSION

For all of the foregoing reasons, as well as those more fully set forth in Defendants' initial motion, Defendants e-gold Limited, Gold & Silver Reserve, Inc., Douglas L. Jackson, Barry K. Downey and Reid A. Jackson respectfully reaffirm their request that this Court hold an evidentiary hearing to determine (a) whether probable cause exists to believe that the Defendants have operated an unlicensed money transmitting business and (b) whether the Defendants are presently capable of paying for their attorneys fees and reasonable living expenses.

Respectfully submitted,


/s/ David B. Smith
David B. Smith
VA Bar No. 25930
ENGLISH & SMITH
526 King Street, Suite 213
Alexandria, Virginia  22314
Telephone: 703-548-8911
Fax: 703-548-8935
dsmith@englishandsmith.com


/s/ Andrew S. Ittleman
Mitchell S. Fuerst, Esq.
Florida Bar No. 264598
Andrew S. Ittleman, Esq.
Florida Bar No. 802441
Fuerst Humphrey Ittleman, PL
1001 Brickell Bay Drive, Suite 2002
Miami, FL  33131
305-350-5690 (o)
305-371-8989 (f)

/s/ Aron U. Raskas
Aron U. Raskas
District of Columbia Bar No. 422939
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202-3201
Telephone: 410-752-6030
Fax: 410-539-1269
araskas@kg-law.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO VACATE SEIZURE WARRANT AND TO MODIFY RESTRAINING ORDER AND REQUEST FOR AN EVIDENTIARY HEARING**

was served on June 20, 2007 on all counsel of record via the Court's Electronic Case Filing system.

/s/ Aron U. Raskas
Aron U. Raskas

# EXHIBIT 1

**to**

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO VACATE SEIZURE WARRANT AND TO MODIFY RESTRAINING ORDER AND REQUEST FOR AN EVIDENTIARY HEARING**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Criminal No.  07-109 - RMC |
| E-GOLD LIMITED, | : | |
| GOLD & SILVER RESERVE, INC., | : | |
| DOUGLAS L. JACKSON, | : | |
| BARRY K. DOWNEY and | : | |
| REID A. JACKSON | : | |
| _____/ | | |
| related case: | : | |
| | : | |
| In the Matter of the Seizure of | : | |
| Any and all property in/underlying E-GOLD | : | |
| Account **544179** and in/underlying E-GOLD | : | CASE NUMBER: |
| account **109243**, held by E-GOLD, Ltd. or | : | 07-167-M-01 |
| Gold & Silver Reserve, Inc. on behalf | : | |
| of **E-GOLD, Ltd.** | : | |
| _____/ | | |

## SUPPLEMENTAL AFFIDAVIT OF E-GOLD LTD.

I, DR. DOUGLAS JACKSON, hereby affirm under penalties of perjury that the matters and facts set forth herein are true and correct to the best of my knowledge:

1.      I am over 18 years of age and I am competent to testify.

2.      I am a director of e-gold Ltd. and authorized to give statements on behalf of e-gold Ltd. The other two directors of e-gold Ltd. are Reid Jackson and Barry Downey.

3.      On June 1, 2007, in support of the request for an evidentiary hearing filed by e-gold Ltd. in this case, I signed an affidavit on behalf of e-gold Ltd. That affidavit was at the time I signed it -- and remains today -- true and correct to the best of my knowledge.

4.     The purpose of this supplemental affidavit is twofold. First, I will address each of the concerns related to e-gold Ltd.'s first affidavit as raised by the government in its response to our request for an evidentiary hearing. Second, I will attest to the company's financial state as of June 12, 2007.

5.     In the government's response, at p.10, the government correctly noted that e-gold Ltd.'s largest monthly expenses are paid to Gold & Silver Reserve, Inc. ("G&SR") in the form of a Super Originator Expense and an Operator Fee. G&SR earns the Operator Fee for the substantial work that it performs for e-gold Ltd. As of today's date, due to G&SR's inability to perform exchange transactions for its customers, these fees are G&SR's only form of income.

