IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Cr. No. 07-109-05 (RMC) |
| | ) | |
| REID JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

*"[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance."[1]*

\* \* \*

Mr. Jackson  respectfully submits this memorandum requesting that, in determining an appropriate sentence, the Court consider his entire life, including his character (as evidenced by the letters submitted on his behalf along with this memorandum), his lack of any criminal history whatsoever, the nature of the offense that he has been convicted of and his role in that offense, and all that he has done to help bring the company into compliance since the plea in this case.

---

[1]    <u>United States v. Adelson</u>, 441 F. Supp.2d 506 (S.D.N.Y. 2006) ("This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant'.")

**LEGAL FRAMEWORK**

Mr. Jackson pled guilty to a violation of 26 D.C. Code §1022, which makes it a felony to engage in the business of money transmission without a license.  Therefore, Mr. Jackson comes before the Court for sentencing under the D.C. Code and the D.C. Voluntary Sentencing Guidelines.  Under the D.C. Code, sentences should:

(1)     Reflect the seriousness of the offense and the criminal history of the offender;

(2)     Provide for just punishment and afford adequate deterrence to potential criminal conduct of the offender and others; and

(3)     Provide the offender with needed educational or vocational training, medical care, and other correctional treatment.

D.C. Code 24-403.01(a).  Toward these ends, the District of Columbia Sentencing Commission enacted voluntary guidelines for the judges to consider in imposing sentences for pleas and/or verdicts entered after June 14, 2004.

In this case, Mr. Jackson has pled guilty to the D.C. offense of operating a money transmitting business without a license, which is essentially a criminal violation of a regulatory provision.  In entering a guilty plea, Mr. Jackson acknowledged that he knew how e-gold, Ltd., and Gold & Silver Reserve, Inc. ("GSR") operated and that he knew that neither company was licensed to transmit money in the District of Columbia.  He has accepted responsibility for his role in this offense, and has begun to make amends by working literally night and day to assist in bringing the companies into compliance with the plea agreement and all applicable laws.

The government, the defendant, and the probation office all agree that the appropriate D.C. advisory sentencing guidelines suggest that the Court sentence Mr. Jackson to a sentence of somewhere between probation and 24 months incarceration.  As part of the plea agreement,

the government reserved its right to allocate for up to 6 months incarceration.  In light of Mr. Jackson's history and characteristics, the nature of the offense, and the need for an appropriate level of deterrence, we respectfully submit that a sentence of probation is appropriate.

There is no dispute that this offense falls near the bottom of the range of severity of offenses.  There is also no dispute that Mr. Jackson has absolutely no criminal history, thus putting him at the lowest possible criminal history category.  When the voluntary guidelines were enacted, the D.C. Sentencing Commission designed a guidelines table that is similar in some respects to the United States Sentencing Guidelines chart.  Mr. Jackson is in a range that is comparable to being within Zone A (the lowest zone) of the federal guidelines.  As a result, it is perfectly consistent with the voluntary guidelines to sentence Mr. Jackson to a period of probation.  Unlike in the federal system, because this case is a D.C. Code offense, the Court also has the option of imposing a suspended sentence.  In other words, the Court can impose a sentence of 6 months incarceration, but suspend execution of that sentence and place him on a period of probation.

The Superior Court voluntary guidelines were enacted with the express purpose of reducing disparity and increasing the likelihood that similarly situated offenders would be treated similarly.  *See generally*, Practice Manual for the Superior Court of the District of Columbia Voluntary Sentencing Guidelines for Pleas and Verdicts Entered On or After June 14, 2004 (June 2004).   And, importantly, the Commission studied historical data regarding sentences imposed and developed a sentencing table that attempted to reflect historical norms. Id.  As such, sentences allowing for probation instead of incarceration were only recommended

if historically at least 25% of the sentences for offenses and offenders fitting into a particular box resulted in probation.  Id. Therefore, while we cannot say specifically what percentage of individuals convicted of operating a money transmitting business without a license received probation, we can say that historically speaking, it is at least 25%.

