## IN THE UNITED STATES  DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT
(18 U.S.C. §§ 981, 1960)

I, Roy Dotson, ("your Affiant"), being duly sworn, depose and state as follows:

1.        I am a Special Agent ("SA") of the United States Secret Service ("USSS"), and

have been so employed for approximately three and one half  years.  I am currently assigned to

the Orlando Field Office.  Among my duties as an SA, I am charged with the investigation of

financial crimes, including check fraud, identity fraud, credit card fraud, bank and wire fraud and

the manufacturing, possession and passing of counterfeit United States currency.  Prior to my

employment with the USSS, I was employed by the Brevard County Sheriff's Office for nine

years.  My last assignment was that of a Federal Task Force Agent with the Drug Enforcement

Administration.  Among my duties as a Task Force Agent, I was charged with investigating large

criminal organizations that distributed and sold controlled substances and financial crimes

involving money laundering.  Several of the investigations resulted in the seizures of criminally

derived property, including, but not limited to, monetary instruments.

2.        This investigation is being conducted jointly by the United States Secret Service,

the Federal Bureau of Investigation, and the Internal Revenue Service.  Information obtained as a

result of the investigative efforts of each agency are being shared with agents from the other

agency and have been incorporated into this affidavit.  The facts set forth in this affidavit are

based on my own personal knowledge; knowledge obtained from other law enforcement officers;

review of documents and computer records related to this investigation; communications with

others who have personal knowledge of the events and circumstances described herein; and

1

information gained through my training and experience and the training and experience of others.

3.    This affidavit is being submitted in support of an application for a seizure warrant, based upon 18 U.S.C. § 981(a)(1)(A), for the property in the e-gold accounts listed below, all of which provide digital currency exchange services.  All of these accounts contain the digital currency "e-gold" that is allocated and transferred among accounts by e-gold, Ltd.  The physical precious metals that are "backing" the e-gold are controlled by e-gold, Ltd., Gold & Silver Reserve, Inc., Douglas L. Jackson, Barry K. Downey, and Reid Jackson, all of whom were indicted on April 24, 2007 by a federal grand jury for this district on charges of money laundering conspiracy and operation of an unlicensed money transmitting business in violation of 18 U.S.C. §§ 1956 and 1960.

| Name | "e-gold" Account Number |
|---|---|
| e-gold, Ltd. | xx4179 and xx9243 |
| AnyGoldNow and Gold to Card | xx3720, xx8652, and xx1318 |
| The Bullion Exchange | xx2900, xxx5383, and xxx9745 |
| Denver Gold Exchange | xxx2324 |
| GitGold | xx0679 |
| Gold Pouch Express | xx8611 |
| uBuyWeRush | xx0023 |
| IceGold | x372 and x7273 |

4.    Based upon the evidence uncovered, there is probable cause to believe that the

property contained in the above- identified e-gold accounts is involved in a violation of Title 18, United States Code, Section 1960, and is therefore subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

5.     The transactions occurring in, and the total value of, the accounts described in this Affidavit for seizure are presented below in both grams of gold and U.S. dollars to reflect the way in which the owners and operators of the e-gold system record the transactions occurring in the e-gold accounts in their databases, as discussed more fully in paragraphs 19 and 20.  To obtain the value subject to seizure in these accounts pursuant to the requested seizure warrant, it will be necessary to require e-gold, Ltd. and/or Gold & Silver Reserve, Inc. to convert the "e-gold" in the accounts specified to United States dollars or physical precious metals before turning the funds over to the United States.  Otherwise, the property in the accounts will remain under the unsupervised control of e-gold, Ltd. and Gold & Silver Reserve, Inc. (defendants in the related criminal case), could be easily dissipated, and would be essentially without value to the United States in the event that e-gold, Ltd. and or Gold & Silver Reserve, Inc. or third party exchangers decide not to provide exchange services.  Further, given that the United States is seeking the seizure of the e-gold accounts of those entities, it is likely that exchange services will be partially, if not entirely unavailable once the seizure warrants are executed.

6.     Because this affidavit is being submitted for the limited purposes of establishing probable cause, I have not included every detail of every aspect of the investigation for this affidavit.  Rather, it only includes the information necessary to prove that probable cause exists for a seizure warrant to be issued for property that was involved in the operation of an unlicensed money transmitting business in violation of Title 18, United States Code, Section 1960.

### *Background on Digital Currency Issuers and Exchangers*

7.      A "digital currency" is a medium of exchange offered over the Internet that is purportedly backed by precious metals and offers users another option for conducting on-line funds transfers.  Digital currencies are generally marketed as offering global acceptance without the need for conversion between national currencies, and are valued at fluctuating rates tied to the price of a particular precious metal, especially gold.  Digital currency is used for on-line commerce or for funds transfers between individuals for private purposes.  While technically speaking, the owner of digital currency could have some right to acquire the actual metal behind the currency, digital currency users typically convert their value into a national currency when they want to take value out of the on-line system.

8.      One of the earliest issuers of digital currency was e-gold, Ltd. ("E-GOLD"), which operates via the Internet using the domain name [www.e-gold.com](www.e-gold.com), and began offering the digital currency "e-gold" in 1996.  E-GOLD appears as the most popular and prominent digital currency available on-line.  e-gold is widely accepted as a payment mechanism for transactions involving credit card and identification fraud, high yield investment programs and other investment scams, and child exploitation.  e-gold is not widely accepted by large or mainstream vendors.

9.      There are four primary steps involved in the transfer of funds through the e-gold system:  (i) opening a digital currency account with E-GOLD; (ii) converting national currency into e-gold to fund the account; (iii) using e-gold to buy or sell a good or service or transfer funds to another person; and (iv) exchanging the e-gold back into national currency.  E-GOLD needs two additional parties to complete these steps: (i) digital currency exchangers; and (ii)

merchants or individuals willing to accept e-gold for the payment of goods and services or to use the e-gold operation to transfer funds.

10.     Digital currency exchangers take national currency from customers and exchange it into e-gold for purposes of funding a new E-GOLD account, or increasing the value of an existing account.

11.     Exchangers also exchange e-gold back into national currency and are typically the only method by which users can obtain the value out of an E-GOLD account, short of taking possession of the precious metal itself, which is not always possible and practically never done. Each exchanger set its own terms and conditions on the types and amounts of national currency that it accepts for exchange.  Some only accept transfers from banks or credit card accounts. Others accept cash and money orders.  Most exchangers (including all of the domestic exchangers investigated) operate out of their home by using an Internet website to service customers, bank accounts for accepting cash and other deposits, and post office boxes for receipt of checks and other mailings.

12.     The exchangers are an integral part of the e-gold operation.  Some of these exchangers are sponsored by E-GOLD on its website and receive discounted rates for the e-gold they purchase to operate their businesses.  While, generally, these exchangers also convert national currency to other online digital currencies, e-gold is the most prominent and extensively-used digital currency.

13.     Individuals using digital currency exchangers typically incur fees on a per transaction basis.  Fees/percentages incurred per transaction depend largely on the exchanger used.  In some instances, the exchanger would charge up to 6% of the amount of funds

transferred.  These fees assessed by the exchanger are referred to as "service fees."

14.     Users around the world can register for a free E-GOLD account via the E-GOLD website and fund their account through a third party digital currency exchanger or through E-GOLD's own exchange service, which it called "OmniPay."  Once open and funded, account holders can access their accounts through the Internet and conduct transactions with other parties anywhere in the world.  E-GOLD advertises on its website that it is "an alternative Internet payment system" that "empowers people to use gold as money."  E-GOLD advertises its service as "Better Money," and "Internet Payments 100% backed by Gold."

15.     The digital currency e-gold can be traded among online account holders using the Internet.  With only a valid e-mail address, each account holder is issued an e-gold account, which can be used to send and receive any amount of e-gold to/from other e-gold account holders anywhere in the world anonymously, instantaneously, and irreversibly.  E-GOLD, in combination with other unregistered money service businesses, has become the perfect funds transfer mechanism for a multitude of criminal financial transactions.