6.     With respect to e-gold Ltd.'s financial state, the government's states in its response, at p.9, that according to the "Defendants' May 22, 2007 Affidavit," e-gold Ltd. held approximately $1,372,622.80 worth of precious metals. In response to that statement, I offer the following:

a.     What the government deems to be a May 22, 2007 affidavit is, in actuality, a May 3, 2007 affidavit based on figures that were accurate as of May 2, 2007. It has absolutely no bearing on e-gold Ltd.'s present financial condition.

b.     The $1,372,622.80 figure is incorrect. I have no idea how the government calculated it. The actual USD value of the e-metal in e-gold Ltd.'s e-gold accounts – less the value of e-gold Ltd.'s seized operating account – was $752,296.33. Roughly 28% of that total was illiquid, i.e. in the form of e-silver, e-platinum and e-palladium.

7.    As of May 28, 2007, e-gold Ltd. had total liquid assets with a USD equivalent value of $823,386.05.[1] As of June 12, 2007 – the date of the most recent update available to e-gold Ltd. – e-gold Ltd. had $941,671.02 in available liquid assets. This $118,284.97 increase was caused by fees and revenues earned in the ordinary course of e-gold Ltd.'s activities. Additionally, as of June 12, 2007, e-gold Ltd. had a USD equivalent of $18,500 in accounts payable.

FURTHER AFFIANT SAYETH NOT.

_____                    _____
Date                                       DR. DOUGLAS JACKSON
                                           Director, e-gold Ltd.

_____

[1] This number is actually higher than the amount reported on e-gold Ltd.'s June 1, 2007 affidavit. Just prior to May 28, 2007 (Memorial Day), G&SR processed a wire from its closed SEB account, $78,000 of which was dedicated to paying for e-gold Ltd. expenses. However, due to the size of the wire, it was subsequently returned to SEB, but consequently did not appear on G&SR's May 28, 2007 balance sheet.

# EXHIBIT 2

**to**

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO VACATE SEIZURE WARRANT AND TO MODIFY RESTRAINING ORDER AND REQUEST FOR AN EVIDENTIARY HEARING**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : |
| | : Criminal No. 07-109 - RMC |
| E-GOLD LIMITED, | : |
| GOLD & SILVER RESERVE, INC., | : |
| DOUGLAS L. JACKSON, | : |
| BARRY K. DOWNEY and | : |
| REID A. JACKSON | : |
| _____/ | |
| related case: | : |
| | : |
| In the Matter of the Seizure of | : |
| Any and all property in/underlying E-GOLD | : |
| Account **544179** and in/underlying E-GOLD | : CASE NUMBER: |
| account **109243**, held by E-GOLD, Ltd. or | : 07-167-M-01 |
| Gold & Silver Reserve, Inc. on behalf | : |
| of **E-GOLD, Ltd.** | : |
| _____/ | |

## SUPPLEMENTAL AFFIDAVIT OF GOLD & SILVER RESERVE, INC.

I, DR. DOUGLAS JACKSON, hereby affirm under penalties of perjury that the matters and facts set forth herein are true and correct to the best of my knowledge:

1.    I am over 18 years of age and I am competent to testify.

2.    I am a director of Gold & Silver Reserve, Inc. (G&SR) and authorized to give statements on behalf of G&SR. The other two directors of G&SR are Reid Jackson and Barry Downey.

3.    On June 1, 2007, in support of the request for an evidentiary hearing filed by G&SR in this case, I signed an affidavit on behalf of G&SR. That affidavit was at the time I signed it – and remains today -- true and correct to the best of my knowledge.

4.    The purpose of this supplemental affidavit is twofold. First, I will address each of the concerns related to G&SR's first affidavit as raised by the government in its

response to our request for an evidentiary hearing. Second, I will attest to the company's financial state as of June 12, 2007.