Because the D.C. guidelines do not include a reduction on the grid for acceptance of responsibility, this range of probation through 24 months incarceration necessarily includes people who have not accepted responsibility for their actions, but instead have been convicted at trial.  It also includes people who have some level of criminal history.  Because Mr. Jackson has absolutely no criminal history, has led an otherwise exemplary life, has accepted responsibility, and is hard at work attempting to bring the company into compliance, a sentence at the lower range of the options available to the Court under the voluntary guidelines (i.e., probation) is appropriate.

## RELEVANT CONSIDERATIONS FOR SENTENCING

**I.      The Lack of any Criminal History and the Personal History and Characteristics of Mr. Jackson Support a Non-Custodial Sentence.**

Mr. Reid Jackson is an honorable man with no criminal history whatsoever who has worked hard all his life.  He was raised in an intact, supportive family as one of five children. Growing up, Mr. Jackson was especially close to his mother, whose lengthy and repeated bouts with cancer and ultimately premature death in 1999, affected him greatly.  Several of the people who have written in support of Mr. Jackson have commented on the impact his mother's illness and death had on him.

Work has always been central to who Reid is.  He worked summer jobs while in high

4

school, picking up golf balls on the local golf course driving range, working as a dishwasher, busboy and waiter.  After graduating from high school, he was employed for a summer at Westinghouse as a landscaper and elevator assembler.  This was a relatively well paying job, and Reid worked Saturdays and Sundays as well, earning enough to pay for his first year of college in its entirety.  Other jobs while in college were hotel Bellboy, Front Desk Clerk in the same hotel (a promotion), sales clerk at a clothing store, and Valet at a parking garage, where he was one of the few of many employees (other than family members) who the elderly Proprietor trusted to run the cash register.   Reid put himself through college starting at Penn State University and finishing at the University of Pittsburgh entirely from a combination of money he earned from employment, grants, and student loans.

For the first three years of college, Reid lived at home with his parents, originally to help minimize costs, but ultimately because his mother had her first bout of cancer early in Reid's college career.  Reid wanted to spend as much time as he possibly could with his mother because of his concern that her time remaining might be short.  Thankfully, although Becky ultimately lost the battle to metastatic cancer, it was not for 17 years, and although some of those years were very difficult, there were good times even in the bad years.  One of the things Reid and his mother shared was their love for gardening and landscaping.  They jointly redesigned and replaced the landscaping of the house the family lived in at the time Becky found out she had cancer, and this was the house that Leigh Jackson refers to in his letter in which he recollects:

> Perhaps Reid's greatest attribute is his determination to solve
> problems, and provide help to whomever needs it. I can

> remember back when Reid was still living at home in
> Greensburg, PA. We had a strip of land, paralleling the drive,
> which looked to Reid's mother, and to Reid, as a promising small
> garden plot. Reid undertook the task of hand tilling the formerly
> grassy area into a garden bed. He encountered what turned out to
> be a very large rock. I can remember that Reid gave it his all till
> this huge rock was finally successfully removed. He was always
> a good son. His mother wanted a garden, and by golly Reid
> helped her to achieve this. (Ex B).

Reid reports this anecdote is extremely meaningful to him on multiple levels.  In descending level of importance, the significance to Reid is:  He did not want to ever give up because he didn't want his Mom to ever give up either, he learned that incredible feats can be accomplished when the will to do so is strong enough, and he and his mother accomplished their objective. This tenacity has served him well and has been commented on by several of the individuals who have written letters to the Court in support of him.

While in college, Reid gained a breadth of knowledge consistent with his wide ranging and eclectic interests.  He obtained minors in math, computer science, theater arts, and English literature.  He also explored his creative side in his younger years, writing poetry and music. He graduated Magna Cum Laude from the University of Pittsburgh in 1987.  Despite his varied interests, his career was ultimately more shaped by events and the needs of others than by Reid's preference.  Reid quips that "I'd rather be the type of Director that makes movies". Other people have continually called on Reid for his ability to analyze and solve problems. Reid characterizes the type of problem solving he does is best labeled "systems analysis."  Now more than ever, these abilities are critical for e-gold Ltd. and GSR as the companies transform themselves into good corporate citizens.