### *The E-Gold Operation*

16.     The e-gold operation consists of two entities, e-gold, Ltd. ("E-GOLD") and Gold & Silver Reserve, Inc. ("GSR"), and three individuals, Douglas Jackson, Barry Downey, and Reid Jackson (collectively the "e-gold operation").  As described above, E-GOLD is the issuer of the digital currency known as "e-gold," which functions as an alternative payment system, is purportedly backed by stored physical gold, and operates via the Internet using the domain name www.e-gold.com.  GSR describes itself as the operator of E-GOLD and its respective website, and offers a digital currency exchange service (known as OmniPay) for individuals wishing to

purchase, transfer, and/or sell e-gold.  OmniPay operates via the Internet using the domain name
www.omnipay.com.  While E-GOLD was incorporated in Nevis, the e-gold operation is located
entirely in Florida, including its physical business location at 175 E. Nasa Blvd., Suite 300,
Melbourne, Florida (including management, employees, and records) and computer servers that
conduct its on-line operations.  All e-gold transactions take place through the e-gold server and
database located in Florida.  All e-gold accounts and balances are maintained there as well.  The
e-gold operation's owners/operators include Douglas Jackson, Barry Downey, and Reid Jackson.

        17.     Ownership of e-gold.  According to the e-gold website, the gold bullion allegedly
backing the digital currency e-gold is physically held in allocated storage in overseas vaults by
three repositories (*i.e.*, custodians) on behalf of the e-gold Bullion Reserve Special Purpose
Trust.  Also according to the e-gold website, the e-gold Bullion Reserve Special Purpose Trust
was established for holding title for the gold collectively on behalf of the e-gold account holders.
The e-gold Account User Agreement provides that an "e-metal balance is accounted by weight
and constitutes title to that precise fine weight of metal."  As such, the beneficiaries of the e-gold
Bullion Reserve Special Purpose Trust are purportedly the account holders of e-gold accounts
(collectively) and e-gold account holders purportedly hold title to the "precise fine weight of
metal" backing the amount of e-gold in their account.  However, the account holders' right to
claim the physical gold in exchange for their e-gold is severely circumscribed by the user
agreement's conditional right of redemption, which provides, among other things, that the
minimum quantity for redemption would "in no case ... be less than the fine weight of the
smallest bullion items held in storage."  According to the e-gold website, E-GOLD's lowest
ounce bar is a 32 ounce bar, worth approximately $21,248.  As a result, at a minimum, an

account holder can only exchange $21,248 worth of e-gold in order to take physical possession

of the gold.  Finally, the e-gold website also provides that "[N]o metal may be removed from

storage or any other disposition made without the signatures of both e-gold Ltd. and a third party

Escrow Agent of good reputation."  This further conditions an e-gold account holder's ability to

obtain physical possession of any gold.

### *Examination of E-GOLD Customer Account Database*

18.     Search warrants were conducted on the business location of the e-gold operation

as well as the location of the operation's computer servers in December of 2005.  Approximately

three terabytes of digital evidence (three quadrillion characters of information) and 100 boxes of

documentary evidence (approximately 288,000 pages) were seized.

19.     Evidence regarding the transactions and account activity of e-gold account

holders and its customers was obtained through examination the e-gold operation's computer

databases.  The e-gold operation maintains Microsoft SQL server databases housing customer

profiles and transaction histories of e-gold account holders, as well as OmniPay customers.

Your Affiant obtained copies of these databases by imaging servers located at AT&T in Orlando,

Florida[1] and seizing back-up tapes at the Melbourne offices of the e-gold operation pursuant to a

December 16, 2005 search warrant issued by a Magistrate Judge in Orlando, Florida.  The e-gold

operation also provided an additional update of the database information (by copying the

database to hard drives) for the period of November 2005 through October 2006 in response to

subpoenas issued on May 22, 2006 and October 25, 2006.  The e-gold operation provided a

---

[1] Both the e-gold and OmniPay websites and corresponding customer databases are run from
servers co-located at AT&T in Orlando, Florida, approximately 100 miles from GSR's physical
business location in Melbourne, Florida.

second update of the database information (by copying the database to an external hard drive) for

the period of October 2006 through March 2007 in response to a subpoena issued on March 6,

2007.

20.     From these images of the servers and copies of the databases, I was able to

reconstruct the customer profiles and transaction histories for e-gold account holders by

transferring the database information on each account holder into a Microsoft Excel spreadsheet.

The following specific information was available for each e-gold account:

a.     Customer profile:  point of contact information for the e-gold account holder,

including account name, mailing address, and email address supplied by the

customer.

b.     Transaction history:  list of transactions demonstrating e-gold being transferred

into and out of the account.  For each transaction, the history contains, among

other things, the date of the transaction, the type of transaction (e.g., whether e-

gold is being transferred into or out of the account), the e-gold account number of

the other party to the transaction (also known as the "counteraccount"), the

amount of the transaction, the Internet Protocol (IP) address of the transferor of e-

gold, and a place for the customer to make a notation about the purpose of the

transaction (also known as the "memo" field).

c.     Value limits: The e-gold operation had a policy of placing a "value-limit" on

accounts that it believed to be engaged in criminal activity or where bogus contact

information had been entered by the account holder.  An account holder with a

"value limit" placed on his or her account was restricted from receiving any

further e-gold into his or her account, although s/he continued to be free to spend or transfer any e-gold out of his or her account.  When a "value-limit" was placed on an account, a notation of the basis for the "value-limit" (such as for "child porn," "scammer," or "cc fraud") was entered in the user's account profile in the e-gold database and would appear, along with the date the value limit was placed, in the transaction history information.

21.     From these images of the servers and copies of the databases I was able to perform various searches of the database, including, for example:

a.     Searches for particular terms used in the "memo" fields in the customer transaction histories, such as "lolita," "IDs" or "HYIP" to indicate that "e-gold" was being used for the purchase and sale of contraband or otherwise used for criminal purposes.

b.     Searches for particular e-mail addresses of known criminals or criminal entities that may have been used to create an e-gold account.

c.     Searches for particular names or nicknames of known criminals or criminal entities that may have been used to create an e-gold account.

e.     Searches for notations of the basis for the e-gold operation placing "value-limits" on particular accounts, such as for "child porn," "scammer," or "cc fraud".

### *Money Transmitting Laws*

22.     Under 18 U.S.C. Section 1960, it is a felony to conduct a money transmitting business without the appropriate state license (in a state that has a licensing requirement and punishes such operation as a misdemeanor or felony) or federal registration, or when it otherwise

involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or intended to be used to promote unlawful activity. The majority of States, including Florida, and the District of Columbia require money transmitting businesses to obtain a license and comply with the other regulatory requirements that apply to such licensed entities, and punish the unlicensed operation of a money transmitting business as a misdemeanor or felony. Likewise, the federal government requires money transmitting businesses to have registered with the Financial Crimes Enforcement Network (FinCEN), a bureau of the Department of Treasury, by December 31, 2001 if they were in existence before that date, and, otherwise, within 180 days after the date the business was established.

23.     The term "money transmitting" under Section 1960(b)(2) includes "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."

### *Digital Currency Exchangers* ### *as Unlicensed Money Transmitting Businesses*

24.     Digital currency exchangers and the e-gold operation are engaged in money transmitting in three distinct ways: (1) funds are transferred when a customer sends money to the exchanger for funding a new e-gold account or adding value to an existing account, whether such transfer occurs by sending cash, money orders, or a Western Union wire, wiring funds from his/her bank account, or providing a credit card number; (2) funds are transferred when the digital currency exchanger sends money back to the customer in order to convert e-gold to a national currency, whether such transfer occurs by sending cash, money orders, or a Western Union wire, or wiring funds to the customer's bank account; and (3) funds are transferred when e-gold is transferred from one e-gold account to another, such as when the exchanger transfers e-

11

gold in the exchanger's account to the customer's account for purposes of effecting the two transactions listed above, or when a customer transfers e-gold in the customer's account to another e-gold account holder to pay for a particular good or service or simply transmit funds as a person-to-person payment.