5.    **G&SR Income**: At page 9 of its Response, the government asserts that "an accounting of income should be provided before a determination of the availability of funds can properly be made." As of today's date, G&SR has no way of knowing what its income will be during the course of this litigation. However, it is very likely that it will be very low. We have previously advised the court that, as a result of the seizure warrants signed in 2005 and the indictment in this case, G&SR no longer has a banking relationship with which to process InExchanges and OutExchanges. Consequently, until G&SR establishes such a relationship – which will be virtually impossible until the indictment is dismissed or G&SR prevails at trial – G&SR's only form of income will be in the form of fees it receives from e-gold Ltd.

6.    **OmniPay Africa**: At page 9 of its Response, the government asserts as follows:

> The defendants have also failed to inform the Court of their efforts to move part of their operation outside of the United States. As explained in the Affidavit of Special Agent Eggland..., Defendants are transferring their exchange operation to "OmniPay Africa," which they state is owned by third parties, but appears to be a subsidiary of a Bermuda corporation owned by the Jackson and Downey family trusts. Further, it may involve the movement of assets outside of the jurisdiction of the Court. In any event, if defendants are leasing OmniPay Africa to outside investors..., that would be additional income not described in defendants submissions.

OmniPay Africa grew out of a need to establish a new primary dealer of e-gold following the unsealing of the indictment and G&SR's loss of its banking relationship with SEB in Estonia. To accomplish these tasks, the OmniPay brand would be leased to outside

investors, but no "transfer" was ever contemplated by this venture. Ancien Ltd., a company owned by the Jackson Family Trust and the Downey Family Trust, would have been a minority owner of OmniPay Africa. Although this venture was announced publicly on the OmniPay website, G&SR did not include the OmniPay Africa idea on its original financial affidavit because it earned no money from it, and any prospective income that may have been earned by G&SR as a result of such a lease would have been entirely speculative and incalculable.

7.    **G&SR Expenses:** At pages 10 and 11 of its Response, the government takes exception with several of G&SR's most important and costly monthly expenditures. However, despite the government's assertions, G&SR requires – on average – approximately $186,569 per month to operate. Each of these expenses are essential for the continued operation of the business:

| Claimed Expense | Monthly Amount | Description of Expense |
| --- | --- | --- |
| Outside IT Services | $15,720.00 | This expense is not discretionary. Rather than being related to growing or expanding the business, this expense pays the fees for the system administration and code writing of the very large and complex e-gold system. Companies such as e-gold Ltd. and G&SR, which exist entirely on the internet, rely on IT services for their very survival. |
| Professional Fees | $50,810.97 | This expense is not discretionary. It pays for the company's accounting, legal (not related to this or the civil forfeiture case), and management fees (including Jackson & Escher, Inc., which oversees certain critical business functions). |
| PR Support | $18,000.00 | This expense – especially after the unsealing of the indictment – is not discretionary. In order for G&SR to survive, it must publicly combat the government's press releases and public statements related to this case which have appeared in such publications as the Washington Post, the New York Daily News, |

| | | |
|---|---|---|
| | | and the Orlando Sentinel and which have caused an exodus from the e-gold system. |
| Travel | $19,963.23 | This expense is not discretionary. It was based – as were all of the expenses submitted by G&SR – on the monthly average of the first quarter of 2007. Upon information and belief, as G&SR representatives are forced to travel to Washington, DC for court, to Miami, FL to meet with our lawyers and to Melbourne, FL to work with each other at G&SR's headquarters <u>all</u> for purposes of defending this criminal case, G&SR's monthly travel expense will meet its first-quarter monthly average. |
| Spread Expense on OutExchange | $2,426.05 | This spread expense is the difference between the bid price and spot price of an OutExchange. When G&SR performs an OutExchange via OmniPay, it – like all other OmniPay users – pays for this "spread expense." |

8.     Between May 28, 2007 and June 12, 2007, based on activities undertaken in the ordinary course of G&SR's business, G&SR's liquid assets decreased from $1,315,199.08[1] to $895,939.38.