6

In preparation for this sentencing hearing counsel has spoken to many people who knew Mr. Jackson very well and one thing has become quite clear – Reid Jackson would never intentionally do wrong by anyone.  He has an incredibly high standard of ethical conduct for himself and others.  He is honest and generous to a fault.  He always tries to do the right thing by everyone, and when he fails, no one internalizes the guilt and regret more than he does.  As Doug Jackson noted to the Probation Officer, Reid "loses sleep over the smallest things that might be wrong." PSR ¶ 45.   His father, Leigh Jackson, has at the request of counsel, submitted a letter on behalf of Reid.  In it he notes that Reid "is a man of great integrity and honesty" who "always puts the interests of others ahead of his own interests."  (Ex B).  Richard Escher, his partner for 25 years and the person who knows him best commented in a letter to the Court:

> I should say that one of his most outstanding characteristics is that of being a truth-teller and a truth-seeker in his inmost heart: he values honesty above everything, and freely gives of this quality himself.  I know that he has never lied to me, or to anyone else.  He is the one person I can depend upon for the truth, and I know him to fulfill the same role in the lives of many, perhaps all, of the other people he knows.  He would certainly never consent to compromise his integrity in the pursuit of any goal; for him to do so would require an intolerable breach of his ethical code.

(Ex. A).

After graduating from the University of Pittsburgh, Mr. Jackson was hired as an Administrative Assistant for the Western Psychiatric Institute and Clinic (WPIC) of the University of Pittsburgh School of Medicine (UPMC) where he worked in the Grants & Contracts Department.  While at WPIC, his diligence was rewarded by a promotion to Senior

Administrative Assistant.

In the course of Reid's work related interactions with other departments of the University, he caught the attention of an administrator in the Department of Epidemiology of the University of Pittsburgh's Graduate School of Public Health, who created a job for him as her Systems Analyst because of her impressions of his abilities and work ethic.

Around 1992, Douglas Jackson, Reid's brother, contacted Reid to let him know he had decided to leave the Army and had been offered a position as Medical Director at the Holmes Regional Medical Center's Radiation Oncology Department in Melbourne Florida.  Physicians in the Radiation Oncology Department were not hospital employees, and, although they were provided with support staff of various disciplines, they were responsible to do their own billing.  Dr. Jackson had never previously been in private practice and he wanted someone he could trust to handle his billing, so he contacted Reid to request that he consider quickly climbing the learning curve necessary to handle the billing for his medical practice.  Reid and Rich found the idea of starting a business together very appealing, so they both gave their employers due notice, moved to Melbourne, Florida and established Jackson & Escher, Inc ("JE").

Reid and Rich strongly considered the possibility that JE should purchase expensive software designed expressly for medical billing, but ultimately they decided that Reid was capable of designing what they needed using Paradox, a relational database product that was popular at that time.  Reid was able to accomplish this, and JE used this application for its medical billing activity until late 2000, at which time they shifted the focus of JE to providing

consulting services to GSR.

Also in summer of 1992, Reid's mother experienced a recurrence of her original cancer in her remaining breast and a second primary cancer in her corpus uteri.  By this time she and Reid's father were living in Carlsbad, New Mexico.  After Mrs. Jackson underwent a second radical mastectomy in New Mexico, she and Reid's father visited Florida so that Reid's mother could undergo a course of radiation therapy to her pelvis and abdomen under the care of Doug's partner, David Grisell, DO.  Although the radiation therapy likely greatly extended her life, the side effects of radiation therapy to the pelvis are not uncommonly internal scarring and adhesions, and are permanent.