25.     None of the digital currency exchangers (described below in this Affidavit) are registered with the federal government[2] or licensed in the District of Columbia or the State in which they are physically present, as discussed more fully below.

26.     The e-gold accounts used by the digital currency exchangers (described below in this Affidavit) in their operations that I have reviewed demonstrated a large volume of deposits coming into an account, followed by a correspondingly large volume of transfers out of that account during the same time period.  I know, based on my training and experience, and based on my consultation with agents of other law enforcement agencies, that money transmitters operating in the United States typically have United States bank accounts (and in the case of digital currency exchangers, bank accounts and e-gold accounts) for which they process financial transactions involving the transferring of funds on behalf of the public by any and all means, including, but not limited to, transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier.  Further, such a pattern of transactions is consistent with operation of a money transmitting business.

---

[2] One exchanger, Denver Gold Exchange, recently registered with the federal government after being contacted by the USSS, as discussed more fully in paragraph 66 below.

### *Individual Digital Currency Exchangers*

**The e-gold operation**
**e-gold accounts xx4179 and xx9243**

27.     For a description of the e-gold operation, see paragraphs 16 and 17 in this Affidavit.

28.     In order to conduct transactions in e-gold, it is necessary for the customer to open an e-gold account via the e-gold website.  To obtain e-gold, a customer has to exchange some amount of national currency, such as United States dollars, into e-gold through a company or individual who offers such exchange services.  As stated above, the e-gold operation offers its own exchange service in the name of OmniPay.  Third party exchangers are also a necessary part of the e-gold operation in that they provided access to the e-gold system for the majority of e-gold users.

29.     To obtain e-gold through OmniPay, a customer is required to wire national currency, in an amount greater than $1,000, to a bank account specified by the e-gold operation. Thereafter, the customer's e-gold account would be credited for the amount of the wire, minus an exchange fee collected by OmniPay.

30.     Once a customer has obtained e-gold, the customer can transfer that e-gold to another individual or entity that has an e-gold account, to another account owned by the same customer, or to an exchanger for conversion back into United States dollars or another national currency.

31.     The e-gold operation advertises on its website at www.e-gold.com that e-gold may be used for: "e-commerce," "business-to-business payments," "point of service sales," "person-to-person payments," "payroll," "bill payments," and "charitable donations."  The e-

gold operation advertises on its website at www.omnipay.com that it offers "currency exchange services supporting the e-gold family of currencies," and that it offers a bill payment service allowing e-gold customers to convert their e-gold into a check payed to the recipient of their choice.  Through this service, a customer can place an order with OmniPay requesting to cash out his or her e-gold via check made payable to any individual or creditor specified by the customer.

32.     To provide its digital currency exchange service for the purpose of facilitating e-gold funds transfers, the e-gold operation opened and maintained several bank accounts in the name of Gold & Silver Reserve, Inc., doing business as OmniPay.

33.     The e-gold operation conducts wire transfers both into and out of their GSR bank accounts in amounts generally totaling millions of dollars each month, both within and outside of the United States.  The e-gold operation receives wire transfers into their accounts from individual customers seeking to exchange their national currency into e-gold, and from other individuals and entities who needed to buy e-gold to provide their own e-gold exchange service. The e-gold operation transfers money out of its accounts by wire for the purpose of exchanging e-gold back into national currency.  The e-gold operation transfers funds between e-gold accounts to fulfill orders by their customers.

34.     The e-gold operation conducts thousands of transactions per day.  For example, on November 25, 2005, the e-gold website advertised that there were 2,500,942 then-existing e-gold accounts.  The website recorded the system activity in the previous 24 hours and showed the following information: 2,932 new accounts, 33,179 users accessing accounts, 38,843 e-metal spends (deposits & withdrawals) and "velocity"(*i.e.*, value circulated by spends over a given

14

time) $6,362,572.88 USD equivalent in gold.

35.     The Florida Money Transmitter's Code, Fla. Stat. §§ 560.101-560.408, prohibits a person from engaging in the business of a money transmitter without registering with the Office of Financial Regulation.  Fla. Stat. § 560.125(1).  Violation of the money transmitter statute is a felony.  Specifically, the penalties for violating this statute are as follows: (1) if currency or payment instruments exceed $300 but are less than $20,000 in any 12-month period, the person has committed a third degree felony; (2) if currency or payment instruments total or exceed $20,000 but are less than $100,000 in any 12-month period, the person has committed a second degree felony; and (3) if currency or payment instruments total or exceed $100,000, the person has committed a first degree felony.  Fla. Stat. § 560.125(5)(a)-(c).

36.     Under Florida Money Transmitters' Code, the term "money transmitter" includes any person located in or doing business in Florida who acts as a payment instrument seller, foreign currency exchanger, check casher, funds transmitter, or deferred presentment provider." Fla. Stat. § 560.103(11).  The term "funds transmitter" includes "any person who engages in the receipt of currency or payment instruments for the purpose of transmission by any means, including transmissions within this country or to or from locations outside this country, by wire, facsimile, electronic transfer, courier, or otherwise."  Fla. Stat. § 560.103(10).

37.     The District of Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq., prohibits a person from engaging in the business of money transmission without obtaining a license from the Superintendent.  D.C. Stat. § 26-1002.  Violation of the money transmitter statute is a felony with penalties of up to a $25,000 fine and five years imprisonment.  D.C. Stat. § 26-1023.

38.     Under the D.C. Money Transmitters Act, the term "money transmission" is defined as "the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer."  D.C. Stat. § 26-1001(10).

39.     I accessed the State of Florida's online search function for money transmitters located at http://www.flofr.com/licensing/download.htm and entered a search for E-GOLD, Gold & Silver Reserve, Inc., and OmniPay, which indicated that the e-gold operation is not licensed in Florida.  I accessed the District of Columbia's online search function for money transmitters located at http://app.dbfi.dc.gov/ifs/default.asp and entered a search for E-GOLD, Gold & Silver Reserve, Inc., and OmniPay, which indicated that the e-gold operation is not licensed in the District of Columbia.  A list of the money transmitters registered with the Department of Treasury (FinCEN) can be found at the internet website http://www.msb.gov/guidance/msbstateselector.php, and reflects the fact that the e-gold operation is not registered with FinCEN.  Additionally, the e-gold operation has not filed any reports with the Department of Treasury related to suspicious transactions or currency transactions, as is required for money services businesses.

40.     On or about the dates listed in the chart below, the following wire transfers from OmniPay customers to GSR (for purposes of funding e-gold accounts) and from GSR to OmniPay customers (for purposes of exchanging e-gold into national currency) occurred to and from banks located in the District of Columbia:

| Date | Amount | From | To |
|------|--------|------|-----|
| 5/14/2002 | $1,000.00 | Account no. xxxx5286 at Riggs National Bank | Gold & Silver Reserve, Inc. Account no. xxxxxxxx7192 at Bank of America |
| 5/28/2002 | $1,000.00 | Account no. xxxx5286 at Riggs National Bank | Gold & Silver Reserve, Inc. Account no. xxxxxxxx7192 at Bank of America |
| 6/27/2002 | $1,000.00 | Account no. xxxx5286 at Riggs National Bank | Gold & Silver Reserve, Inc. Account no. xxxxxxxxx7487 at First Union National Bank |
| 10/24/2002 | $70.00 | Gold & Silver Reserve, Inc. Account no. xxxxxxxxx7487 at First Union National Bank | Account no. xxxxx4345 at Wright Patman Congressional Federal Credit Union |
| 11/15/2002 | $1,500.00 | Account no. xxxx5286 at Riggs National Bank | Gold & Silver Reserve, Inc. Account no. xxxxxxxxx7487 at First Union National Bank |
| 11/20/2002 | $195.00 | Gold & Silver Reserve, Inc. Account no. xxxxxxxxx7487 at Wachovia Bank | Account no. xxxxx4345 at Wright Patman Congressional Federal Credit Union |
| 3/24/2003 | $1,500.00 | Account no. xxxx5286 at Riggs National Bank | Gold & Silver Reserve, Inc. Account no. xxxxxxxxx7487 at Wachovia Bank |