9.     The shareholders of Gold & Silver Reserve, Inc. have elected to pay for the legal fees for Reid Jackson, Barry Downey, and me, and have also elected to pay for the attorneys fees for each of the G&SR employees and contractors who will be subpoenaed by the government to testify during the government's case-in-chief. I have been advised that the sum of those costs will exceed $3.5 million. G&SR cannot afford that cost.

---

[1]     This number is actually higher than the amount reported on G&SR's June 1, 2007 affidavit. On May 28, 2007 (Memorial Day), G&SR had a wire in transit in the amount of $298,000 from its closed SEB Bank account. Due to its size, that wire was subsequently returned to SEB, but consequently did not appear on G&SR's May 28, 2007 balance sheet.

10.    To the extent that the Government has taken issue with any of the statements made by me on behalf of G&SR in G&SR's original affidavit (signed and filed on June 1, 2007), I respectfully state as follows:

a.    The separation that exists between e-gold Ltd. and G&SR is not – as the government claims in its Response – artificial. G&SR and e-gold Ltd. are two separate entities. They always have been and they always will be.

b.    The government bases its response on an affidavit that I signed on May 3, 2007 and that our lawyers submitted for filing under seal on May 22, 2007. While the government calls it the "May 22, 2007 Affidavit," it was actually signed on May 3, 2007 and was based on numbers which were accurate as of May 3, 2007. Numbers that were accurate as of May 3, 2007 have absolutely no bearing on G&SR's current financial condition.

c.    In its response, at pp.8-9, the government states that as of May 2, 2007, G&SR had "approximately $2,607,538.00 worth of precious metals" *exclusive of* G&SR's seized operating account (e-gold account no.109243). This is not true. The figure presented by the government actually includes the value of e-gold account no.109243 which was seized pursuant to a seizure warrant served on G&SR on April 26, 2007.

d.    As of May 28, 2007, G&SR had total liquid assets with a USD equivalent of $1,315,199.08.[2] As of June 12, 2007 – the date of the most recent update available to G&SR – G&SR had $895,939.28 in available liquid assets. This $419,259.80 decrease was caused by the expenditure of funds in the ordinary course of G&SR's activities, which includes the payment of payroll, InExchange

---

[2]    See footnote 1 above.

fulfillments, OutExchange fulfillments and other fees and costs. Additionally, as of June 12, 2007, G&SR had a USD equivalent of $613,448.07 in accounts payable and exchange liabilities.

FURTHER AFFIANT SAYETH NOT.

_____                    _____
Date                                       DOUGLAS JACKSON, M.D.
                                           Director, Gold & Silver Reserve, Inc.

# EXHIBIT 3

**to**

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO VACATE SEIZURE WARRANT AND TO MODIFY RESTRAINING ORDER AND REQUEST FOR AN EVIDENTIARY HEARING**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : |
| | :     Criminal No.  07-109 - RMC |
| E-GOLD LIMITED, | : |
| GOLD & SILVER RESERVE, INC., | : |
| DOUGLAS L. JACKSON, | : |
| BARRY K. DOWNEY and | : |
| REID A. JACKSON | : |
| _____/ | |
| related case: | : |
| | : |
| In the Matter of the Seizure of | : |
| Any and all property in/underlying E-GOLD | : |
| Account **544179** and in/underlying E-GOLD | :     CASE NUMBER: |
| account **109243**, held by E-GOLD, Ltd. or | :     07-167-M-01 |
| Gold & Silver Reserve, Inc. on behalf | : |
| of **E-GOLD, Ltd.** | : |
| _____/ | |

## SUPPLEMENTAL AFFIDAVIT OF DOUGLAS L. JACKSON

I, Douglas L. Jackson, M.D., hereby affirm under the penalties of perjury that the facts set forth herein are true and correct upon personal knowledge:

1.      I am over 18 years of age and competent to testify.

2.      I make this Affidavit in response to the assertions made by the United States of America in the Government's Response to Defendants' Motion to Vacate Seizure Warrant and to Modify Restraining Order and Request for an Evidentiary Hearing ("Government Response"), and in the Affidavit of Ryan Eggland that accompanied the Government Response.