By 1994, the side effects of Becky's course of radiation therapy were negatively impacting her health, causing her to have chronic debilitating diarrhea and malabsorption problems – both of which caused her to gain inadequate nutrition from her food with resulting profound weight loss.  Leigh wanted to retire early to spend as much time as he could with his wife, but he hesitant to do so because of his concern he had not saved enough to provide for their old age.  In order to make Leigh's early retirement feasible, Reid and Rich offered him full-time employment at JE to handle the billing for a third physician Doug's medical group had previously recruited to fill a need at the Radiation Oncology Department at the Indian River Medical Center (IRMC).  This offer of ongoing compensation for as long as he wanted to continue working, combined with an offer from Doug to provide them a house to live in, enabled Leigh to retire early, and for he and Becky to be able to move to Florida to be closer to some of their children in their old age.  Even though Leigh had no ownership interest in JE,

9

Reid and Rich committed a full third of its payroll to him for the entire duration of his JE employment.

The elder Mr. Jackson remarked on this time in his letter to the Court on behalf of Reid:

> "I had the opportunity to see first hand his technical competence, good judgement, dedication, and his honesty in conjunction with his abilities." (Ex. B).

Mr. Jackson's mother died in 1999. To this date, it is still hard for Mr. Jackson to talk about this time in his life, but those close to him describe it as extremely hard on him. His father said "when Reid's mother, Becky was in the hospital, slowly dying from cancer and related complications, Reid could be counted upon to be at her bedside, often, to visit her faithfully." (Ex B). His father-in-law stated, "when Reid's mother lost her on-going battle with cancer in July 1999 he was at her side. Throughout that difficult time Reid was always available to his parents. Those were, indeed, trying and stressful times for Reid . . . I was impressed with how Reid handled all of this and feel that he matured and became a stronger person because of this very personal tragedy." (Ex. C).

Reid Jackson is a man of modest means whose entire life is focused on his work and his family. He lives a very modest lifestyle – living in a rented condominium that he and his partner use both as a home and as an office for their business, JE. He has only a minor ownership interest in GSR (approximately 3%). Since late 2000, JE's sole customer has been GSR, from which it presently collects a flat fee of $11,800.00 monthly. That monthly amount has been the same since Feb 2003, as Reid Jackson and Richard Escher have declined to raise JE's rates until their client is profitable. Salaries drawn from JE are the primary source of

income for both Mr. Jackson and his partner, Mr. Escher.  Additionally, Mr. Jackson and Mr.

Escher have loaned a substantial portion of the money they have accumulated over the years to

the companies.  As a result, they do not own a home and share a 1992 vehicle worth less than

$2000.

When GSR was established, Dr. Jackson asked his brother to serve as a Director.  Reid

Jackson supported his brother's vision, and his contribution to the corporation was to give

advice and assistance on technical matters.  Until August 2000, he did so on a limited basis and

without compensation for his efforts.  When e-gold was spun off to e-gold Ltd in 2000,

Douglas Jackson and Barry Downey asked Reid Jackson to serve as a Director of e-gold Ltd. as

well.  But after his mother died and at the request of his brother, in 2000, Mr. Jackson agreed to

take a more active role in e-gold Ltd., and GSR.  Thus, over the next few months, Rich wound

down their medical billing practice and Mr. Jackson went to work more exclusively on e-gold

and OmniPay matters.  However, even then, although he participated in consensus decision-

making, his primary role in the company was the technical side.  He was never tasked with

investigating fraud or criminal activity within the system.  He was aware that Randy Trotter

had primary responsibility for that function and always believed that the company was trying to

root out problems.  He recognizes now that illegal activity using e-gold accounts was more of a

problem than was recognized at the time.  However, he was never under the impression that

anyone at the company believed it was appropriate to turn a blind eye toward criminal activity.