41.     The e gold operation has been utilizing e-gold account numbers xx4179 (in the name of C1 By HF/e gold Ltd.) since May 10, 2002, and 109243 (in the name of GSR/OmniPay) since November 8, 1999, for its operations.  Analysis of activity occurring in e-gold account number xx4179 from May 2002 through March 2007 yielded the following results: There were 1,080 transactions with a total value of 57825.359949 grams ($17,590,484.65), comprised of 790 transactions into the e gold account valued at 30288.893383 grams ($8,178,345.15), and 290 transactions out of the account valued at 27536.465660 grams ($8,869,880.37).  As of March 2007, approximately 1729.83928 grams of gold and 2996.63542

17

grams of silver (totaling $1,180,022.29) remained in e gold account number xx4179.

42.    Analysis of activity occurring in e gold account number xx9243 from November 1999 through March 2007 yielded the following results: There were 51,866 transactions with a total value of 2492053.53643 grams ($370,165,764.60), comprised of 46,163 transactions into the e gold account valued at 1233751.63975 grams ($238,064,379.30), and 5,703 transactions out of the account valued at 1258301.89668 grams ($132,101,385.30).  As of March 2007, approximately 1324.235454 grams of gold, 28157.1133 grams of silver, and 228.70542 grams of platinum (totaling $1,529,111.14) remained in e gold account number xx9243.

### AnyGoldNow and Gold to Card
### e-gold accounts xx3720, 148652, and xx1318

43.    "AnyGoldNow" is a digital currency exchanger operating via the Internet at www.anygoldnow.com, and is operated by Patrick Verbeeck at his home residence, xxxxx xxxx Way, #xxx, xxxxxx, California xxxxx.  AnyGoldNow has a registered fictitious name in California that was registered in 2002, although its e-gold account was in operation since October 2000.  Exchange activity appears to have begun in December 2001.

44.    AnyGoldNow advertises on its website that it has been one of the "leading Exchange providers since 2001," and offers to exchange national currency for a number of digital currencies, including e-gold, at various exchange fees depending on the type of digital currency involved.  AnyGoldNow accepts national currency via domestic or international bank wire, or electronic bank payment, for conversion and transfer into the e-gold system.  AnyGoldNow also accepts e-gold for conversion back into national currency, and will send that currency to its customers via domestic or international wire, or by check drawn on its domestic bank.

18

45.     Pursuant to section 1800.3 of the California Financial Code, a person may not engage in the business of "receiving money for the purpose of transmitting the same or its equivalent to foreign countries" without first obtaining a license from the Commissioner of Financial Institutions.  A "Directory of Transmitters of Money Abroad" licensed by the State of California can be found at the Internet website http://www.dfi.ca.gov/directry/tma.asp, and reflects the fact that AnyGoldNow is not licensed in California.

46.     The District of Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq., prohibits a person from engaging in the business of money transmission without obtaining a license from the Superintendent.  D.C. Stat. § 26-1002.  Violation of the money transmitter statute is a felony with penalties of up to a $25,000 fine and five years imprisonment.  D.C. Stat. § 26-1023.  Under the D.C. Money Transmitters Act, the term "money transmission" is defined as "the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer."  D.C. Stat. § 26-1001(10).  I accessed the District of Columbia's online search function for money transmitters located at http://app.dbfi.dc.gov/ifs/default.asp and entered a search for AnyGoldNow, which indicated that AnyGoldNow is not licensed in the District of Columbia.

47.     A list of the money transmitters registered with the Department of Treasury (FinCEN) can be found at the internet website http://www.msb.gov/guidance/msbstateselector.php, and reflects the fact that AnyGoldNow is not registered with FinCEN.  Additionally, AnyGoldNow has not filed any reports with the Department of Treasury related to suspicious transactions or currency transactions, as is required

for money services businesses.

48.    On March 4, 2007, your affiant oversaw the opening by other agents of e-gold account number xxx0759, using e-mail address samskyw@gmail.com.   On the same day, I oversaw the placement by other agents of an order via the www.anygoldnow.com website requesting to convert $100 national currency into e-gold, and received an automated e-mail response asking me to fax or electronically upload them a copy of a photo I.D. and a copy of a phone bill.  On March 5, 2007 a USSS SA acting in an undercover capacity opened account number xxxxxxxx0209 at Wachovia Bank located at 1150 K St., N.W., Washington, D.C.  On March 12, 2007, I electronically sent the required identification documents to AnyGoldNow.

49.    On March 13, 2007, I received wiring instructions by e-mail informing me to wire my funds ($116.59, including a $16 transaction fee, and .59 to reflect the last 2 numbers of my e-gold account to facilitate identification of the transfer) to account number xxxxxx4524 at Washington Mutual bank in California, and to indicate the order instructions on the wiring instructions.  On March 15, 2007, I initiated a wire transfer of $116.59 from the undercover Wachovia Account to AnyGoldNow's Washington Mutual Account.  On March 16, 2007, my undercover e-gold account reflected an incoming transfer from AnyGoldNow's e-gold account number xx3720 in the name of "AnyGoldNow."

50.    Analysis of e-gold account numberxx3720 yielded the following results: An approximate total of 15,320 transactions occurred, including 6,378 transactions into the account valued at 61363.22044 grams ($27,085,634.32), and 8,942 transactions out of the account valued at 59916.89565grams ($27,047,227.46).  As of March16, 2007, approximately 137.663201 grams of gold and 1282.64305 grams of silver (totaling $104,816.35) remained in e-gold account

number xx3720.

51.     A search in the e-gold database for Patrick Verbeeck, the operator of
AnyGoldNow, revealed that he has used several e-gold accounts to operate AnyGoldNow and
other similar businesses.  A second account that AnyGoldNow uses in its operation is e-gold
account number xx8652 in the name of AGN Hold Fraud Investigations.  By its name, this
second account appears to contains funds that will be held temporarily by AnyGoldNow if it is
concerned that the funds are related to fraudulent transactions or activity.  On June 29, 2006,
695.504665 grams ($410,000) was transferred from e-gold account number xx3720
(AnyGoldNow's primary e-gold account in the name of Any Gold Now Main AGN Account) to
e-gold account number xx8652 in the name of AGN Hold Fraud Investigations.  The 725.278613
grams ($410,000) was originally transferred into AnyGoldNow account number xx3720 from the
owner of e-gold account number xxx9281, Georgi Lukanov, whose listed address is in Bulgaria,
for purposes of exchange into national currency.  Instead of completing the transaction,
AnyGoldNow transferred the funds into its "Hold Fraud Investigations" account, most likely
because it suspected Mr. Lukanov of being involved in fraudulent activity.  After this transfer,
Mr. Lukanov transferred approximately 8.558713 grams ($5,000) worth of e-gold from his
e-gold account to the e-gold account of Michael Bruzzese with a reference in the "memo" field
of "Georgi Lukanov v Anygoldnow.com our case".  Michael Bruzzese is an attorney, who
maintains the website www.lawyers.com/bruzzeselaw and is known to represent e-gold
customers in disputes involving HYIPs and other investment scams.  As of March 2007,
approximately 690.842542 grams ($442,070.14) remained in e-gold account number xx8652.