3.      The government asserts that I did not mention in my original Affidavit that I supposedly owned  "approximately 41 e-gold accounts in [my] name, with a total approximate value of $196,590.15 . . .." Government Response, p. 12. This affidavit responds to that and other assertions made by the government.

4.     Account 2030073, listed in the exhibit to the Government Response, is an account that I described in paragraph 13 of my original affidavit, where I advised that I receive a revenue stream of no more than about $1,000.00 to $2,000.00 (worth) per month derived from e-gold's Referral Incentive Program.  That e-gold goes into this account.

5.     Account Numbers 212880, 212890, 212893, 2128947, 212901, 212902, 253192 and 348640, listed in the exhibit to the Government Response, are owned by Ancien Ltd.  I am not an owner of Ancien.  Rather, Ancien is owned by the Jackson Family Trust and the Downey Family Trust.  Barry Downey and I are potential beneficiaries under that Trust, but do not have any ownership interest or control over it.

6.     The remaining 33 accounts listed by Agent Eggland, have a total value equivalent to 3,265.26 U.S. dollars.  Many of these are accounts that I established over the years to use for demonstration purposes when seeking to explain and market the e-gold system to outsiders.  Others may be accounts that I established many years ago for miscellaneous purposes. Most of these have not been accessed in years.

7.     Eight of the accounts listed in the exhibit to the government's Response bear the notation "Not in FIFO."  This means that each such account *never* had any value in it.

8.     Account numbers 10052 and 10057 are my personal accounts through which I have been paid by G&SR.  I have never had much in these accounts, nor did I have more than several hundred dollars of value in them when I made my initial affidavit.  The largest transaction through one of these accounts was several months ago, when G&SR paid $30,000.00 of its outstanding debt to me via a transfer to one of these accounts, and I then used that value to pay down $30,000.00 of my credit card debt – leaving myself then with *only* about $130,000.00 of credit card debt accumulating interest against me.

2

9.      I created account numbers 168705 and 168708 in 2000 when conducting an investigation on behalf of e-gold Ltd. The total value that apparently remains in these accounts, equivalent to approximately $1,177, belongs to e-gold Ltd. I last accessed these accounts in August, 2000, and had frankly forgotten about them. Account number 533848 was another account that I created long ago, in about 2002, as a part of a failed business venture that I have long tried to forget. I have not accessed that account either for many years.

10.      I have reviewed the remaining twenty accounts that the government has listed. As noted above, most of them are accounts that I established when demonstrating the e-gold system to outsiders. The most relevant fact about all of these accounts is that there has been no activity in any of them since at least November, 2005. Indeed, I had completely forgotten about many of them.

11.      The government's assertion that my wife or my parents may have assets available to pay my attorneys' fees and living expenses is particularly hurtful. As I stated in my initial Affidavit, I was forced to relocate – in reality, to evict – my parents from my second home which I sold in order to raise funds to inject into the e-gold and G&SR business. My parents never were wealthy people, and have struggled since that date to provide for themselves. They do not have any funds to spare for me in their savings or retirement accounts, nor do I believe that they would even provide them to me at this point even if they did. Furthermore, as I stated, I believe as emphatically as I could, in my initial Affidavit, my family and I – including my wife – are destitute. We are about a paycheck away from becoming homeless.

_____          _____
Date                                            Douglas Jackson, M.D.

3

# EXHIBIT 4

**to**

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
MOTION TO VACATE SEIZURE WARRANT AND TO
MODIFY RESTRAINING ORDER AND REQUEST FOR AN
EVIDENTIARY HEARING**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : |
| | : Criminal No. 07-109 - RMC |
| E-GOLD LIMITED, | : |
| GOLD & SILVER RESERVE, INC., | : |
| DOUGLAS L. JACKSON, | : |
| BARRY K. DOWNEY and | : |
| REID A. JACKSON | : |
| _____/ | |
| related case: | : |
| | : |
| In the Matter of the Seizure of | : |
| Any and all property in/underlying E-GOLD | : |
| Account **544179** and in/underlying E-GOLD | : CASE NUMBER: |
| account **109243**, held by E-GOLD, Ltd. or | : 07-167-M-01 |
| Gold & Silver Reserve, Inc. on behalf | : |
| of **E-GOLD, Ltd.** | : |
| _____/ | |