Nor, had he known that, would he have been a party to it.  Many who knew him well have

commented to this end:  Douglas Jackson advised the Probation Officer that Reid Jackson was

11

"very conscientious and indicated he loses sleep over the smallest things that might be wrong."
PSR ¶ 45.  Reid Jackson saw his brother's public actions to thwart criminal abuse of the e-gold
system and believed these efforts to be both sincere and effective.  (He continues to believe that
the efforts were completely sincere, even if not entirely effective.)  Mr. Jackson is now aware
that e-gold was used for illicit activity and is fully committed to working with the consultants
that have been hired to ensure that an Anti-Money Laundering program is in place and that
customer identification is sufficient to minimize misuse of e-gold.

      Reid Jackson is a fine, upstanding citizen who has never had any negative involvement
with law enforcement.  He is a college-educated businessman who has a long-term, stable,
loving relationship.  He and his partner have been together for 25 years in a committed
relationship that has outlasted many legally recognized marriages. They are also business
partners, having formed JE in the early 1990s.  They met while both were in college and have
been together ever since.  Mr. Escher advised the Probation Officer that he and Mr. Jackson are
very fortunate in that they have managed to create a very successful personal and work
relationship and mutually rely upon each other.  PSR ¶ 48.   Throughout that time, Mr. Escher's
family has come to know Mr. Jackson and their letters in support of him demonstrate how
much he is part of their family. They are fully supportive of him and have attended nearly all of
the court proceedings.  As the senior Mr. Escher noted, "I am as proud of Reid as I am of my
own children."  (Ex. C).

      Mr. Jackson has a tremendous amount of support.  No one who knows him believes he
would have knowingly broken the law.  Had he believed that it was necessary to register the

businesses as money transmitting businesses in the District of Columbia, he would have done everything in his power to make sure that this was done.  While the Court may not believe that his belief to the contrary was reasonable, there is nothing to suggest that it was not genuine. Shortly after this Court's decision rejecting the theory that the companies' prior counsel had advanced, he began attempting through counsel to resolve the case.  He accepts responsibility for his role in the offense and has been working nonstop since entering his plea to ensure that the company is in compliance with the requirements of the plea agreement and the law.

Richard Escher, Sr., has described Mr. Jackson as "gentle, caring, generous, hardworking, and honest to a fault."  (Ex. C).  Rich's sister, Christa Escher also wrote in support of Mr. Jackson, noting that over the past 24 years he has been "a devoted friend and partner to my brother as well as a consistent presence and loved member of our family."  She too describes him as a "gentle, kind person who has demonstrated nothing but loyalty and devotion to those close to him."  She comments that he is "extremely focused and hard-working, dedicating himself completely to any task he tackles."  (Ex. D).  Richard Escher, Jr. commented, "Reid is a good man who readily shows great loving kindness, constancy and trustiness toward his fellow men." (Ex A).

Many have also commented on the tremendous toll this case has already taken on Mr. Jackson.  Christa Escher, for example, noted that it has "taken a monumental toll on this gentle soul . . . caus[ing] him mental and emotional anguish, resulting in a severe deterioration of his health." (Ex. D).  Rich has also noticed the deterioration of his health.  He describes him as "overwhelmed by stress and work without end, harassed by worry – for himself, for me and

for our business interests – and worn down by fatigue and fear."  (Ex. A).

It also speaks volumes that several of the people who have written letters on behalf of Reid Jackson are not family members, but rather are people he has worked with over the years. Mr. Jackson is known in the small community in which he exists to be a fair, honest, and law-abiding person.  He is generous and loyal to a fault to his friends, family and coworkers. Common threads emerge from the numerous letters of support submitted on his behalf: he is known to be of the highest integrity, always acting honorably towards those he works with and tireless in his pursuit of a solution to any problem. For example, Rhonda Reed, his CPA and friend noted, "Reid Jackson is without reproach!"  (Ex. E).  In describing her work relationship with him, she describes him as "honest, transparent and above board".  Id.  She also has a friendship with him and describes him as "a kind person and considerate of others. He is dependable, ethical, reliable, sincere, trustworthy and truthful." Id.