52.     Patrick Verbeek also operates e-gold account number xx1318 for a separate but

related business called "Gold to Card."  Gold to Card operates via the Internet website

www.goldtocard.com and offers a reloadable debit card as a way to exchange out e-gold into

national currency.  It advertises on its website "cash out your Gold anywhere you go!".  The

debit cards were issued by North York Community Credit Union and do not have the customer's

name printed on the cards.  On February 9, 2007, Gold to Card announced on its website that it

was discontinuing its debit card program for various compliance issues.

53.     An analysis of  Gold to Card's e-gold account number xx1318 yielded the

following results:  Patrick Verbeek began operating the account on December 31, 1999.  From

December 1999 through March 2007 it conducted 10,630 e-gold transactions, with a total value

of 43864.24359 grams ($21,153,789), comprised of 9,912 transactions into the account valued at

23688.79515 grams ($10,665,070), and 718 transactions out of the account valued at

20175.44844 grams ($10,488,719).  After February 2007 there were only three transactions out

of the account, and no further transactions into the account: one transfer for 45.160319 grams

($30,000) was made on February 13, 2007 to the AnyGoldNow primary account (e gold account

number 183720); two transfers were made on February 25, 2007 and February 26, 2007 totaling

approximately 43.973257 grams ($30,061) to e gold account number xx9090 in the name of

Gold X Gold Debit Cards controlled by Marco Lavana.  As of March 2007, approximately

137.663201 grams of gold and 1282.64305 of silver (totaling $157,757) remained in e gold

account number xx1318.

## The Bullion Exchange
## e-gold accounts xx2900, xxx5383, and xxx9745

54.     "The Bullion Exchange" is a corporation incorporated in Utah, located at xxxx

xxxxx Street, Salt Lake City, Utah, xxxxx, the home address of the operators of the corporation –

Carole and Don Neve.  The Bullion Exchange advertises itself as a "Discount Exchange Provider

of online digital money and Precious Metals," that offers to buy or sell e-gold (and "e-bullion,"

another form of online digital currency) for various exchange fees depending on the type of

transaction.  The Bullion Exchange accepts funds for transfer into the e-gold system in the form

of direct cash deposit or wire transfer into its Wells Fargo Bank account, or by cashier's check or

money order.

55.     Pursuant to section 7-1-501 of the Code of Utah, a person engaged in the business

of "allowing persons to effect third party payments from loan, charge, or other accounts by

checks, drafts, or other instruments or by electronic means," is subject to the jurisdiction of the

Utah Department of Financial Institutions and is required to be licensed.  A list of the money

transmitters licensed by the State of Utah can be found at the internet website

http://www.dfi.utah.gov/MonTrans.htm, and reflects the fact that The Bullion Exchange is not

licensed in Utah.

56.     The District of Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq.,

prohibits a person from engaging in the business of money transmission without obtaining a

license from the Superintendent.  D.C. Stat. § 26-1002.  Violation of the money transmitter

statute is a felony with penalties of up to a $25,000 fine and five years imprisonment.  D.C. Stat.

§ 26-1023.  Under the D.C. Money Transmitters Act, the term "money transmission" is defined

as "the sale or issuance of payment instruments or engaging in the business of receiving money

for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer." D.C. Stat. § 26-1001(10).  I accessed the District of Columbia's online search function for money transmitters located at http://app.dbfi.dc.gov/ifs/default.asp and entered a search for The Bullion Exchange, which indicated that The Bullion Exchange is not licensed in the District of Columbia.

57.     A list of the money transmitters registered with the Department of Treasury (FinCEN) can be found at the internet website http://www.msb.gov/guidance/msbstateselector.php, and reflects the fact that The Bullion Exchange is not registered with FinCEN.  Additionally, The Bullion Exchange has not filed any reports with the Department of Treasury related to suspicious transactions or currency transactions, as is required for money services businesses.

58.     On March 4, 2007, your affiant oversaw the opening by other agents of e-gold account number xxx0875, using the e-mail address of shadesofgreyster@gmail.com.  On the same day, I placed an order requesting to exchange $100 into e-gold via wire transfer, and received instructions to send $118 ($18 being the transaction fee) to a specified bank account. On March 5, 2007, another USSS SA, acting in an undercover capacity, opened account number xxxxxxxxx1253 at Wachovia Bank located at 1301 Pennsylvania Ave., Washington, D.C. for the purpose of funding this account.  On March 6, 2007, the undercover agent initiated a wire transfer of $118 to account number xxxxxx5693 belonging to The Bullion Exchange at Wells Fargo Bank.  On March 7, 2007, I received a message on an undercover cellular phone voice mail account from a representative of The Bullion Exchange.  When the undercover agent

returned the call, The Bullion Exchange representative requested that a copy of a photo I.D., a phone bill matching the phone number used for the order, and a utility bill matching the D.C. address being used in the order be faxed to 801-486-0777 prior to processing the transaction. A copy of an undercover Florida driver's license, along with fictitious phone and utility bills, were faxed to The Bullion Exchange on March 8, 2007. On March 9, 2007, "The Bullion Exchange 2" e-gold account xxx5383 transferred $100 worth of e-gold (.153657 troy oz.) to the undercover e-gold account number xxx0875.

59.     The Bullion Exchange has two e-gold accounts, which are used to facilitate its digital currency exchange business by holding the e-gold that The Bullion Exchange is selling to and buying from its customers.

60.     An analysis of The Bullion Exchange's primary e-gold account, number xx2900, yielded the following results: The Bullion Exchange began operating the account on August 6, 2001. From August 2001 through October, 2006 it conducted 69,821 e-gold transactions, with a total value of 370331.7551 grams ($178,867,744.10). This total was comprised of 26,728 deposits of funds into the account, with a total value of 170281.2557 grams $($88,323,607.08), and 43,093 transactions out of the account valued at 200050.4994 grams ($88,349,820.55). As of March 2007, approximately 216.811258 grams ($138,737.52) remained in e-gold account number xx2900.

61.     An analysis of account number xxx5383 in the name of "Bullion Exchange 2" - the account that funded our undercover exchange - yielded the following results: The account began operating on August 2005. From August 2005 through October 2006, The Bullion Exchange conducted 6,509 transactions with a total weight of 81669.0983 grams ($38,840,867),

comprised of 388 transactions of funds into the account valued at 40834.95901 grams ($19,421,738), and 6,121 transactions out of the account valued at 40834.13929 grams ($19,419,129). e-gold account number xxx5383 appears to serve as the primary e-gold account used by The Bullion Exchange to fund e-gold transfers for customers purchasing e-gold by bank wire or direct cash deposit as opposed to other forms of payment. When additional e-gold is needed to fulfill customer requests, The Bullion Exchange transfers funds into this account from its main operating account (e-gold account xx2900). As of March 2007, approximately $0 remains in e-gold account number xxx5383. Although the balance in March was zero, historically the balance of this account has fluctuated greatly, and as a result, it is possible that the actual amount in the account at the time of seizure will be significantly greater.

62.     An analysis of e-gold account number xxx9745 in the name of "Bullion Exchange III" yielded the following results:  The account began operating in September 2005, and from September 2005 through October 2006, 9,853 transactions occurred, with a total value of 22142.99647 grams ($9,664,529). Of these transactions, there were 273 transactions of funds received into the account valued at 11071.9944 grams ($4,832,454), and 9,580 transactions of funds transferred out of the account valued at 11071.002 grams ($4,832,075). E-gold account number xxx9745 appears to be the account used by The Bullion Exchange for customers funding their exchanges through money orders and cashier's checks, as opposed to cash or wire. The Bullion Exchange makes transfers from their main operating account (e-gold account number xx2900) as needed to cover spends. As of March 2007, approximately $0 remained in e-gold account number xxx9745. Although the balance in March 2007 is zero, historically the balance of this account has fluctuated greatly, and as a result, it is possible that the actual amount in the

26

account at the time of seizure will be significantly greater.