## SUPPLEMENTAL AFFIDAVIT OF BARRY K. DOWNEY

I, Barry K. Downey, hereby affirm under the penalties of perjury that the matters and facts set forth herein are true and correct upon personal knowledge:

1.      I am over 18 years of age and competent to testify.

2.      I make this Affidavit in response to the assertions made by the United States of America in the Government's Response to Defendants' Motion to Vacate Seizure Warrant and to Modify Restraining Order and Request for an Evidentiary Hearing ("Government Response"), and in the Affidavit of Ryan Eggland that accompanied the Government Response.

3.      The Government questions whether "some amounts reducing [my] gross earnings [from past years] may be deductions for retirement accounts or other assets." Government Response, p. 12. There were in fact such deductions made for my retirement account, and I

prominently disclosed the full amount of money in my retirement account in paragraph 13 of my initial Affidavit.

4.    The Government also suggests that there are 11 e-gold accounts in my name or the name of my family members, with value equivalent to approximately $22,065.22, in addition to the assets disclosed in my initial Affidavit. However, my Affidavit did in fact address all of the accounts that I own.

5.    e-gold account number 100060, in which I am designated as a "trustee," represents funds held under the Smith & Downey 401(k) Plan. This is a 401(k) plan established by my law firm and is part of the amount that I disclosed in paragraph 13 of my initial Affidavit. e-gold account number 2030081 is precisely the account that I described in the last two sentences of paragraph 6 of my initial Affidavit. As I said in the initial Affidavit, this is the account that receives the "originator" shares of "spend fees" from the accounts for which it is the originator.

6.    e-gold account number 667280 is not an account that I own. It was established after an e-gold customer brought suit against another e-gold customer. I was asked to serve as an escrow agent and to establish an e-gold account to hold in escrow the e-gold that was the subject of that litigation. Account number 667280 is the account established for that purpose and the value remains in that account subject to further court ordered disposition. Likewise, I opened e-gold account numbers 220541 and 244983 to establish similar escrow accounts in other litigations. The proceeds of those accounts were paid out pursuant to court orders.

7.    The remaining accounts that the government has identified are either miscellaneous accounts that I have established over time or accounts that I do not know who established, apparently in my name. Specifically, account number 100136 is the Smith & Downey, P.A. corporate account, pursuant to which my law firm receives e-gold when it is paid

{06676/0/00290601.DOCv2}

2

in that fashion.  Any value in that account belongs to Smith & Downey, P.A.  Account number 100068 is a personal account which I have used from time to time to receive e-gold Spends and to pay bills.  I have never maintained a substantial amount in that account.  Account number 111175 is an account that I established to use when I made demonstrations of the e-gold system to potential customers.  I have therefore never had more than about five dollars of value in that account.  I do not recall establishing account numbers 100055, 312078 or 518220 (which, according to the government's exhibit, have in them value of $0.00, $0.00 and $1.67, respectively), and I do not have any passcode to them to even access them and determine anything more about them.

8.      My wife does not hold any assets in her name individually, nor do my parents or other family members have assets that are available to pay my attorneys' fees or living expenses.

9.      I am simply astounded by the Government's suggestion that my share in my law firm's profits is being reduced as a means of shielding my assets.  I believe I said it clearly enough in my initial Affidavit, yet I will say it again here: The reduction in earnings that I have and will continue to suffer in my law practice has occurred, involuntarily, as a direct and proximate result of the overly aggressive action that the government has taken against me, including particularly the scurrilous press release that it distributed.  As a result of those allegations and the time that I will have to invest in defending against them, my law partners independently and without my approval decided and voted to change the manner in which my law firm's profits are split, reducing my share from the 1/3 that I had previously received to an estimated 1/6 of the firm's profits.  For the government to suggest anything else, when its aggressive actions were the direct cause of this, is simply shameful.