There has never been any suggestion that Mr. Jackson has defrauded anyone.  Those who know him well attest to his honesty.   As just one example, but a very telling one, Rhonda Reed describes that she, as a single mother, has left instructions that should anything happen to her, her 9 year old son's financial well-being would be tended to by Mr. Jackson.  She states, "I have so much faith in his character & principles that my assets will be left to him for the benefit of my son."  (Ex. E).  What greater statement can be made about the integrity of an individual?

Wanda Trotter also wrote to the Court on Reid Jackson's behalf.  She describes him as "dedicated, loyal, honest, and fair."  She describes him as "selfless" and a "wonderful person."

14

(Ex. F).  Randy Trotter has also written in support of him, noting "I can honestly say that I have never met a more honest, loyal and supportive person than Reid."  Mr. Trotter went on to say "[h]e truly cares for the people who work with him and its not unusual for him to put their needs ahead of his own." (Ex. G).

Mr. Jackson has a tremendous amount of support from his family.  His partner Richard and Richard's family have been at almost all of the court hearings in this case.  They have stood behind him because of a true belief that he is a good, honest person.  No one who knows him believes he would have knowingly broken the law.  Had he believed that it was necessary to register the businesses as money transmitting businesses in the District of Columbia, he would have done everything in his power to make sure this was done.  In fact, shortly after this Court's decision rejecting the theory the companies' prior counsel had advanced, he began attempting through counsel to resolve the case.  He accepts responsibility for his role in the offense and has literally been working nearly nonstop since entering his plea to ensure that the company is in compliance with the requirements of the plea agreement and the law.

**II.      Mr. Jackson's Remarkably Low Risk of Recidivism Supports a Non Custodial Sentence.**

Mr. Jackson is an older man in a stable, long term relationship that is the functional equivalent of a marriage.  He has a good educational history and a stable history of employment.  He has no criminal history.  As a result, he is statistically less likely to recidivate.  See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 12, 28 (2004), *www.ussc.gov/publicat/Recidivism_General.pdf*

Although this is not a sentencing guidelines case but a D.C. Code offense, a number of

courts have considered this as a factor in sentencing defendants below the advisory guidelines range.  See e.g., United States v. Wadena, 470 F.3d 735, 740 (8th Cir. 2006) (where 67 year old defendant convicted of mail fraud and guidelines suggested sentence of 18 to 24 months, proper for district court to impose probation because "Wadena's age and recent deterioration in his health reduce the risk of re-offending"); United States v. Lucania 379 F. Supp. 2d 288, 297 (E.D.N.Y. 2005) ("Post Booker courts have noted that recidivism is markedly lower for older defendants."); United States v. Carmona-Rodriguez, 2005 WL 840464, at *4 (S.D.N.Y. April 11, 2005) (court imposed lesser sentence because defendant was older (55) and thus there was a lower probability of recidivism).

III.    **Mr. Jackson's Long Term Compliance with His Pretrial Release Conditions Further Demonstrates That He Is Amenable to Supervision Within the Community**.

        Mr. Jackson has been on release in this case since his arraignment on May 3, 2007.  He has been in complete compliance with all of his release conditions.  In essence, he has been on probation before judgement for 18 months with no violations.  He has cooperated fully with pretrial services and the probation office.  He has committed no criminal activity. Additionally,  he does not have a substance abuse problem, thus increasing the likelihood that a sentence served in the community will be successful for him and the community.  There is no reason whatsoever to suspect he would be a danger to anyone in the community.  To the contrary, he could himself be subject to increased danger were he to be incarcerated due to his age, inexperience, slight stature, as well as the health issues he suffers from (and notably his significant anxiety issues).