**Denver Gold Exchange**
**e-gold account xxx2324**

63.     "Denver Gold Exchange" is a Colorado corporation operating via Internet website

www.denvergoldexchange.com that was registered with the Colorado Secretary of State on July

24, 2006, and lists as its address 5082 E. Hampden Ave., #332, Denver, Colorado 80222.  This

address is a retail mailing and business service center.  The owner of Denver Gold Exchange is

David S. Metzel, who has previously identified himself as such to USSS agents.  Denver Gold

Exchange advertises itself as a "Digital Currency Exchanger" offering "lots of payment options"

and "worldwide funding," and to buy or sell e-gold (and "e-bullion," another form of online

digital currency) for various exchange fees depending on the type of transaction.  Denver Gold

Exchange accepts funds for transfer into the e-gold system in the form of "Direct Cash Deposits

at (Bank of America, Chase, Washington Mutual and Wells Fargo), Bank Wires, Money Orders,

Moneygram Express and American Express."

64.     Pursuant to section 12-52-104 of the Colorado Statutes, a person engaged in the

business of "selling or issuing exchange or in the business of money transmission," must first

obtain a license from the Colorado Banking Board.  Section 12-52-103 defines "money

transmission" as meaning "the sale or issuance of exchange or engaging in the business of

receiving money for transmission or transmitting money within the United States or to locations

abroad by any and all means including but not limited to payment instrument, wire, facsimile, or

electronic transfer."  Further, "exchange" means any check, draft, money order, or other

instrument for the transmission or payment of money or credit.  It does not mean money or

currency of any nation."  I accessed the State of Colorado's online search function for money

27

transmitters located at http://www.dora.state.co.us/pls/real/bidS_Search.Search_Page, and entered a search for Denver Gold Exchange, which indicated that Denver Gold Exchange is not licensed in Colorado.

65.     The District of Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq., prohibits a person from engaging in the business of money transmission without obtaining a license from the Superintendent.  D.C. Stat. § 26-1002.  Violation of the money transmitter statute is a felony with penalties of up to a $25,000 fine and five years imprisonment.  D.C. Stat. § 26-1023.  Under the D.C. Money Transmitters Act, the term "money transmission" is defined as "the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer."  D.C. Stat. § 26-1001(10).  I accessed the District of Columbia's online search function for money transmitters located at http://app.dbfi.dc.gov/ifs/default.asp and entered a search for Denver Gold Exchange, which indicated that Denver Gold Exchange is not licensed in the District of Columbia.

66.     A list of the money transmitters registered with the Department of Treasury (FinCEN) can be found at the internet website http://www.msb.gov/guidance/msbstateselector.php, and, at the time I searched the website in early March 2007, reflected the fact that Denver Gold Exchange was not registered with FinCEN.  However, the investigation has revealed that Denver Gold Exchange has registered with FinCEN as of March 7, 2007, most likely as a result of contact between David Metzel and the USSS in late February 2007 in regards to Denver Gold Exchange's activities.  Additionally,

Denver Gold Exchange has not filed any reports with the Department of Treasury related to suspicious transactions or currency transactions, as is required for money services businesses.

67.     On March 4, 2007, your affiant opened e-gold account number xxx0812, using the e-mail address of qwerty9ster@gmail.com.  On the same day, I registered with Denver Gold Exchange and placed an order requesting to exchange $100 into e-gold via direct cash deposit. On March 5, 2007, an undercover agent working with me made a direct deposit at Bank of America located at 1501 Pennsylvania Ave., N.W., Washington, D.C. 20006 of $114 ($14 exchange fee) into account number xxxxxxxx0864 in the name of Used Media, LLC. for the purpose of funding the undercover e-gold account.  On March 9, 2007, as requested by Denver Gold Exchange, I faxed a copy of the bank deposit receipt notated with my exchange order number to (303) 379-4256.  On that same date, I received $100 worth of e-gold transferred into my undercover e-gold account from Denver Gold Exchange's e-gold account number xxx2324.

68.     Denver Gold Exchange has been utilizing e gold account number xxx2324 for its operations since June 2006.  Analysis of activity occurring in this account from June 2006 through March 2007 yielded the following results: There were 2953 transactions with a total weight of 6286.879491 grams ($3,975,249.60), comprised of 457 transactions into the e gold account with a weight of 3195.823731 grams ($2,021,936), and 2496 transactions out of the account with a weight of 3091.05576 grams ($1,953,312).  As of March 2007, approximately 103.770199 grams ($68,395) remained in e gold account number xxx2324.

**GitGold**
**e-gold account xx0679**

69.     "GitGold" is a digital currency exchanger operating via Internet website

www.gitgold.com, and lists as its corporate name and address GitGold Worldwide Inc., 2117 S.

Babcock Street, Melbourne, Florida 32901.  This address is a retail mailing and business service

center.  GitGold advertises that it is "The fastest way to turn dollars into gold" and offers to

exchange national currency for a number of digital currencies, including e-gold.  The owners and

operators of GitGold are Jane Anderson, the president and sole shareholder, and David

Anderson, the treasurer.  The Andersons created their digital currency exchanger business in

response to a solicitation from Douglas Jackson in the early stages of e-gold's development.  The

Andersons also own and operate a mail service business, Stop N Mail, from the address listed

above.  GitGold accepts funds for transfer into the e-gold system in the form of bank wires,

money orders, and cashiers checks.

70.     According to the GitGold website, money orders (in contrast to bank wires) allow

for anonymous transactions:

> "Note - you can send a money order using an overnight service that will cost less
> than sending a wire, have it funded in the same time frame (evening of the next
> business day) and we won't have to confirm your identity first."

71.     The Florida Money Transmitter's Code, Fla. Stat. §§ 560.101-560.408, prohibits a

person from engaging in the business of a money transmitter without registering with the Office

of Financial Regulation.  Fla. Stat. § 560.125(1).  Violation of the money transmitter statute is a

felony.  Specifically, the penalties for violating this statute are as follows: (1) if currency or

payment instruments exceed $300 but are less than $20,000 in any 12-month period, the person

has committed a third degree felony; (2) if currency or payment instruments total or exceed

$20,000 but are less than $100,000 in any 12-month period, the person has committed a second degree felony; and (3) if currency or payment instruments total or exceed $100,000, the person has committed a first degree felony.  Fla. Stat. § 560.125(5)(a)-(c).

72.     Under Florida Money Transmitters' Code, the term "money transmitter" includes any person located in or doing business in Florida who acts as a payment instrument seller, foreign currency exchanger, check casher, funds transmitter, or deferred presentment provider." Fla. Stat. § 560.103(11).  The term "funds transmitter" includes "any person who engages in the receipt of currency or payment instruments for the purpose of transmission by any means, including transmissions within this country or to or from locations outside this country, by wire, facsimile, electronic transfer, courier, or otherwise."  Fla. Stat. § 560.103(10).

73.     I accessed the State of Florida's online search function for money transmitters located at http://www.flofr.com/licensing/download.htm and entered a search for GitGold Worldwide Inc, which indicated that GitGold is not licensed in Florida.

74.     The District of Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq., prohibits a person from engaging in the business of money transmission without obtaining a license from the Superintendent.  D.C. Stat. § 26-1002.  Violation of the money transmitter statute is a felony with penalties of up to a $25,000 fine and five years imprisonment.  D.C. Stat. § 26-1023.  Under the D.C. Money Transmitters Act, the term "money transmission" is defined as "the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer."  D.C. Stat. § 26-1001(10).  I accessed the District of Columbia's online search function

for money transmitters located at http://app.dbfi.dc.gov/ifs/default.asp and entered a search for

GitGold, which indicated that GitGold is not licensed in the District of Columbia.

　　　　75.　　A list of the money transmitters registered with the Department of Treasury

(FinCEN) can be found at the internet website

http://www.msb.gov/guidance/msbstateselector.php, and reflects the fact that GitGold is not

registered with FinCEN.  Additionally, GitGold has not filed any reports with the Department of

Treasury related to suspicious transactions or currency transactions, as is required for money

services businesses.