10.    Finally, I reluctantly add one last item.  While my wife and I are private people and would prefer to keep our personal issues to ourselves, the government in its zealotry seems to have no such limitations about challenging personal aspects of the lives of my wife or other family members.  Accordingly, it seems appropriate for the Court to know that on Tuesday, June 19, 2007, my wife, Rhonda, was diagnosed with lymphoma, and the primary focus of all of our resources will be on ensuring that she receives the most capable treatment necessary to defeat this disease.  She is scheduled to begin an initial course of chemotherapy on Friday, June 22, 2007.

Date: June 20, 2007

Barry K. Downey

{06676/0/00290601.DOCv2}

4

# EXHIBIT 5

**to**

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO VACATE SEIZURE WARRANT AND TO MODIFY RESTRAINING ORDER AND REQUEST FOR AN EVIDENTIARY HEARING**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Criminal No. 07-109 - RMC |
| E-GOLD LIMITED, | : | |
| GOLD & SILVER RESERVE, INC., | : | |
| DOUGLAS L. JACKSON, | : | |
| BARRY K. DOWNEY and | : | |
| REID A. JACKSON | : | |
| _____/ | : | |
| related case: | : | |
| | : | |
| In the Matter of the Seizure of | : | |
| Any and all property in/underlying E-GOLD | : | |
| Account **544179** and in/underlying E-GOLD | : | CASE NUMBER: |
| account **109243**, held by E-GOLD, Ltd. or | : | 07-167-M-01 |
| Gold & Silver Reserve, Inc. on behalf | : | |
| of **E-GOLD, Ltd.** | : | |
| _____/ | : | |

## SUPPLEMENTAL AFFIDAVIT OF REID A. JACKSON

I, Reid A. Jackson, hereby affirm under the penalties of perjury that the matters and facts

set forth herein are true and correct upon personal knowledge:

1.      I am over 18 years of age and competent to testify.

2.      I make this Affidavit in response to the assertions made by the United States of

America in the Government's Response to Defendants' Motion to Vacate Seizure Warrant and to

Modify Restraining Order and Request for an Evidentiary Hearing ("Government Response"),

and in the Affidavit of Ryan Eggland that accompanied the Government Response.

3.      The government suggests in its Response that there are assets that I own but failed

to disclose in my Affidavit.  The government is incorrect.

4.      The government lists 100064 as an account belonging to me.  This is true.

Richard Escher and myself have had joint bank accounts since the 1980s and long ago decided to

handle our e-gold accounts the same way. Accordingly, I Spent the balance out of 100064 to 100932 (jointly owned by Richard Escher and myself) in 1998. Concurrently, Richard then Spent the entire balance out of 100065 to this same joint account. There has been no consequential activity in e-gold account 100064 or 100065 since 1998. I do also own e-gold account 8. This e-gold account has never had any consequential value in it. Since Nov 2005, the highest balance in that account has been 0.294227 troy ounces of e-gold, worth approximately USD 200.00 at that time.

5.    Account number 100081 identified by the government is an account owned by Jackson & Escher, Inc., and is an asset of that corporation. I made it clear in my initial Affidavit, that I own 50% of the stock of Jackson & Escher, Inc. and that my salary is paid from money that Jackson & Escher, Inc. receives from G&SR, which is Jackson & Escher, Inc.'s only client. Likewise, account number 593007, which the government notes had a value equivalent to 236.29 on April 30, 2007, is a Jackson & Escher, Inc. corporate account.

6.    e-gold account numbers 637219, 100932, 593073 and 593059 are accounts owned jointly by myself and Richard Escher. The balance in these accounts (which is the complete list of personal e-gold accounts we actively use) was correctly stated in paragraph 5(b) of my initial Affidavit, specifically $69,620.94. That figure was the correct equivalent value in those accounts on June 1, 2007, when I signed my initial Affidavit.