**IV.    The Combination of All of These Factors Supports a Non-Custodial Sentence**

Respect for the law is promoted not by inordinately long sentences, but by justice tempered with mercy.  Mr. Jackson accepted responsibility and pled guilty, through his involvement and participation in the operation of e-Gold, Ltd., and GSR, to operating a money transmitting business without a license in the District of Columbia.  He fully admits that he was aware of how e-gold, Ltd and GSR operated.  He was also fully aware that it was not licensed or registered as a money transmitting business in the District of Columbia.  At the time, he was under the impression that e-Gold, Ltd and GSR were not required to be licensed because they did not accept cash.  And, while it may be that this belief was not well-founded and was indeed naive, that does not change the fact that it was a true belief.  He knew of no reason for e-Gold, Ltd or GSR to avoid licensing, if licensing was required.  He had no motive or desire to avoid any legal requirements.  Had he believed that a license was required, he would have done everything in his power to ensure that one was obtained.

Mr. Jackson's physical condition, his slight stature, his severe allergies, anxiety issues and panic attacks all militate against incarceration when such is not necessary under the voluntary guidelines given the seriousness of the offense and the lack of any criminal history. While these conditions standing alone might not be sufficient to depart from a sentencing range that would otherwise require incarceration, they are certainly relevant to where within a range Mr. Jackson should be sentenced.  Mr. Escher explained that any period of incarceration would be extremely difficult for Mr. Jackson because of his severe anxiety disorder, which most usually manifests in panic attacks and claustrophobia, and his other health problems, the

17

most prominent of which are extreme environmental sensitivities. Both of these conditions require medication and a well-regulated environment and diet.  Mr. Escher also explained that Mr. Jackson's absence would place a tremendous emotional burden on him personally, and that it would be a significant financial strain on their small business. Also, significantly, he stated his belief that Mr. Jackson's departure from the concerns of GSR and e-Gold at this critical time in their fortunes, as they struggle to comply with the dictates of the plea agreement and the law, would cripple the efforts these companies are making to become better corporate citizens.   PSR ¶ 51 and 53.  He also explained what a tremendous burden an absence of Mr. Jackson would have on Mr. Escher and their business.  PSR ¶ 51 and 53. Also, significantly, the absence of Mr. Jackson in this critical time when the company is struggling to comply with the dictates of the plea agreement and the law would cripple the efforts the company is making to become a better corporate citizen.  PSR ¶ 48.

The Department of Justice has recognized "management problems with elderly inmates . . . are intensified in the prison setting and include: vulnerability to abuse and predation, difficulty in establishing social relationships with younger inmates, need for special physical accommodations in a relatively inflexible physical environment. *Correctional Health Care, Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, U.S. Department of Justice, National Institute of Corrections, 2004 edition, pp 9 and 10. (Throughout the report the "elderly" are defined by the various institutions as 50 or older). The report also notes that first time offenders (which Mr. Jackson is) are "easy prey for more experienced predatory inmates."  Id.  Richard Escher has noted that "Reid is delicately

sensitive, needing order and stability in his affairs, in his environment, and on the part of the people around him to feel secure; he is apt to become distressed at any sign of disorder or discord."

Finally, the Court may consider the costs of incarceration and weigh that against the necessity for it and other alternatives available to the Court.  See e.g., United States v. Moreland, 366 F. Supp.2d 416, 422 (S.D.W.Va., 2005); United States v. Angelos, 345 F. Supp.2d 1227 (D. Utah 2004); United States v. Chavez, 230 F.3d 1089, 1092 (8th Cir. 2000 (Bright, J., concurring); United States v. Hughes, 825 F. Supp. 866, 868 (D. Minn. 1993). Thus, in light of all of these issues, probation or a suspended sentence is appropriate given the nature of the offense.

## CONCLUSION

As one of three directors of e-Gold and GSR, Mr. Jackson failed to ensure that the companies were properly licensed in the District of Columbia to transmit money. He accepted responsibility for that crime. He has paid dearly – he has lost his health and his reputation, and his business may well fail, leaving him and his partner without a retirement safety net. He has been adequately deterred and punished. Thus, we urge the Court to temper justice with mercy, and sentence Mr. Jackson to a period of probation as provided for in the D.C. sentencing guidelines.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____
          "/s/"

Michelle Peterson
Assistant Federal Public Defender
625 Indiana Avenue, NW
Suite 550
Washington, DC 20004
202/208-7500 x125

20