　　　　76.　　On March 4, 2007, your affiant opened e-gold account number xxx0234, using

the e-mail address of jawalover@gmail.com.  In accordance with instructions on the GitGold

website for accepting money orders, on March 5, 2007 I purchased a money order for $100 from

the post office branch located at 1400 L Street NW, Washington DC, and sent this money order

overnight from the District of Columbia to Gitgold Worldwide, Inc. 2117 S. Babcock St.,

Melbourne, FL 32901 referencing e-gold account number xxx0234.  The money order was

delivered on March 6, 2007 at 12:39 p.m., and signed for by J Anderson.  On March 7, 2007 I

received $90 ($100 minus the $10 fee collected by GitGold) worth of e-gold transferred into my

undercover e-gold account number xxx0234 from Gitgold's e-gold account number xx0679.

　　　　77.　　GitGold has been utilizing e gold account number xx0679 for its operations since

May 2001.  Analysis of activity occurring in this account from May 2001 through March 2007

yielded the following results: There were 31,064 transactions with a total weight of 62796.00473

grams ($24,065,399), comprised of 5,140 transactions into the e gold account with a weight of

31432.38649 grams ($12,047,797), and 25,924 transactions out of the account with a weight of

31363.61824 grams ($12,017,602).  As of March 2007, approximately 54.636427 grams

($36,002) remained in e gold account number xx0679.

**Gold Pouch Express**
**e-gold account xx8611**

78.      "Gold Pouch Express" is a digital currency exchanger that operates via the

Internet website www.goldpouchexpress.com. It advertises itself as an "Exchange Service

Provider" and offers to purchase, sell, or trade e-gold and other digital currencies.  The owners

and operates of Gold Pouch Express are Roger and Mimi Savoie, who operate the business from

their home residence (a trailer in a park for recreational vehicles) at xxxx xx Highway xx, Lot

xx, Arcadia, Florida xxxxx.  This address is listed on the website as their business address.  Gold

Pouch Express accepts funds for transfer into the e-gold system in the form of money order, bank

wire, Interac e-mail money transfer, internet/telephone banking, and credit card.  Gold Pouch

Express also accepts e-gold for conversion back into national currency, and will send that

currency to its customers via company check, cashier's check, Interac e-mail money transfer,

bank wire, or Royal Bank transfer.  They maintain banking relationships with The Royal Bank of

Canada to facilitate their funds transfer activities.

79.      The Florida Money Transmitter's Code, Fla. Stat. §§ 560.101-560.408, prohibits a

person from engaging in the business of a money transmitter without registering with the Office

of Financial Regulation.  Fla. Stat. § 560.125(1).  Violation of the money transmitter statute is a

felony.  Specifically, the penalties for violating this statute are as follows: (1) if currency or

payment instruments exceed $300 but are less than $20,000 in any 12-month period, the person

has committed a third degree felony; (2) if currency or payment instruments total or exceed

$20,000 but are less than $100,000 in any 12-month period, the person has committed a second

degree felony; and (3) if currency or payment instruments total or exceed $100,000, the person

has committed a first degree felony.  Fla. Stat. § 560.125(5)(a)-(c).

80.     Under Florida Money Transmitters' Code, the term "money transmitter" includes

any person located in or doing business in Florida who acts as a payment instrument seller,

foreign currency exchanger, check casher, funds transmitter, or deferred presentment provider."

Fla. Stat. § 560.103(11).  The term "funds transmitter" includes "any person who engages in the

receipt of currency or payment instruments for the purpose of transmission by any means,

including transmissions within this country or to or from locations outside this country, by wire,

facsimile, electronic transfer, courier, or otherwise."  Fla. Stat. § 560.103(10).

81.     I accessed the State of Florida's online search function for money transmitters

located at http://www.flofr.com/licensing/download.htm and entered a search for Gold Pouch

Express, which indicated that Gold Pouch Express is not licensed in Florida.

82.     The District of Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq.,

prohibits a person from engaging in the business of money transmission without obtaining a

license from the Superintendent.  D.C. Stat. § 26-1002.  Violation of the money transmitter

statute is a felony with penalties of up to a $25,000 fine and five years imprisonment.  D.C. Stat.

§ 26-1023.  Under the D.C. Money Transmitters Act, the term "money transmission" is defined

as "the sale or issuance of payment instruments or engaging in the business of receiving money

for transmission or transmitting money within the United States, or to locations abroad, by any

and all means, including but not limited to payment instrument, wire, facsimile, or electronic

transfer."  D.C. Stat. § 26-1001(10).  I accessed the District of Columbia's online search function

for money transmitters located at http://app.dbfi.dc.gov/ifs/default.asp and entered a search for

Gold Pouch Express, which indicated that Gold Pouch Express is not licensed in the District of Columbia.

83.    A list of the money transmitters registered with the Department of Treasury (FinCEN) can be found at the internet website

http://www.msb.gov/guidance/msbstateselector.php, and reflects the fact that Gold Pouch Express is not registered with FinCEN.  Additionally, Gold Pouch Express has not filed any reports with the Department of Treasury related to suspicious transactions or currency transactions, as is required for money services businesses.

84.    On March 4, 2007, your affiant opened e-gold account number xxx0537, using the e-mail address of r2d2lover@gmail.com.  In accordance with instructions on the Gold Pouch Express website for accepting money orders, on March 5, 2007, I purchased a money order for $110 from the post office branch located at 1400 L Street NW, Washington DC, and sent this money order overnight from the District of Columbia to Gold Pouch Express, xxxx xx Highway xx, Lot xx, Arcadia, Florida xxxxx referencing e-gold account number xxx0537.  The money order was delivered on March 8, 2007 at 12:36 p.m., and signed for by R. Savier.  On March 26, 2007, I received $100 ($110 minus the $10 fee collected by Gold Pouch Express) worth of e-gold transferred into my undercover e-gold account number xxx0537 from Gold Pouch Express' e-gold account number xx8611.

85.    Gold Pouch Express has been utilizing e gold account number xx8611 for its operations since February 2000.  Analysis of activity occurring in e gold account number xx8611 from February 2000 through March 2007 yielded the following results: There were 26,911 transactions with a total weight of 59407.663122 grams ($23,078,896), comprised of 3116

transactions into the account with a weight of 30430.82988 ($11,551,513) and 23,795

transactions out of the account with a weight of 28976.833242 grams ($11,527,383).  As of

March 2007, approximately 31.198899 grams of gold ($20,563) remained in e gold account

number xx8611.

**uBuyWeRush**
**e-gold account xx0023**

86.    "uBuyWeRush" is a digital currency exchanger operating via Internet website

www.ubuywerush.com, and lists as its corporate name and address uBuyWeRush, Inc., 3329 E

South Street, Long Beach, CA 90805, which is adjacent to uBuyWeRush's actual store-front

location at 3327 E South Street, Long Beach, CA 90805.  The operator of uBuyWeRush is Cesar

Carranza.  uBuyWeRush advertises that it is an "E-Gold Exchanger" and that "We Buy E-Gold"

and "We Ship Worldwide."  Cesar Carranza has advertised his services as an exchanger for e-

gold to the carding community, including on the website Carderplanet, which is dedicated to the

purchase and sale of stolen financial information.   uBuyWeRush charges a 6% transaction fee

for the purchase of e-gold, which is 300% higher than other digital currency exchangers.

uBuyWeRush utilizes other exchangers that charge a lower transaction fee to facilitate

transactions on behalf of its customers.  uBuyWeRush accepts funds for transfer into the e-gold

system in the form of Money Gram, Western Union, cash deposits, bank wire, and money orders.

It recently discontinued accepting credit card payments.  uBuyWeRush also accepts e-gold for

conversion back into national currency, and will send that currency to its customers worldwide

in the form of Western Union, Money Gram, PayPal, cash deposit, money orders, AlertPay,

COD, company check, or merchandise trade.  The company utilizes Bank of America account

number 05104-69545 in the name of uBuyWeRush to receive cash deposits and interbank wires.