7.    The government failed to note that on May 22, 2007 and May 23, 2007, Richard Escher and I funded OmniPay OutExchange orders (from e-gold to USD) funded by our joint e-gold account 637219 for wire transfers of $20,000 and $30,000 respectively, to the joint Checking account that I referred to in paragraph 5(a) of my initial Affidavit. The OutExchanges

thus reduced the balance in our joint e-gold accounts and increased the balance in our joint checking account.

      8.      In other words, prior to receipt of the wire transfers in fulfillment of the OutExchanges described in the previous paragraph, Richard Escher and myself had only about $6,000 in our joint checking account. Thereafter, on June 1, 2007, when I signed my initial Affidavit, I correctly stated that we had $54,695.95 in our joint checking account. That included the $50,000 received via wire transfer to our joint checking account in fulfillment of the OutExchange orders referenced in the previous paragraph. Conversely, the e-gold accounts did in fact have $50,000.00 (plus exchange spread and fulfillment fees) less value in them on June 1, 2007 than they did on May 1, 2007. That value, however, was fully and forthrightly accounted for in the checking account that I described in paragraph 5(a) of my initial Affidavit.

      9.      I neglected to mention on my original affidavit that e-gold account 100932 is the recipient of a revenue stream from e-gold Ltd pursuant to the "e-gold Account Referral Incentive Program" (described on e-gold website). Over the past four years, this account has generated annual e-gold income equivalent to approximately $22,700. Given the effect that these proceedings have had on the e-gold system, it is probable that this revenue stream will be significantly reduced for the remainder of 2007 and going forward.

      10.      I also neglected to mention that Richard Escher and I jointly own (or at one time owned) an e-Trade account. The balance in this account is believed to be less than $200.00 (based on a statement from October 2001); however, I was not able locate a recent statement to verify the balance (or for that matter that the account is even still open).

      11.      e-gold account number 100985 is an account which the exhibit offered by the government properly notes I maintain as a "trustee." In fact, this is an account belonging to the

Jackson & Escher, Inc. 401(k) Plan and is held for the benefit of Leigh Jackson, who is my

father. My father funded this account, when he was an employee of Jackson & Escher, Inc.,

with a rollover from the retirement plan of his former employer, Westinghouse Corporation.

Therefore, this account does not contain any of my assets. Furthermore, in the Government

Response, the government suggests that I really have additional assets of $103,279.98, because

"GSR's Affidavit indicated the value of the Jackson & Escher 401(k) Plan is actually

$103,279.98 . ..." Government Response, paragraph 4. The government is wrong about that as

well. The note payable in the amount of $103,279.98 identified in G&SR's Affidavit is a note

payable to this 401(k) Plan account held for the benefit of my father. As noted above, it was

funded with a rollover from his Westinghouse retirement plan.

    12.    The only Jackson & Escher, Inc 401(k) Plan funds held for my benefit are in e-

gold account no. 100988. I prominently listed those funds in paragraph 5(d) of my initial

Affidavit.

    13.    Account number 101490 is a 401(k) Plan account established for the benefit of

Douglas Jackson during the brief period of time in 1998 that he was an employee of Jackson &

Escher, Inc. Douglas elected to take a lump sum distribution from that account in January 1999.

Account number 547136 is an account owned by Ancien, Ltd. I do not have any ownership

interest in Ancien, Ltd. Account number 552909 is an account owned by e-gold, Ltd. The value

in that account was included on the Affidavit filed on behalf of e-gold, Ltd. in this matter.

    14.    The government has listed a number of other e-gold accounts (account nos.

393474, 448433, 448435, 448436, 448437, 449438, 448439, and 448440) which appear to have

references to my name. I did not create these accounts and do not own these accounts.

Moreover, I do not now control, nor have I ever controlled any of these accounts. I do not know

{06676/0/00290616.DOCv3}

4

why my name was placed in connection with these accounts.  In any event, there is  currently little value in these accounts (in fact no value in most of them) and there has never been much value in any of these accounts.


_____
Date

_____
Reid A. Jackson