36

87.     Pursuant to section 1800.3 of the California Financial Code, a person may not engage in the business of "receiving money for the purpose of transmitting the same or its equivalent to foreign countries" without first obtaining a license from the Commissioner of Financial Institutions.  A "Directory of Transmitters of Money Abroad" licensed by the State of California can be found at the Internet website http://www.dfi.ca.gov/directry/tma.asp, and reflects the fact that uBuyWeRush is not licensed in California.

88.     The District of Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq., prohibits a person from engaging in the business of money transmission without obtaining a license from the Superintendent.  D.C. Stat. § 26-1002.  Violation of the money transmitter statute is a felony with penalties of up to a $25,000 fine and five years imprisonment.  D.C. Stat. § 26-1023.  Under the D.C. Money Transmitters Act, the term "money transmission" is defined as "the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer."  D.C. Stat. § 26-1001(10).  I accessed the District of Columbia's online search function for money transmitters located at http://app.dbfi.dc.gov/ifs/default.asp and entered a search for uBuyWeRush, which indicated that uBuyWeRush is not licensed in the District of Columbia.

89.     A list of the money transmitters registered with the Department of Treasury (FinCEN) can be found at the internet website http://www.msb.gov/guidance/msbstateselector.php, and reflects the fact that uBuyWeRush is not registered with FinCEN.  Additionally, uBuyWeRush has not filed any reports with the Department of Treasury related to suspicious transactions or currency transactions, as is required

for money services businesses.

90.    On March 4, 2007, your affiant opened e-gold account number xxx0895, using

the e-mail address of asdfgh99ster@gmail.com.  In accordance with instructions on the

uBuyWeRush website for making cash deposits, on March 5, 2007 a Secret Service special agent

at my direction made a deposit at a Bank of America branch in the District of Columbia for

$100.95 to Bank of America account number xxxxx-x9545 in the name of uBuyWeRush.  On

March 12, 2007, I received $100 worth of e-gold into my undercover e-gold account number

xxx0895 from e-gold account xxx2119, a second account through which uBuyWeRush makes

transfers.

91.    uBuyWeRush has been utilizing e gold account number xx0023 for its operations

since August 2003.  Analysis of activity occurring in e gold account number xx0023 from

August 2003 through March 2007 yielded the following results: A large percentage of the

transactions appear to be transactions with other exchange providers.  Another large percentage

of the transactions appear to be transactions with carders (i.e., individuals known to be engaged

in credit card fraud and identity theft).  There were 2,078 transactions with a total weight of

7291.495578 grams ($4,054,419), comprised of 543 transactions into the account with a weight

of 3646.278503 grams ($2,025,387) and 1,535 transactions out of the account with a weight of

3645.217075 grams ($2,029,032).  As of March 2007, approximately .011213 grams ($7.39)

remained in e gold account number xx0023.  Although the balance in March 2007 is a small

amount, historically the balance of this account has fluctuated greatly, and as a result, it is

possible that the actual amount in the account at the time of seizure will be significantly greater.

**IceGold**
**e-gold accounts x372 and x7273**

92.     "IceGold" is a digital currency exchanger that operates via the Internet website

www.icegold.com.  The Icegold website advertises that it is an international e-currency

exchange with customers in 142 countries and jurisdictions worldwide and that its customers can

"buy e-gold or 1mdc with a bank wire" or "sell e-gold or 1mdc for a bank wire".  The website

also indicates that IceGold is owned by Estonian and United States individuals and companies.

Douglas Jackson and Barry Downey provided IceGold with an initial investment in exchange for

a 25% ownership in the business.  Jackson and Downey continue to be 25% shareholders in

IceGold.  IceGold is allegedly operated by Paul Vahur in Tallinn, Estonia and lists on its website

a corporate address in Estonia (IceGold OÜ, Pikk 7, 0123 Tallinn, Estonia).  Nonetheless, the

IceGold website is in English and solicits customers in the United States (e.g., information,

including exchange rates and sending bank wires, references U.S. dollars).  Indeed, as discussed

more fully below, a significant percentage of IceGold's customers are e-gold account holders

from the United States.  IceGold accepts funds for transfer into and out of the e-gold system via

bank wire.

93.     A list of the money transmitters registered with the Department of Treasury

(FinCEN) can be found at the internet website

http://www.msb.gov/guidance/msbstateselector.php, and reflects the fact that IceGold is not

registered with FinCEN.  Additionally, IceGold has not filed any reports with the Department of

Treasury related to suspicious transactions or currency transactions, as is required for money

services businesses.

94.     The District of Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq.,

prohibits a person from engaging in the business of money transmission without obtaining a license from the Superintendent.  D.C. Stat. § 26-1002.  Violation of the money transmitter statute is a felony with penalties of up to a $25,000 fine and five years imprisonment.  D.C. Stat. § 26-1023.  Under the D.C. Money Transmitters Act, the term "money transmission" is defined as "the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer."  D.C. Stat. § 26-1001(10).  I accessed the District of Columbia's online search function for money transmitters located at http://app.dbfi.dc.gov/ifs/default.asp and entered a search for IceGold, which indicated that IceGold is not licensed in the District of Columbia.

95.    On March 4, 2007, your affiant opened e-gold account number xxx0999, using the e-mail address of prinleia@gmail.com.  On the same date, I opened an account with IceGold, number xxxx0400.  In accordance with instructions on the IceGold website for sending international wires, on March 15, 2007, I sent a wire from an undercover Wachovia bank account (from a Wachovia bank branch at 1100 Connecticut Avenue, NW, Washington DC) for $100 to Sampo Pank AS account number xxxxxxxxxxxxxxxx0005 in the name of IceGold OU. On March 16, 2007 I received $93.03 ($100 minus the service fee collected by IceGold) worth of e-gold transferred into my undercover e-gold account number xxx0999 from IceGold's e-gold account number x7273.

96.    IceGold has been utilizing e-gold account number x372 since July 2000 and x7273 since September 2003 for its operations.  Analysis of activity occurring in e-gold account number x372 revealed an extremely high number of transactions.  From January 2006 through

October 2006, for example, the analysis yielded the following results: There were a total of 20,071 transactions for this 10-month period with a total weight of 192810.66398 ($115,508,709), comprised of 10,553 transactions into the account with a weight of 96832.08416 grams ($57,960,516), and 9,518 transactions out of the account with a weight of 95978.57982 ($57,548,193). The analysis also revealed that IceGold customers with total activity exceeding $100,000 represented $78,565,248 of the total $115,508,709 account activity. Twenty percent (20%) of this activity ($15,541,942) resulted from e-gold account holders with United States addresses. An additional one percent (1%) of this activity ($1,560,455) resulted from e-gold account holders with non-U.S. addresses, but whose transactions originated with U.S. Internet Protocol (IP) addresses (indicating that the non-U.S. addresses were bogus and that the account holders were actually U.S. citizens). As of March 2007, approximately 56.824415 grams ($37,453) remained in e-gold account number x372.

97.     Analysis of activity occurring in e gold account number x7273 from September 2003 through March 2007 yielded the following results:  There were a total of 57,696 transactions with a total weight of 55348.45387 grams ($31,815,473), comprised of 515 transactions into the account with a weight of 27683.6275 grams ($15,910,889) and 57,181 transactions out of the account with a weight of 27664.82637 ($15,904,584).  As of March 2007, approximately 16.530842 grams ($10,895) remained in e gold account number x7273.

98.     I am advised that 18 U.S.C. § 981(b)(3) provides that "a seizure warrant may be issued . . . by a judicial officer in any district in which a forfeiture action against the property may be filed under Section 1355(b) of Title 28, and may be executed in any district in which the property is found . . . ."  Accordingly, this District Court may issue and cause to be served in any

other district the requested seizure warrant.

_____

Roy Dotson
Special Agent, USSS


Subscribed and sworn to before me this _____ day of April, 2007

_____

United States District Judge
District of Columbia